**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 18-33836-H1-11** |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § | **CHAPTER 11** |
| | § | **JOINTLY ADMINISTERED** |
| Debtor. | § | |

| | | |
|---|---|---|
| **MARK SHAPIRO, TRUSTEE OF THE** | § | |
| **UNSECURED CREDITOR TRUST OF** | § | |
| **NEIGHBORS LEGACY HOLDINGS, INC.** | § | |
| **AND ITS DEBTOR AFFILIATES,** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| VS. | § | **ADV. P. NO. 20-03016** |
| | § | |
| **TOM VO ET AL.** | § | |
| | § | |
| *Defendants.* | § | |

## CHAMBERLAIN GROUP DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the Court may consider evidence at the hearing and may decide the motion at the hearing.

Represented parties should act through their attorney.

There will be a hearing on this Motion on November 9, 2020 at 9:00 a.m. in Courtroom 404, 515 Rusk, Houston, Texas 77002.

TO THE HONORABLE MARVIN ISGUR,
UNITED STATES BANKRUPTCY JUDGE:

COME NOW Defendants AB Physician Services LLC, a Texas limited liability company, Abarado & Do Family, LP, a Texas limited partnership, Atiba Bell Medical Associates, PLLC, a Texas professional limited liability company, EDR Investments, LLC, a Texas limited liability company, EMTEX Investments, LLC, a Texas limited liability company, Ekta Popat, an individual resident of Texas, Fillory Holdings, LLC, a Texas limited liability company, Isaac Freeborn, an individual resident of Texas, Kenneth M. Direkly, an individual resident of Texas, Manuel Acosta, PLLC, a Texas professional limited liability company, Pranav Shukla MD, an individual resident of Texas, Thanh Cheng MD, an individual resident of Texas, and Towards Infinity LLC, a Texas limited liability company (collectively, the "Chamberlain Group"), by and through their attorneys of record, who hereby move for summary judgment of the claims raised in the Plaintiff's First Amended Complaint ("Complaint") pursuant to 11 U.S.C. §§ 544, 548, and 550, and Texas Business and Commerce Code § 24.006.  In support of this motion for summary judgment, the Chamberlain Group would show the Court as follows:

## EXHIBIT LIST

The following Exhibits[1] are referenced in this Motion:

| Exhibit No. | Description |
|:---:|:---|
| 1 | NHS Operating Agreement |
| 2 | NHS Certificate of Formation and Amendment |
| 3 | Series Management and Administrative Services Agreement |
| 4 | Series Agreements—Crosby and Porter Centers |
| 5 | Series Interest Purchase Agreements—Crosby and Porter Centers |
| 6 | Schedules K-1 received by Chamberlain Group |
| 7 | Email from Tensie Axton, dated Jan. 16, 2018 |
| 8 | Financial Statements—Crosby and Porter Centers |

---

[1] In addition to the Exhibits provided herein, we make reference to several documents located in the Data Room set up by the Plaintiff at this Court's direction.  We understand this Court has access to such Data Room; however, we are happy to provide any additional documentation at the Court's request.

| Exhibit No. | Description |
|:-----------:|:------------|
| 9 | Email from Chad J. Shandler, dated July 12, 2018 |
| 10 | Correspondence from Setul Patel and Management Team, dated December 20, 2017 |

## BACKGROUND

1.      On July 12, 2018, Neighbors Legacy Holding, Inc. f/k/a Neighbors Health System, Inc. and 50 affiliated entities filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").[2]  All 51 debtors are jointly administered under Case No. 18-33836 and are defined in the Plaintiff's Complaint as the "Neighbors Debtor Entities," as listed therein.  (Dkt. 4, at ¶ 87, n.1).

2.      The Chamberlain Group members comprise skilled emergency room physicians who provided medical services through the Neighbors Debtor Entities.  They are currently working on the front lines of the global pandemic and risking their lives and the lives of their families daily to uphold their oath of ensuring the health, safety, and recovery of our community as Houston and the world struggles through this COVID-19 crisis.

## I.      Organizational Structure of NHS

3.      Prior to filing for Chapter 11 bankruptcy on July 12, 2018, the Neighbors Debtor Entities, including NHS Emergency Centers, LLC ("NHS"), operated several freestanding emergency room centers (collectively, "Centers", and each a "Center") in and around the state of Texas and provided support from the corporate headquarters located in Houston, Texas.  (Bky. Dkt. Nos. 16, at ¶ 14; 773, at p. 13).[3]

---

[2] NEC Beaumont Asset Holdings, LLC and NEC Beaumont Emergency Center, LP filed voluntary petitions for Chapter 11 relief on July 23, 2018.

[3] Unless otherwise indicated, any reference to the "Bky. Dkt." refers to the bankruptcy proceeding jointly administered under Case No. 18-33836, *In re Neighbors Legacy Holdings, Inc., et al.*, in the U.S. Bankruptcy Court for the Southern District of Texas, Houston Division.

4.     As noted in the bankruptcy pleadings and various formation and organizational documents of NHS, NHS was organized as a series LLC under subchapter M of the Texas Business Organizations Code (the "TBOC").  (Second Amended Disclosure Statement for Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code (Bky. Dkt. No. 773, p. 14); First Amended Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code (Bky. Dkt. No. 772, p. 18); Exhibit 1, NHS Operating Agreement, at § 2.02; Exhibit 2, NHS Certificate of Formation and Amendment).

5.     NHS utilized its status as a series LLC fifty-three times to create separate series (the "Series") pursuant to the NHS Operating Agreement and formation documents. (Bky. Dkt. Nos. 16, at ¶ 18; 773, at p.14).  Each Series was managed by a manager under a separate Series Management and Administrative Services Agreement.  (Exhibit 3).  According to the Series Management and Administrative Services Agreement, Neighbors Legacy Holding, Inc. f/k/a Neighbors Health System, Inc. served as manager of the Series.  (Exhibit 1, at § 8.01; Exhibit 3, Series Management and Administrative Services Agreement—Crosby Center, at Preamble).[4]

6.     Each Center was structured as a limited partnership with each Series serving as the 99% limited partner and Neighbors GP, LLC serving as general partner of each Center.  (Bky. Dkt. Nos. 16, at ¶ 18; 773, at p. 14).  According to the terms and conditions set forth in the NHS Operating Agreement and the series agreements governing each individual Series (the "Series Agreements") (Exhibit 4), no Series generally was responsible for the debts and obligations of any other Series or for the debts and obligations of NHS, except that the Series Agreements provided

---

[4] In contrast to the Manager named in Exhibit 3, certain Series Agreements, such as the Porter Series Agreement, listed "Neighbors Health System, LLC" as the Manager.  However, no record of such entity has been located in the bankruptcy proceedings upon a diligent examination.  The most similarly named entity is "Neighbors Health, LLC", which is purported to have provided management services to the Neighbors Debtor Entities as well.  (Bky. Dkt. Nos. 16, at ¶ 19; 773, at p. 15.).

that each Series *may* be required to guaranty commercial loans entered into by NHS Emergency

Centers, LLC and/or the Series.  (Exhibit 1, at § 2.02(c); Exhibit 4, Series Agreements—Crosby

and Porter Centers, at §§ 1.H, 2.A(b)(v)) (emphasis added).[5]

## II.    Ownership Structure of the Series

7.      Each Series Agreement created two classes of membership interests in the Series—

Class A shares and Class B shares.  (Exhibit 4, at §§ 2.A(a)-(b); Bky. Dkt. Nos. 16, at ¶ 18; 773,

at p. 14).  The ownership ratio of each Series varied between Class A shares and Class B shares,

with Class A shares consisting of somewhere between 39% and 69% of the value of the Series and

100% of the voting shares, whereas the Class B shares consisted of the remainder of the value of

such Series, but were non-voting shares.  (*Compare* Exhibit 4—Porter Series Agreement, *with*

Crosby Series Agreement—at §§ 1.B-1.C)

8.      The Class A shares were owned by the original nine founding physicians, and the

Class B shares were purchased by physicians who staffed the Centers.  (Bky. Dkt. Nos. 16, at ¶

18; 773, at p. 14).  Class B shareholders were required to work a 24-hour shift at the Center

corresponding to the Series for each 100 to 200 Class B shares purchased, depending on the

number of shares available for purchase.  (*Compare* Exhibit 5—Porter Series Interest Purchase

Agreement, *with* Crosby Series Interest Purchase Agreement—at Recitals, p. 1, § 1, p. 2).

9.      The Chamberlain Group consists solely of Class B shareholders who had no voting

rights and otherwise did not have managerial or decision-making authority over NHS or any of the

Series established under the NHS Operating Agreement and Series Agreements.  (Exhibit 4, at §§

2.A(b), 3.A).  Accordingly, each and every member of the Chamberlain Group had absolutely no

control of the Series and no authority to direct distributions or make any other decisions on behalf

---

[5] The Series Agreements provided were obtain from Chamberlain Group members.  It is our understanding that the Series Agreements for all Series were substantially identical.

of the Series.  One or more of the Chamberlain Group members held a membership interest in the following profitable Series:   Series 102—Baytown; Series 103—Pasadena; Series 108—Yorktown; Series 109—Harlingen; Series 110—Crosby; Series 118—Port Arthur; Series 123—McAllen; and Series 124—Porter.

10.     Notably, none of the Chamberlain Group was consulted about or given an opportunity to vote on a possible bankruptcy and none of the Series filed a petition for bankruptcy, and thus all of the Series are "non-debtors" for all bankruptcy purposes, including this adversary proceeding.  (Exhibit 4, at §§ 2.A(b), 3.A; Bky. Dkt. Nos. 16, at ¶ 18, n.5 ("A series LLC is a form of a limited liability company in which each "series" operates as its own, unique entity so that the series are separate from each other for liability purposes.  All Series LLC's are non-Debtors"); 773, at p. 14 ("NHS Emergency Centers, LLC is a Debtor, but the underlying Series LLCs are non-Debtors.").

11.     Pursuant to the Series Agreements governing the individual Series, each Series was required to make distributions to each member in the amounts necessary to pay the members' tax obligations and such operating profits as shall be reasonably determined by the manager.  (Exhibit 4, at § 9.H).  However, any such distributions were conditioned upon being permitted by any applicable bank covenants, contractual restrictions, or events of default with respect to such loan agreements as the Series may be guaranteeing.  (Exhibit 4, at §§ 9.H-9.I).

12.     Only those Series that were operating at a profit made any such distributions during the relevant period from 2016 through 2018 and it was represented to the Class B shareholders on numerous occasions that such distributions were being made with the approval of Neighbors' commercial lenders and in accordance with the foregoing restrictions.  For example, according to the Schedules K-1 received by certain members of the Chamberlain Group, Series 110-Crosby allegedly generated approximately $3.5 million in operating profits in 2018.  Similarly, Series 124-

Porter purported to generate around $2.8 million in profits and Series 103-Pasadena supposedly cleared $3.1 million in 2018. In contrast to the Crosby, Porter, and Pasadena Centers, the Texas City and Yorktown Centers' Schedules K-1 reflected that those Centers were not profitable. Accordingly, none of the Chamberlain Group received distributions from the Texas City or Yorktown Centers in 2018. (Exhibit 6, select Schedules K-1 received by Chamberlain Group). However, the Complaint does not specifically allege which of the Neighbors Debtor Entities and/or Series made the alleged transfers to each specific Defendant and for what reason. As such, the Chamberlain Group is left to hypothesize as to what alleged distributions may be referred to in the Complaint.

13.     Based on the financial data provided by Plaintiff in accordance with this Court's Scheduling Order of July 24, 2020, it appears that the alleged transfers may have originated from the limited partnerships, of which the respective Series were limited partners. Nevertheless, the Series Agreements and Schedules K-1 reflect that the alleged transfers are attributable to the Series in which the Chamberlain Group members held interests, and further, the general ledgers of the Neighbors Debtor Entities reflect a consolidated accounting system.

14.     Not only were any distributions received by the Chamberlain Group received from or on behalf of profitable Series, but a large portion of the transfers at issue were exclusively tax distributions for tax periods 2017 and 2018. (Exhibit 7, Email from Tensie Axton, dated Jan. 16, 2018). The tax distributions were calculated at a rate of 40% in all years from 2016-2018 within the discretion of the Series management. (*See id. See also* Exhibit 4, at § 9.H). However, for the same periods, Series management provided little to no indication of financial hardship for those Series from which the Chamberlain Group received alleged transfers. According to the financial statements (Exhibit 8, Financial Statements—Crosby, Porter) and Schedules K-1 received by the Class B doctors and Chamberlain Group for those Centers that made distributions during 2016-

2018, the distributing Series were solvent and thriving, and pursuant to the Series Agreement, were authorized to make such distributions.

15.     The Class B doctors, and particularly the Chamberlain Group, relied on periodic communications from Neighbors and its officers for information relating to their membership interests in the Series.  Even as the Neighbors Debtor Entities were filing for bankruptcy protection on July 12, 2018, the Class B doctors received communications reassuring them that despite the bankruptcy filings everything was fine—that Houston operations were being sold to a new owner, that the Centers will stay open and continue to do business as usual, and that everyone will continue to get paid as usual.  (Exhibit 9, Email from Chad J. Shandler, dated July 12, 2018; Exhibit 10, Correspondence from Setul Patel and Management Team, dated December 20, 2017).

## III.    Inaccuracies in the Complaint

16.     A review of the records upon which the Trustee relied in formulating the basis for the Complaint confirms the existence of material several errors with respect to the Trustee's calculations of the alleged transfers.  For example, on several occasions, certain tax distributions allegedly received by several of the Chamberlain Group members attributable to the 2017 tax year were double counted within the Trustee's figures as 2018 tax year alleged transfers as well.  These errors resulted in an aggregate overstatement of approximately $200,000 with respect to the Chamberlain Group.

17.     In addition to these inaccurate figures, the Chamberlain Group members were required to pay, and did pay, federal income taxes on substantially more income reported on their Schedules K-1 than what was reported as distributed in each year included in the Complaint.

18.     All members of the Chamberlain Group paid substantial amounts of money to be allowed the opportunity to work at the Centers.  On average, the minimum initial buy-in to be able to work a 24-hour shift per month at a single Center was approximately $25,000.  (Exhibit 5, Series

Interest Purchase Agreements).[6]   Many of the Chamberlain Group did not recoup this "employment fee" during their tenure at the specific Center or Centers in which they purchased shifts.

19.    Additionally, if the Series that made the transfers in question were insolvent, then it appears that the Neighbors Debtor Entities, through management, may have committed significant misfeasance or fraud in its bankruptcy administration, injuring the Chamberlain Group in the process.  Specifically, the Neighbors Debtor Entities failed to timely notify the Chamberlain Group members about any solvency issues, and led the Chamberlain Group members to believe amounts they were paid had been distributed with the approval of the Neighbors Debtor Entities' creditors and during a period of financial solvency.[7]  The Neighbors Debtor Entities' management also lacked transparency in addressing post-petition tax reporting issues.  Consistent with their misrepresentations about the Neighbors Debtor Entities' financial health, they issued the Neighbors Debtor Entities' 2018 and 2019 Schedules K-1, which may be inaccurate and unreliable for certain or potentially all Series, including, but not limited to, Series 110-Crosby, Series 124-Porter, and Series 103-Pasadena.  Neighbors Debtor Entities management lacked transparency in addressing these post-petition tax reporting issues, which is deeply disturbing.

20.    For example, the Chamberlain Group members who invested in the Crosby, Porter, and Pasadena Series received three different versions of their 2018 Schedules K-1 associated with their Series interests.  The first "Estimate" Schedules K-1 with respect to the Series for 2018 was provided on or around April 1, 2019, just two weeks before the filing due date for individuals, and reflected staggering amounts of ordinary and capital income, especially considering that the

---

[6] Additionally, the general ledger files provided by Plaintiff as directed by this Court and located in the electronic Data Room reflect all buy-in amounts paid by the Chamberlain Group members.
[7] Again, the Schedules K-1 received by the Chamberlain Group members for those Series making distributions reflect that such Series were solvent and thriving at the time of the alleged transfers.

Neighbors Debtor Entities enterprise was purportedly distressed and entered bankruptcy on July 12, 2018.  In contrast, the 2018 actual distributions for the same Series were approximately 5-10% of the phantom income reported on the Schedules K-1, which did not even cover the taxes allegedly due on the reported income items, as guaranteed under the Series Agreements.  (*See* Exhibit 4, *at* 9.H).

21.     Chamberlain Group members raised these disparities with the Neighbors Debtor Entities' management and bankruptcy counsel and requested records to substantiate the figures reported on the "Estimate" Schedules K-1, but received limited and incomplete responses and no production of records to which they were entitled under the NHS Operating Agreement, Series Agreements, and Texas law.  Instead, the Chamberlain Group members received a second 2018 Schedule K-1 estimate after the first, and ultimately, a final Schedule K-1 less than two weeks before the extended filing due date, all of which reported substantial amounts of phantom income, irreconcilable with the fact that Neighbors Debtor Entities had filed for bankruptcy in the same tax period.

22.     A careful review of the Schedules K-1 and the income items reported therein for the Series which allegedly made the transfers at issue (or otherwise attributable to such Series) demonstrate that either those Series were in fact solvent, healthy and thriving businesses, or alternatively, that the Schedules K-1 have been prepared and issued improperly.  If the former is true—that the Schedules K-1 are accurate—those Series responsible for the alleged transfers at issue were solvent and the claims alleged in the Complaint should be entirely dismissed with respect to the Chamberlain Group.  If the latter is true, then the Chamberlain Group should be entitled to a full accounting and be issued corrected Schedules K-1 to ensure that the Chamberlain Group's individual federal income tax liability has not been fraudulently manipulated during the course of the bankruptcy administration.

23.     The Class B doctors, and particularly the Chamberlain Group, suffered significant lost revenue following the debacle with the Neighbors Debtors Entities, from which many are still recovering.  Further, for several months now, the Chamberlain Group members have been risking their lives to heroically serve our community quite literally on the "front lines" of the war against the COVID-19 virus during this global pandemic, working additional and longer shifts to ensure that emergency medical care is provided to all of those suffering from this new and tragic illness. Now, the Unsecured Creditor Trustee attempts to improperly recover alleged transfers that were, as explained in detail below, not fraudulently conveyed, and were transferred in accordance with the agreements in place with their employer and any existing creditors at the time the transfers were made.

## ARGUMENT & AUTHORITIES

### I.     Summary of The Argument

24.     For the Chamberlain Group members, allowing the claims against them to proceed is particularly burdensome because Plaintiff has failed to state and does not have a valid claim against them, and thus, for reasons set forth in this Motion, the claims against them should be dismissed with prejudice.  First, the Chamberlain Group members did not receive transfers of an interest of "Debtors" in bankruptcy.  Second, the transferors of the alleged transfers were, in fact, solvent at the time of the alleged transfers: the balance sheets demonstrate solvency, the amounts reported to certain Chamberlain Group members on Schedules K-1 and reported to the IRS demonstrate solvency, the individual Series were not unreasonably undercapitalized, and were able to pay their debts as they came due.  Third, assuming, *arguendo*, that the alleged transfers were transfers of an interest of "Debtors" in bankruptcy, the Neighbors Debtor Entities received reasonably equivalent value in exchange for the alleged transfers in the form of tax distributions

and supplemental compensation for services.   Finally, the Chamberlain Group members are considered subsequent transferees under Section 550 of the Bankruptcy Code.   In sum, the Complaint fails to support its claims under Section 548 of the Bankruptcy Code and applicable Texas law to survive a Motion for Summary Judgment and the Chamberlain Group members are entitled to judgment as a matter of law.   These pleading standards are important because, as this Motion reveals, if Plaintiff is held to plead facts specific to each Chamberlain Group member, Plaintiff cannot satisfy its burden by stating viable claims.

## II.    Applicable Legal Standard

25.    Summary judgment is appropriate if the pleadings, affidavits and other summary judgment evidence show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); *Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005).  For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  If the movant does so, the burden shifts to the non-movant to show, by more than mere allegation, the existence of a genuine fact issue for trial. *Reyna*, 401 F.3d at 349-50.  If a non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial, there ceases to be a genuine issue as to any material fact, such that the moving party is entitled to summary judgment as a matter of law. *Texaco Inc. v. Duhe*, 274 F.3d 911, 916 (5th Cir. 2001).

**III.    The Plaintiff Fails to Satisfy the Applicable Elements of Section 548 of the Bankruptcy Code, or Applicable Texas Law**

26.    The Court should dismiss all of the Plaintiff's claims against the Chamberlain Group pursuant to Rule 56 because no genuine issue of material fact exists and the Plaintiff has failed to establish the existence of several required elements of Section 548 of the Bankruptcy Code or applicable Texas law.  To satisfy Rule 56, the movant must demonstrate the "absence of a genuine issue of material fact," *Reyna*, 401 F.3d at 349, and the Plaintiff has failed to establish the existence of several essential elements vital to the claims asserted in the Complaint. Accordingly, the Chamberlain Group members are entitled to summary judgment as a matter of law. *See Texas Inc.*, 274 F.3d at 916.

27.    For its first cause of action, Plaintiff purports to seek avoidance of the transfers alleged as "fraudulent" pursuant to Section 548 of the Bankruptcy Code.  Section 548(a)(1) of the Bankruptcy Code states:

> The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A)    made such a transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)
>
> (i)    received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)    (I)    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any

13

property remaining with the debtor was an unreasonably small capital;

(III)     intended to incur, or believe that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV)     made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business

28.      No cause of action under Section 548(a)(1)(A) of the Bankruptcy Code was alleged in the Complaint, that is, that any of the Neighbors Debtor Entities intended to commit actual fraud with respect to the alleged transfers.  Accordingly, the Plaintiff must demonstrate facts sufficient to support the elements of the cause of action under Section 548(a)(1)(B) of the Bankruptcy Code. Therefore, to prevail on a claim for fraudulent transfer under § 548(a)(1)(B), the Trustee must demonstrate: (1) a transfer was made of property in which the debtor held an interest at the time of the transfer; (2) the transfer was made within two years of the petition date; (3) the debtor received less than reasonably equivalent value in exchange for such transfer; *and* (4) the debtor was insolvent at the time of such transfer or the presence of an alternative condition in subsection (a)(1)(B)(ii).  11 U.S.C. § 548(a)(1)(B).  The Plaintiff misses the mark on at least three of these requirements.

29.      Additionally, Section 544(b)(1) of the Bankruptcy Code, known as the "strong-arm" provision, generally "allows a trustee to avoid transfers that a creditor could avoid under applicable state law." *Smith v. Suarez (In re IFS Financial Corp.)*, 417 B.R. 419, 432 (Bankr. S.D. Tex. 2009).  To succeed on a claim under the Bankruptcy Code's "strong-arm" provision, the trustee "must establish three elements: (1) the transferred property was an 'interest of the debtor,' (2) the transfer is voidable under applicable state law, and (3) a creditor holding an allowable unsecured claim could bring [such a] state law avoidance action." *Id.* at 433.  Plaintiff's claims

also fail under applicable Texas law.  Critically, the Plaintiff failed to identify a pre-existing

unsecured creditor whose claim arose prior to the alleged transfers at issue.  Without identifying

the existence of an unsecured creditor with a claim specific to each debtor, whose claims arose

prior to the transfers at issue, the Plaintiff cannot maintain its causes of action under Section 544(b)

of the Bankruptcy Code and Section 24.006(a) of the Texas Business and Commerce Code.

30.     The trustee bears the burden of establishing the alleged fraudulent transfer by a

preponderance of the evidence." *Id.* (citing *Jenkins v. Chase Home Mortgage Corp. (In re Maple

Mortgage, Inc.)*, 81 F.3d 592 (5th Cir. 1996); *Walker v. Anderson*, 232 S.W.3d 899, 913

(Tex.App.—Dallas 2007, no pet.); *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842-43

(Tex.App—Dallas 2006, no pet.).

31.     Here, the Plaintiff alleged that a claim exists under TEX. BUS. & COM. CODE

§ 24.006(a), which states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
> whose claim arose before the transfer was made or the obligation was incurred if
> the debtor made the transfer or incurred the obligation without receiving a
> reasonably equivalent value in exchange for the transfer or obligation and the
> debtor was insolvent at the time or the debtor became insolvent as a result of the
> transfer or obligation.

32.     Thus, to prevail on a claim for fraudulent transfer under Section 24.006(a) of the

Texas Business and Commerce Code, the Trustee must demonstrate: (1) the transfers were made

without the debtor receiving a reasonably equivalent value in exchange for the transfers; (2) the

debtor was insolvent at the time of the transfers or became insolvent as a result of the transfers; (3)

a creditor exists whose claim arose before the occurrence of the transfers for whom the Trustee

can act; *and* (4) the cause of action arose within four years after the transfers were made.  TEX.

BUS. & COM. CODE §§ 24.006(a), 24.010(a)(2) (emphasis added).

33.     Here, the Plaintiff failed to allege facts sufficient to support any of the elements required under Section 548 of the Bankruptcy Code or under Section 24.006(a) of the Texas Business and Commerce Code, including any factual support that the transfers even originated from one or more of the Neighbors Debtor Entities.

### A.     Chamberlain Group Did Not Receive Transfers of an interest of "Debtors" in Bankruptcy"

34.     The Complaint makes the following allegations:

Each of the Transfer Defendants received transfers of funds ("Transfers") from the Neighbors Debtor Entities in 2016-2018.  Summaries of those transfers are listed in the attached Exhibit A and total more than $22 million.

Specifically, the cash from Neighbors Debtor Entities bank account was sent directly to the Transfer Defendants.

The Transfers were made from funds in the Debtor's bank account and was a transfer of an interest in property of the Neighbors Debtor Entities.

(Dkt No. 4, at ¶¶ 95, 99, 100).  The Complaint identifies 51 entities as the "Neighbors Debtor Entities" and 77 entities or individuals as the "Transfer Defendants," but fails to identify specifically which, if any, of the Neighbors Debtor Entities directly transferred funds to which, if any, Transfer Defendants, and for good reason: the alleged transfers were not made by a debtor in bankruptcy, but rather such transfers at issue are attributable to the non-debtor Series in which the Chamberlain Group members held interests.

35.     Under Section 101.601 of the TBOC, a limited liability company may establish "one or more designated series of members, managers, membership interests, or assets."  Such series may have separate rights, powers, or duties with respect to specified property, separate obligations of the limited liability company, separate profits and losses associated with specified property or obligations, or separate business purpose or investment objectives.  *See* TBOC §

101.601(a)(1)-(2).  A separate series is authorized to carry on any business, purpose, or activity, whether or not for profit, that is not otherwise prohibited.

36.     Once established under the series LLC's certificate of formation and company agreement, a series shall be treated as a separate business unit and "the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to a particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the limited liability company generally or any other series."  TBOC § 101.602(a)(1). Similarly, "none of the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to the limited liability company generally or any other series shall be enforceable against the assets of a particular series."  TBOC § 101.602(a)(2).  Further, each individual series established by a series LLC has the following powers separate and apart from each other series and from the master series LLC:

> (1) sue and be sued;
>
> (2) contract;
>
> (3) acquire, sell, and hold title to assets of the series, including real property, personal property, and intangible property;
>
> (4) grant liens and security interests in assets of the series;
>
> (5) be a promoter, organizer, partner, owner, member associate, or manager of an organization; and
>
> (6) exercise any power or privilege as necessary or appropriate to the conduct, promotion, or attainment of the business, purposes, or activities of the series.

TBOC § 101.605.

37.     Here, Section 2.02 of the NHS Operating Agreement specifically provides:

(c)     Notwithstanding any provisions of the Texas Business Organization Code or other provision of law, but subject to the provisions of Section 2.02(c)(ii) below:

(i)     The debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to a particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the Company generally or any other series; and

(ii)     None of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to the Company generally or any other series shall be enforceable against the assets of a particular series.

38.     It is therefore clear that under the TBOC, federal case law, and the governing documents of the Series, each Series operated as a separate business unit and therefore would have to formally submit itself to the jurisdiction of the Bankruptcy Court to be considered a "debtor." Despite such a requirement, none of the Series established under the NHS Operating Agreement and Series Agreements filed a petition with the Bankruptcy Court or otherwise submitted to the jurisdiction of the Bankruptcy Court.  In fact, Mr. Shandler, the Chief Restructuring Officer of Neighbors, admitted in his Declaration that: "All Series LLC's are non-Debtors" and "each 'series' operates as its own unique entity so that the series are separate from each other for liability purposes."  (Bky. Dkt. No. 16, at ¶ 18, n.5).  Accordingly, the Series in which the Chamberlain Group members owned interests constituted business units separate and apart from the underlying limited partnership that served as the operating entity for each such Center, and importantly, were non-debtors in the bankruptcy.

39.     Next, the Complaint alleges that the Chamberlain Group "received transfers of funds from the Neighbors Debtor Entities" directly out of the Neighbors Debtors Entities' bank accounts.  The records upon which Plaintiff relied in identifying the alleged transfers appear to indicate that the Chamberlain Group may have received such alleged transfers directly from the limited partnership Centers owned by the Series and named as Neighbors Debtor Entities rather than receiving such transfers directly from the Series in which the Chamberlain Group members owned an interest.  Nevertheless, any transfers received by the Chamberlain Group, if any, would

not have constituted an interest of a debtor, as required under Section 548 of the Bankruptcy Code and applicable Texas law.  Instead, the Series in which the Chamberlain Group members held interests owned the funds allegedly transferred, as such transfers would have constituted distributions of the Series profits in which the Chamberlain Group members held interests—not the Neighbors Debtor Entities.

40.     "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."  *Rodriguez v. FDIC*, 589 U.S. ___, 140 S.Ct. 713, 718 (2020) (quoting *Butner v. United States*, 440 U.S. 48, 54 (1979)); *In re Regency Holdings*, 216 B.R. at 375 ("State law normally determines the extent of an interest in property, absent an overriding federal policy.").

41.     "[D]etermining whether a transfer is of 'an interest of the debtor in property' involves a two-step analysis: (1) the nature of the debtor's interest in the transferred asset under applicable state property law; and (2) whether the state-law defined property interest becomes 'property of the estate' under the Bankruptcy Code."  *IFS Financial*, 417 B.R. at 434.

42.     Here, regardless of whether certain of the Centers may have transferred funds directly to the Chamberlain Group members, such transfers still did not constitute transfers of an interest of a debtor in property.  First, in *Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371 (Bankr. S.D.N.Y 1998), the Court stated:

> As a rule, parent and subsidiary corporations are separate entities, having separate assets and liabilities.  The parent's ownership of all of the shares of the subsidiary does not make the subsidiary's assets the parent's.  Hence, the parent's creditors have no claim to the subsidiary's assets, and vice versa.

*Id.* at 375 (Internal Citations Omitted).

43.     Further, in PSN Liquidating Trust v. Intelsat Corp. (In re PSN USA, Inc.), 615 Fed.Appx. 925 (11th Cir. 2015), the Court held that transfers from a debtor-subsidiary to a third

party made on behalf of its non-debtor parent company were not avoidable despite the debtor not being a party to the underlying contract.  In so determining, the Court concluded that "any benefit [the parent company] received under the contract also indirectly benefited the Debtor."  Id. at 927.

44.     Here, the Schedules K-1 received by the Chamberlain Group members were issued from the corresponding Series in which each member reported taxable income and received distributions.  (*See* Exhibit 6).  Any transfers at issue were received by virtue of the Chamberlain Group members' interests in the Series with such funds necessarily belonging to the Series prior to distribution.  Although any alleged transfers may have come directly from the underlying limited partnerships, such practice was a matter of convenience and does not establish that such property was of an interest of any of the Neighbors Debtor Entities.[8]

45.     Instead, the fact that the Neighbors Debtor Entities may have provided the funds directly to the Chamberlain Group as Series members does not make such funds an "interest of the debtor," first because the Series was a legal business unit separate and apart from the corresponding limited partnership, and second, the benefits conferred upon the Series by the Chamberlain Group also benefitted the corresponding limited partnership.  Specifically, as further discussed *infra*, the Chamberlain Group provided services as emergency room physicians and assumed the Series tax liability in exchange for the transfers at issue.  Both economic benefits assisted the non-debtor Series, as well as the underlying operating entity.

46.     Accordingly, the Complaint failed to allege facts sufficient to establish that any of the Series were "debtors" in bankruptcy and that any such alleged transfers were "interests of the debtor in property."  In fact, the property transferred was an interest of the Series in that it was

---

[8]An inspection of the general ledger files in the data room provided by Plaintiff at the direction of this Court only identified such transfers at issue as coming from a particular facility number, and not whether such transfers originated from the limited partnership or the Series.  In contrast, it is undisputed that the Schedules K-1 were issued from the Series and that the Chamberlain Group members held interests only in the Series and not the underlying limited partnerships.

used to satisfy non-debtor Series obligations.  The transfers at issue represent mandatory and tax distributions required to be made by the non-debtor Series, and as such, the Neighbors Debtor Entities held no interest in the property allegedly transferred.  Thus, the Plaintiff's claims fail to establish that the transfers at issue were "an interest of the debtor" subject to Section 548 of the Bankruptcy Code or Section 24.006(a) of the Texas Business and Commerce Code.

47.    Furthermore, the Plaintiff judicially admits that the profits and losses of the Series are owned by the members of the Series.  (*See* Pl. Am. Compl., Adv. P. No. 20-03017, Dkt No. 4, at ¶¶ 35-37).  Accordingly, Plaintiff cannot prove that the funds transferred to the Chamberlain Group constituted a property interest of the Neighbors Debtors Entities—a critical element of its claims under Section 548 of the Bankruptcy Code and Section 24.006(a) of the Texas Business and Commerce Code.  This factual deficiency is fatal to Plaintiff's claims against the Chamberlain Group.

48.    Based on the foregoing, the Plaintiff has failed to establish (1) that the transfers at issue were made by a "Debtor" in the bankruptcy, and (2) that the property transferred represented an "interest of a debtor" for federal or state law purposes.  Therefore, the Chamberlain Group respectfully requests that the Court dismiss with prejudice that claims raised in the Plaintiff's Complaint.

### B.    Transferors were Solvent at the Time of the Transfers

49.    Although Mr. Shandler, Chief Restructuring Officer of Neighbors, has judicially admitted that "[a]ll Series LLCs are non-Debtors," assuming, *arguendo*, that the individual Series established by the NHS Operating Agreement and Series Agreements somehow were properly included in the bankruptcy and thus the transfers at issue were transfers of "an interest of a debtor," the alleged transfers nevertheless are not avoidable under Section 548 of the Bankruptcy Code or

applicable Texas law.  For a transfer to be avoidable, the transferor must have received less than

reasonably equivalent value in exchange for such transfer *and*:

(I)     was insolvent on the date that such transfer was made or such obligation
        was incurred, or became insolvent as a result of such transfer or obligation;

(II)    was engaged in business or a transaction, or was about to engage in business
        or a transaction, for which any property remaining with the debtor was an
        unreasonably small capital;

(III)   intended to incur, or believe that the debtor would incur, debts that would
        be beyond the debtor's ability to pay as such debts matured; or

(IV)    made such transfer to or for the benefit of an insider, or incurred such
        obligation to or for the benefit of an insider, under an employment contract
        and not in the ordinary course of business

11 U.S.C. § 548(a)(1)(B)(ii).

50.     The Plaintiff has not alleged any facts applicable to subparagraph (IV) above.

Accordingly, this Motion addressed only subparagraphs (I) through (III).

51.     The Bankruptcy Code defines insolvency as a "financial condition such that the

sum of [the] entity's debts is greater than all of [its] property, at a fair valuation . . . ."  11 U.S.C. §

101(32).  Texas law parallels the Bankruptcy Code's approach to insolvency.  *See* TEX. BUS. &

COM. CODE § 24.003.

52.     In order to prevail in a fraudulent conveyance action brought under Section

548(a)(1)(B) of the Bankruptcy Code, Plaintiff must make the requisite showing of insolvency or

of one of the alternative circumstances, e.g., unreasonably small remaining capital or inability to

pay future debts as they mature.  *See In re Gustafson*, 381 B.R. 259, 262 (Bankr. W.D. Ark. 2008).

53.     The Complaint makes the conclusory and unspecific allegations that:

At the time the Transfers were made, the Neighbors Debtor Entities were insolvent
when it made the Transfers as the fair market value of their assets exceeded their
liabilities.  The Neighbors Debtor Entities were engaged in business or transactions
for which any property remaining after the Transfer was an unreasonably small

capital.  Additionally, at the time of the Transfers, the Neighbors Debtor Entities could not make payments on its debts as they became due.

(Dkt. No. 4, at ¶ 96, reiterated at ¶ 102).  The Complaint does not, and could not, truthfully allege fraudulent transfers by the specific Series of which the Chamberlain Group are members.

54.     On its face, the Complaint's allegations constitute a mere recitation of the elements contained in 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(III).   Because no specific facts are alleged demonstrating why the specific Series were insolvent or became insolvent as a result of the alleged transfers, or why the alternative circumstances contained in subsection 548(a)(1)(B)(ii)(II)-(III) apply, the Complaint's allegations are too conclusory to survive.  Again, no reference is made in the Complaint to 11 U.S.C. § 548(a)(1)(B)(ii)(IV).

55.     Without more, it is impossible for this Court to make a reasonable inference that the Series or Neighbors Debtor Entities were insolvent or became insolvent as a result of the transfers at issue, or that any of the alternative conditions under subsection 548(a)(1)(B)(ii)(I)-(III) apply.  In fact, the Complaint is devoid of these facts because the facts actually demonstrate the opposite—that the Series and corresponding Centers that allegedly made the transfers at issue were solvent at the time the transfers at issue were made.  Accordingly, the Complaint and all claims asserted thereunder should be dismissed with prejudice.

1.      The Series Balance Sheets and Issued Schedules K-1 Confirm Solvency

56.     A review of Series financial statements and the records relied upon by Plaintiff in calculating the alleged transfers confirm solvency for those Series that allegedly made the transfers at issue.  "To perform the balance sheet insolvency test, courts conduct a two-step analysis.  The court first determines whether the debtor was a 'going concern' or was 'on its deathbed.'  The court must then value the debtor's assets, depending on the status determined in the first inquiry, and apply the balance sheet test to determine whether the debtor was solvent."  *Ogle v. JT Miller, Inc.*

*(In re HDD Rotary Sales, LLC)*, 499 B.R. 542, 551 (Bankr. S.D. Tex. 2013).  "To decide whether a firm is insolvent within the meaning of [§ 548(a)(1)(B)(ii)(I)], a court should ask:  What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?  If the price is positive, the firm is solvent; if negative, insolvent."  *Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992).  In other words, if the transferor's assets exceed liabilities, then it is solvent for purposes of Section 548(a)(1)(B)(ii)(I) of the Bankruptcy Code.  "For a debtor that was a going concern, the court would 'determine the fair market price of the debtor's assets as if they had been sold as a unit in a prudent manner, and within a reasonable time.'"  *Ogle*, 499 B.R. at 551.

57.     Here, those Series that allegedly made the transfers at issue were not insolvent; in fact, they were solvent.  All distributions required to be made under Section 9.H of the Series Agreements were conditioned upon any such distributions being permitted by any applicable bank covenants, contractual restrictions, or events of default with respect to such loan agreements as the Series may be guaranteeing.  Accordingly, only those Series that were operating at a profit made any such distributions during the relevant period from 2016 through 2018, as any such distribution from a profitless Series would violate bank covenants.  For example, the Chamberlain Group members received distributions with respect to Series interests in Crosby, Porter, and Pasadena (as reflected on the 2016-2018 Schedules K-1 received), which all continue to operate to date, but did not receive any such distributions from the Texas City Series because no profits were generated during the relevant period and other Centers, such as the Yorktown Series, provided only modest distributions proportional to profits generated during 2016 and 2017.

58.     Chad J. Shandler, the Chief Restructuring Officer of Neighbors Legacy Holdings, Inc., confirmed in his Declaration in Support of Chapter 11 Petitions and First Day Pleadings that the Neighbors Debtor Entities did not begin to experience financial difficulties until late 2016.

(Bky. Dkt. No. 16, at ¶ 10). Accordingly, to the extent that any transfers were made in 2016, the

Neighbors Debtor Entities admitted that in 2016, the Centers were financially healthy. Beginning

in 2017, only profitable Centers continued to make alleged transfers, which were reduced to only

tax distributions in 2017, and in 2018, any such transfers did not come close to covering tax

liabilities for the Chamberlain Group. (Exhibit 7, Email from Tensie Axton, dated Jan. 16, 2018;

Exhibit 6 – Schedules K-1). An examination of financial statements available for certain profitable

Centers continue to demonstrate financial health in 2017 and 2018 for those Centers that allegedly

continued to make transfers. (Exhibit 8, Financial Statements—Porter and Crosby Centers).

Based on the test identified in *Covey*, 960 F.2d at 660, such profitable Centers would have attracted

buyers because assets exceeded liabilities for such Centers, and in fact, many of those Centers

purportedly found a buyer in Altus Health Systems, according to Mr. Shandler. (Exhibit 9, Email

from Chad Shandler, dated July 12, 2018).

2.      The Series were not Unreasonably Undercapitalized

59.     Alternatively, the Complaint alleges that the Neighbors Debtor Entities held

"unreasonably small capital" following the alleged transfers. "[A]n 'unreasonably small capital'

would refer to the inability to generate sufficient profits to sustain operations. Because an inability

to generate enough cash flow to sustain operations must precede an inability to pay obligations as

they become due, unreasonably small capital would seem to encompass financial difficulties short

of equitable insolvency." *In re SemCrude*, 526 B.R. 556, 560 (D. Del. 2014) (quoting *Moody v.

Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992)).

> [T]he test for unreasonably small capital is reasonable foreseeability. Under this
> analysis, it was proper for the district court to consider availability of credit in
> determining whether, in this case, the debtor, was left with an unreasonably small
> capital. The critical question is whether the parties' projections were reasonable.
> The "reasonableness" of the projections must be tested by an objective standard
> anchored in the company's actual performance. However, reliance on historical
> data alone is not enough. To a degree, parties must also account for difficulties that

are likely to arise, including interest rate fluctuations and general economic
downturns, and otherwise incorporate some margin for error. To strike a proper
balance under the "reasonable foreseeability" test, the Third Circuit directed courts
to take into account that businesses fail for all sorts of reasons, and that fraudulent
conveyance laws are not a panacea for all such failures.

*Id.* (quoting *Moody*, 971 F.2d at 1073.) (internal quotations, citations and revisions omitted).

In this regard, cautioned the Court, one has to be careful with a term like
"unreasonably small." It is fuzzy, and in danger of being interpreted under the
influence of hindsight bias. One is tempted to suppose that because a firm failed it
must have been inadequately capitalized. The temptation must be resisted. . . .
[T]here must be a causal relationship between the fraudulent transfers and the
likelihood that the Debtor's business will fail . . . . A debtor's later failure, alone, is
not dispositive on this issue. The Court's analysis must be done as of the time of
the transfers in question.

*Id.* (citing *Boyer v. Crown Stock Distributions, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009); *In re Kane
& Kane*, No. 09-15556-EPK, Adv. No. 10-01022-EPK, 2013WL1197609, at *10 (Bankr. S.D. Fla.
Mar. 25, 2013)) (internal quotations and revisions omitted).

60.     Assuming, *arguendo*, the Series were even debtors in bankruptcy, which they were

not, in order to prevail under a theory of "unreasonably small capital" the Trustee must show that

(1) it was "reasonably foreseeable" at the time of transfer that the alleged transfers would cause

the Series to be unreasonably undercapitalized and (2) that a causal relationship exists between the

alleged transfers and the Series' failure.

61.     Here, not only is the Complaint devoid of any allegations surrounding which, if

any, of the Series suffered unreasonably small capital, but it also contains no allegations or specific

facts demonstrating which, if any, of the Neighbors Debtor Entities suffered unreasonably small

capital, whether it was reasonably foreseeable that the alleged transfers would cause such Series

or Neighbors Debtor Entities, if any, to be undercapitalized, or whether such unreasonably small

capital contributed to the failure of such Series or Neighbors Debtor Entities.

62.     In fact, Plaintiff admits that the reason for failure of the Neighbors Debtor Entities

was because the Neighbors' officers and directors "engaged in a pattern of breaching their fiduciary

duties, abuse of control, grossly negligent mismanagement, and waste of assets," and their failure

"to have even the basic corporate governance systems in place ultimately led to the collapse of

Neighbors."  (Pl. Am. Compl., Adv. P. No. 20-03017, Dkt No. 4, at ¶ 49).  The Plaintiff continues:

> Further acknowledging this cavalier attitude towards corporate funds, there was not even a basic budgeting process in place.  In response to complaints from some of the local emergency physicians about the shifting of money from performing emergency centers to non-performing centers, one of the Neighbors' O&Ds commented that "[w]here there are no budgets, there are not 'expected norms.'  I would prefer not to emphasize that there have been no budgets."

(*Id*., at ¶ 51 (citing Ex. D of Pl. Am. Compl., Adv. P. No. 20-03017—Draft Letter to Investors

with Comments and Redline)).  Based on Plaintiff's admissions above, Neighbors' failure was not

that the profitable and thriving Series had unreasonably small capital, but that the controlling

investors (of which the Chamberlain Group were not among) engaged in mismanagement and self-

dealing to their own short-term benefit of themselves, which ultimately proved unsustainable.  The

modest alleged transfers that the Chamberlain Group and other Class B physicians received for

their non-voting memberships in certain profitable and thriving Series had nothing to do with

ultimate fate of the Neighbors Debtor Entities.

63.     Furthermore, as reflected in the financial statements available to the Chamberlain

Group, the amount of working capital available to several of the Centers, and particularly those

from which the Chamberlain Group received transfers, does not suggest that such Centers were

unreasonably undercapitalized.  Such financial statements reflect that current and total assets

significantly exceeded current and total liabilities and that net income was positive throughout

2017 and through June 30, 2018, following the financial hardship that the Neighbors Debtor

Entities began to experience in late 2016.  (Exhibit 8, Financial Statements—Porter and Crosby

Centers).[9]   Again, those Centers that were struggling do not appear to have made any transfers during the relevant period.  Additionally, it is notable that several of the profitable Centers did not fail due to unreasonably small capital or otherwise, as they continue to operate in the Houston area to date.

### 3.   The Series were able to Pay Debts as they Came Due

64.   The Complaint fails to make specific allegations that the Neighbors Debtor Entities or Series made the transfers with the intention or belief that they were unable to pay debts as they came due.  "Insolvency is proven under the 'cash flow' test if at the time of a transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured." *In re Opus East, LLC*, 528 B.R. 30, 51 (Bankr. D. Del. 2015) (quoting *EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 359 (Bankr. D. Del 2008) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured."))  In sum, for the Plaintiff to prevail under this theory, it must show (1) transfers made by a debtor and (2) a debtor's contemporaneous intent or belief that such debtor would incur debts beyond its ability to pay such subsequent debts.

65.   Here, similar to the insolvency and unreasonably small capital tests, the Plaintiff has failed to allege specific facts demonstrating that the alleged transfers caused the Series to be unable to pay their debts as they came due or that the Series contemporaneously intended or believed that subsequent creditors would not be paid as their claims matured.

---

[9] Additionally, the bank account statements and reconciliation summaries provided by Plaintiff in the Data Room at the direction of this Court for each Center demonstrate that sufficient funds were available for expenses, and particularly for the January, April, July, and October statements, which also reflect the alleged transfers for distributions.

66.     Furthermore, the select financial statements available show positive net income sufficient to make payments on the liabilities listed on the Centers' balance sheets.  For example, the December 31, 2017 income statement for the Porter Center reported net income of $2,878,805 year-to-date while total liabilities on the balance sheet for December were reported as $2,792,666. (Exhibit 8, Financial Statement—Porter).   Additionally, the Porter Center's working capital, calculated as cash plus current assets over current liabilities, shows a working capital surplus of $5,897,097 for the month of December (*Id.*), which does not demonstrate an inability to pay debts as they come due.  Moreover, distributions reported year-to-date for 2017 at the Porter Center amounted to a modest $1,114,134 (*Id.*), which has been established to reflect only tax distributions for 2017, thus further suggesting that the Center was taking a conservative fiscal approach in an effort to ensure debts would be paid as they matured.

67.     Based on the foregoing, any alleged transfers received by the Chamberlain Group originated from the Series that were not insolvent, not unreasonably undercapitalized, and able to pay their bills as they came due.  Thus, such alleged transfers are not avoidable under Section 548 of the Bankruptcy Code or Section 24.006(a) of the Texas Business and Commerce Code.

**C.     Neighbors Debtor Entities Received Reasonably Equivalent Value in Exchange for the Alleged Transfers**

1.     Chamberlain Group Provided Professional Services in Exchange for the Alleged Transfers

68.     The Complaint alleges that "[t]he Neighbors Debtor Entities received less than reasonably equivalent value for the Transfers."  (Dkt. No. 4, at ¶ 101).  This solitary allegation is a mere recitation of the element provided for in subsection 548(a)(1)(B)(i) and contains no factual information.  The Complaint does not offer any factual information sufficient to establish which of the Neighbors Debtor Entities made which transfers at issue, which Chamberlain Group member

received any such transfers, why such Neighbors Debtor Entities made the transfers, and what the Neighbors Debtor Entities received in return.

69.     In fact, the transfers at issue here were made in exchange for reasonably equivalent value, and thus are not avoidable under Section 548 of the Bankruptcy Code or Section 24.006 of the Texas Business and Commerce Code.

70.     Although the Bankruptcy Code does not define "reasonably equivalent value," many courts have applied a two-step process.  First, a court determines whether the debtor received an economic benefit at the time of the transfers or obligations.  *See Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir.1993); *Brandt v. Charter Airlines, LLC (In re Equipment Acquisition, Inc.)*, 511 B.R. 527, 534 (Bankr. N.D. Ill. 2014). Second, the value provided must be "reasonably equivalent" to what the debtor received.  *See Think3 Litigation Trust v. Zuccarello et al. (In re Think3, Inc.)*, 529 B.R. 147, 200 (Bankr. W.D. Tex. 2015); *see also Abramoff v. Life Ins. Co. of Georgia (In re Abramoff)*, 92 B.R. 698, 703-04 (Bankr. W.D. Tex. 1988).  This two-step inquiry considers the value of what was transferred and what was received at the time of the transfer.  *See Gutierrez v. Lomas Mortgage, et al. (In re Gutierrez)*, 160 B.R. 788, 790 (Bankr. W.D. Tex. 1993).  "The concept of reasonably equivalent value does not require a dollar-for-dollar transaction.'  The value received needs only be 'reasonably equivalent' in value to what was transferred."  *In re PSN USA*, 615 Fed.Appx. at 932 (quoting *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1257 (11th Cir. 2013)).

71.     Further, "whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact that the goods and services had on the bankrupt enterprise."  *Orick v. Kozyak (In re Financial Federated Title & Trust, Inc.)*, 309 F.3d 1325, 1332 (11th Cir. 2002).  "Courts generally construe the term 'value' broadly for purposes of

the Bankruptcy Code." *In re PSN USA*, 615 Fed.Appx., at 930 (citing *Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 163 (5th Cir. 2015); *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1127 (5th Cir. 1993) (Some Internal Citations and Quotations Omitted).  "In keeping with this broad understanding of value, the test that courts have applied to determine 'reasonably equivalent value' is whether the transfer 'confers an economic benefit upon the debtor, either directly or indirectly', not whether the debtor received property rights by virtue of a transfer or whether the debtor was a party to the contract at issue" *Id.* (citing *Gen. Elec. Credit Corp. of Tenn. V. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990); *In re Fairchild*, 6 F.3d, at 1127).

72.     In *In re PSN USA*, the court held that transfers from a debtor-subsidiary to a third party made on behalf of its non-debtor parent company were given in exchange for reasonably equivalent value despite the debtor not being a party to the underlying contract.  In that case, the debtor subsidiary operated a television channel and received satellite services from a third party, but was not party to the contract providing for the services from the third party.  *See In re PSN USA*, 615 Fed.Appx. at 926-27.   Rather, the non-debtor parent-company contracted for such services from the third party satellite provider.  *See id*.  In determining that the debtor-subsidiary received reasonably equivalent value despite not being a party to the satellite services contract, the court recognized "that a party may receive an 'economic benefit' for purposes of determining 'reasonably equivalent value' if it 'share[s] in the enjoyment of' or 'use[s]' a good or service." *Id.* at 931 (quoting *In re Rodriguez*, 895 F.2d at 728).  Although the court found that the debtor-subsidiary benefitted directly from the satellite services provided, as such services were necessary for the debtor-subsidiary to operate the television channel, the court went further and determined even if the debtor-subsidiary was merely operating the channel on behalf of the non-debtor parent who was the signatory on the satellite contract, the debtor-subsidiary nevertheless benefitted

indirectly because it was able to use the services provided under the satellite contract.  *See id* at 933.  Accordingly, *In re PSN USA* indicates that courts must broadly analyze whether a debtor received an economic benefit either directly or indirectly under the facts and circumstances.

73.     Similarly, in *LandAmerica Fin. Group, Inc. v. S. Cal. Edison Co. (In re LandAmerica Fin. Group, Inc.*, 525 B.R. 308 (E.D. Va. 2015), the debtor-parent company was unsuccessful in avoiding utility payments it made on behalf of wholly-owned subsidiaries from centralized accounts funded by income earned by the subsidiaries.  *See id.* at 310-12.  In analyzing whether the debtor-parent company received reasonably equivalent value, the court confirmed that "there is no requirement that the consideration be contemporaneous" with the transfer from the debtor.  *Id.* at 315 (Internal Quotations Omitted).  In addition, the court found that the relationship between the debtor-parent company and the subsidiaries created an implied contract that created a duty for the holding company to pay the subsidiaries' utility expenses.  *See id*. at 317-19.  As a result, the transfers to the subsidiaries' vendors were in satisfaction of an antecedent debt.  *See id.*

74.     Section 548 of the Bankruptcy Code contemplates that compensation for services may constitute reasonably equivalent value if received in the ordinary course of business—a notion which is further supported by the courts.  *See, e.g., In re Think Retail Sols., LLC*, No. 15-56153-BEM, 2019 WL 2912717 (N.D. Ga., July 5, 2019).  Furthermore, satisfaction of an antecedent debt constitutes value in exchange for the transfer.  11 U.S.C. § 548(d)(2)(A).

75.     Pursuant to the Series Interest Purchase Agreements and Series Agreements, all Class B shareholders were required to work shifts at the Centers as part of their contractual obligations for holding the Class B shares.  Specifically, Section 3.C(a) of the Series Agreements states that "each Class B Member has agreed to work clinical shift coverage at the Series Business as set forth under the terms of his or her Share Purchase Agreement."  Further, the Series Interest Purchase Agreements provides the "Purchaser acknowledges and agrees that the consideration for

the Purchase of the Class B Series Shares includes a commitment by Purchaser to work ONE 24 hour clinical shift as a physician at the Emergency Center for each 200[10] Class B Series Shares purchased . . . ."  The Chamberlain Group members paid substantial sums of money for the opportunity to work at the Centers—in short, they were required to "pay-to-play" (or in this case, "pay-to-work").  On average, the "pay-to-work" fees were approximately $25,000 in order to work a 24-hour shift per month.  Accordingly, the transfers received by the Chamberlain Group members were in consideration of the clinical services that they were contractually required to provide to the Series.  Stated directly, the Chamberlain Group members were paid for the medical services they rendered.

76.     Additionally, the compensation the Chamberlain Group received under the terms of their employment agreements was below market for compensation of emergency room physicians, thus further demonstrating that their compensation for services rendered necessarily included the distributions received on account of their Class B shares.  Such distributions from the particular Series were necessary to supplement their Center staff's compensation for the services rendered and to retain quality physicians.

77.     Furthermore, because the distributions provided for under the Series Agreements were mandatory and not within management's discretion, such distributions constituted an antecedent debt with respect to Section 548 of the Bankruptcy Code and Section 24.006 of the Texas Business and Commerce Code.  *Cf. In re The Heritage Org., L.L.C.*, 413 B.R. 438, 485-86 (Bankr. N.D. Tex. 2009) (explaining that, if present, mandatory distributions may constitute an antecedent debt, the payments of which provide reasonably equivalent value).

---

[10] Although the actual number of shares purchased varied from Center to Center, the general requirement was the same that the purchase of shares included a physician's commitment to work clinical shifts.

78.     Moreover, even if the alleged transfers came directly from the limited partnership Centers rather than the Series which held the obligation to make mandatory distributions pursuant to the Series Agreements, and assuming *arguendo*, that the Centers possessed some interest in the property constituting the alleged transfers, which they did not, the Centers' economic interests were nevertheless aligned with the Series.  As such, the Centers received a direct or indirect economic benefit from the profits interest arrangement in exchange for services rendered by doctors because the underlying Centers were the operating entities of the emergency centers and benefitted from the doctors' services.  *See generally In re PSN USA*, 615 Fed.Appx. at 925.  Further, because the Series Agreements required mandatory distributions for each profitable and thriving Series, and at a minimum tax distributions were required to assist the Series members in satisfying the Series federal tax burden assumed by the Series members on behalf of each Series, once management determined the amount of such distributions and announced payment of such in accordance with the Series Agreements, the Centers impliedly were obligated to advance such funds necessary to cover the distributions in satisfaction of the antecedent debt.  *See generally LandAmerica Fin. Group, Inc.*, 525 B.R. at 308.

   2. <u>Chamberlain Group Provided Reasonably Equivalent Value for all Transfers Constituting Tax Distributions</u>

79.     Additionally, the distributions received by the Chamberlain Group that constituted tax distributions were also received in exchange for reasonably equivalent value because the Series received the benefit of having a pass-through tax structure and transferring the responsibility to pay federal income taxes to its interest holders.  *See In re Northlake Foods, Inc.*, 715 F.3d at 1256. In *Northlake Foods*, the shareholders signed a shareholder agreement wherein the shareholders agreed to pay their share of the company tax liability if the company elected to be treated as an S corporation.  *See id*.  Such agreement benefitted the company because it shifted the tax burden

from the company to the shareholders and in exchange the company was required to reimburse the shareholders for the personal tax liability. *See id.; see also Matter of De Feo Fruit Co., Inc.*, 24 B.R. 220, 222-23 (Bankr. W.D. Mo. 1982) (finding no fraudulent intent when the debtor corporation was a subchapter S corporation because it was of benefit tax-wise to the corporation to ensure that all profits or excess funds were periodically paid out).

80.     Furthermore, the courts in *In re PSN USA* and *In re LandAmerica* both acknowledged that pass-through arrangements for the payment of federal tax liability by an entity's members constitutes an ongoing and continuing obligation that is not avoidable under Section 548 of the Bankruptcy Code.   The court stated in *In re LandAmerica* for the proposition that consideration for tax distributions or otherwise need not be contemporaneous with the transfers:

> The consideration was the election by the shareholders of the corporation to be taxed as a chapter S corporation as long as the corporation paid their additional personal taxes.  There was a continuing benefit to the corporation over the year and a continuing obligation on the part of the corporation to reimburse the shareholders.

*Id.* at 316 (quoting *Gold v. U.S. (In re Kenrob Info. Tech. Solution, Inc.)*, 474 B.R. 799, 802-03 (Bankr. E.D. Va. 2012)).   Likewise, the court in *In re PSN USA* cited *In re Lakeshore, supra,* repeatedly for the proposition that reasonably equivalent value need not be based in contract or property rights, but rather economic benefit, and in the case of *Lakeshore*, the court noted that the ongoing obligation of the shareholders to pay federal taxes on behalf of the debtor-S corporation provides time value of money to the S corporation because although the S corporation incurred the financial obligation to its shareholders on an ongoing basis it did not have to satisfy that obligation until a year after the shareholders had incurred the tax liability. *See In re PSN USA*, 615 Fed.Appx. at 930 (quoting *In re Northlake*, 715 F.3d at 1256).   Similarly, the Chamberlain Group has assumed the tax liability under the Series Agreement to the benefit of the Series, and in exchange, the Series

is required to make tax distributions estimated to cover the personal income tax liability incurred by the Chamberlain Group, which may not be avoided.

81.     Pursuant to the Series Agreements for each Series, the Series were required to "make distributions to the Members in such amounts as may be reasonably determined by the Manager to be necessary to fund the Members' respective income tax obligations."  (Exhibit 4, at § 9.H).  Further, beginning in 2017, only tax distributions were made by the Series, and thus any alleged transfers at issue in periods 2017 and 2018, as well as those transfers in 2016 constituting tax distributions, may not be avoided.  (Exhibit 7).[11]

82.     Based on the foregoing, each Series received reasonably equivalent value for the transfers alleged in the Complaint and thus the transfers are not avoidable under Section 548 of the Bankruptcy Code or Section 24.006 of the Texas Business and Commerce Code.

**D.     Transferees are Subsequent Transferees under 11 U.S.C. § 550**

83.     Even assuming, *arguendo*, that the alleged transfers constitute constructively fraudulent transfers under Section 548 of the Bankruptcy Code or other applicable state law, such transfers are nonetheless not avoidable because the Chamberlain Group members received the alleged transfers by virtue of their membership in the Series, and thus, they were not legally the initial transferees of such alleged transfers, since such transfers would have been received on behalf of the Series.

84.     The Complaint alleges the following:

The Neighbors Debtor Entities made the Transfers to or for the benefit of the Transfer Defendants.

Section 550 of the Bankruptcy Code provides that if a transfer is avoided under §§544 and 548 of the Bankruptcy Code, the Unsecured Creditor Trustee may

---

[11] In addition to Exhibit 7, Plaintiff provided documentation in the Data Room as directed by this Court that confirm only tax distributions occurred in 2017 and 2018, and contain sufficient data to calculate the amount of tax distributions for 2016.  Series management's standard practice was generally to calculate each member's tax distribution as 40% of the income reported on their Schedules K-1.

> recover the property or the value of the property transferred from the initial
> transferee, the entity for whose benefit the transfer was made, or any immediate or
> mediate transferee of the initial transferee.

(Dkt. No. 4, at ¶¶ 99, 102).   Again, the Complaint fails to state anything more than legal

conclusions and does not provide specific facts showing which, if any, Neighbors Debtor Entities

made the transfers at issue, which, if any, such transfers at issue were directed to or received by

the Chamberlain Group members as initial transferees, which, if any, of the Chamberlain Group

members benefitted from the transfers at issue, how the Chamberlain Group members could be

considered initial transferees when they did not in fact receive the transfers at issue from one or

more of the Neighbors Debtor Entities, or which, if any, of the Chamberlain Group members were

subsequent transferees.   Instead, the Complaint merely states the rule contained in subsections

550(a)(1)-(2), almost verbatim., giving the court little factual information to support its claims

against the Chamberlain Group.

      85.   Further, Section 550(b) of the Bankruptcy Code provides a good faith defense to

immediate or mediate transferees that take the transfer for value, in good faith, and without

knowledge of the voidability of the transfer avoided.  *See* 11 U.S.C. § 550(b).  To the extent that

the Chamberlain Group members received any transfers, they would have received such transfers

from the Series that they joined and not from the corresponding Neighbors Debtor Entities, and

thus, the Chamberlain Group members could not have been the initial transferees.

      86.   In the Southern District of Texas, a transferee takes in good faith where the

transferee executed good faith within the meaning of an ordinary business transaction.  *See In re*

*Great Gulfcan Energy Tex., Inc.*, 488 B.R. 898, 914 (Bankr. S.D. Tex. 2013).  The Chamberlain

Group acted in good faith when receiving their transfers from the Series because the Series were

not insolvent at the time of the transfers, were generally doing well, were not directly liable for the

debts of the Neighbors Debtor Entities, and the Chamberlain Group had been reassured by

management multiple times that the company was in good financial health—an assurance supported by the 2018 Schedules K-1 that certain of the Chamberlain Group received showing substantial profits, as previously discussed.

87. Additionally, the Chamberlain Group received the transfers at issue for value in the form of services rendered to the transferors. In Texas, value is determined by looking at what the transferee surrendered in order to receive the transfer. *See id*. As discussed above, the Chamberlain Group members were required to work a certain number of shifts in direct correlation to the number of Class B shares each held in their respective Series, and thus the transfers received represented compensation for services rendered, which is further supported by the fact that the members of the Chamberlain Group otherwise received below-market wages for their shifts. Furthermore, the Series directly benefitted from the pass-through tax structure of the Series and agreed to provide tax distributions in exchange for the Series members carrying the tax burden.

88. Finally, the Chamberlain Group did not have knowledge of the potential voidability of the transfers they received; in fact, their lack of knowledge was built into the organization of the Series business model. The Chamberlain Group members were non-voting shareholders in their respective Series. They were strictly prohibited from participating in management of the Series as provided in the respective Series Agreements. (Exhibit 1, at § 8.01; Exhibit 4, at § 3.A). Beyond their provision of services to the Series, they had no interests at stake in the Neighbors Debtor Entities' endeavors. While ordinary distributions and tax distributions were mandatory under the terms of the Series Agreement, the determination of tax liability and whether excess cash existed resided strictly with management. Therefore, the limited knowledge that the Class B shareholders had of the Series' operations was not sufficient to charge the Chamberlain Group with knowledge of the alleged potential voidability of the transfers. In fact, as previously discussed, when certain Chamberlain Group members sought additional information regarding the health of

the overall Neighbors Health endeavor, they were explicitly told that the Neighbors Debtor Entities were not entering into or considering bankruptcy and none of the formal correspondence from management indicated consideration of bankruptcy, and that profitable clinics would continue to operate in the ordinary course.  (Exhibit 10, Correspondence from Setul Patel and Management Team, dated December 20, 2017).

89.     Accordingly, the transfers alleged in the Complaint are not avoidable and may not be recovered from any immediate or mediate transferees under Section 550 of the Bankruptcy Code.

**IV.     The Two-Year Look Back Period Bars Plaintiff's Claims with Respect to Transfers Made Before July 12, 2016**

90.     Under Section 548(a)(1) of the Bankruptcy Code, Plaintiff is allowed only a two-year look back period for the avoidance of transfers from the date the bankruptcy petition is filed. Here, the bankruptcy was initiated on July 12, 2018.  Thus, the Plaintiff may only seek to avoid transfers that occurred after July 12, 2016.  However, Plaintiff's alleged transfer amounts, as reflected in the Complaint's Exhibit A includes several transfers that occurred prior to July 12, 2016, which amount to approximately $1,511,383.06.[12]  Such amounts are not avoidable and the Chamberlain Group members respectfully request that the Court dismiss with prejudice claims for alleged transfers that occurred prior to July 12, 2016.

**V.     No Unsecured Creditor Existed at the Time of each Transfer at Issue in the Complaint**

91.     Under Subsection 544(B)(1) of the Bankruptcy Code, a trustee is granted "the right to avoid any transfer of the interest of a debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable

---

[12] This figure was derived from an inspection of the general ledger files included in Plaintiff's data room at the direction of this Court.  The alleged transfers occurring in April 2016 total to $1,511,383.06.

under the Bankruptcy Code . . . ." *In re Northstar Offshore Group, LLC*, 616 B.R. 695, 724 (Bankr. S.D. Tex. 2020) (Internal Quotations Omitted).  However, for this provision to apply, the Plaintiff must demonstrate the existence of "an actual, existing unsecured creditor" who would be able to raise the same claim, and without such "the trustee is powerless to act as far as 544(B) is concerned." *Smith v. American Founders Financial Corp*., 365 B.R. 647, 659 (Bankr. S.D. Tex. 2007).  Without the identification of such a creditor "whose claim arose before the transfer was made," the Plaintiff lacks standing to pursue such claims under Section 544 of the Bankruptcy Code and the Texas Business and Commerce Code § 24.006(a).

92.     Here, the Plaintiff has identified no such creditor with respect to each transfer at issue.  Thus, Plaintiff lacks standing and the Chamberlain Group respectfully requests that all claims alleged under Section 544 of the Bankruptcy Code and applicable Texas law be dismissed with prejudice.

## CONCLUSION AND PRAYER

Based on the foregoing, the Chamberlain Group has demonstrated that no genuine issue of material fact exists in this case and the Plaintiff, as a matter of law, has failed to establish several essential elements to its claims raised in the Complaint.  Accordingly, each member of the Chamberlain Group is entitled to summary judgment as a matter of law.

WHEREFORE, PREMISES CONSIDERED, the Chamberlain Group prays the following:

(a) that the Court grant this Motion for Summary Judgment and dismiss with prejudice the Plaintiff's Complaint and claims therein;

(b) that all costs of suit, including attorney's fees, be taxed against said Plaintiff; and

for such other and further relief to which the Court may find the Chamberlain Group to be justly entitled.

Date: September 30, 2020

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE,**
**WILLIAMS & AUGHTRY, P.C.**
1200 Smith Street, 14th Floor
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553

 */s/ Juan F. Vasquez, Jr.*
JUAN F. VASQUEZ, JR.
juan.vasquez@chamberlainlaw.com
Texas Bar No. 24033294
Southern District No. 2982

Of Counsel:

DAVID N. CALVILLO
david.calvillo@chamberlainlaw.com
Texas Bar No. 03673000
Southern District No. 11431

STUART H. CLEMENTS
stuart.clements@chamberlainlaw.com
Texas Bar No. 24087315
Southern District No. 3005543

PETER A. LOWY
peter.lowy@chamberlainlaw.com
Texas Bar No. 24038517
Southern District No. 37792

**COUNSEL FOR DEFENDANTS AB**
**PHYSICIAN SERVICES LLC, ABARADO &**
**DO FAMILY, LP, ATIBA BELL MEDICAL**
**ASSOCIATES, PLLC, EDR INVESTMENTS,**
**LLC, EMTEX INVESTMENTS, LLC, EKTA**
**POPAT, FILLORY HOLDINGS, LLC, ISAAC**
**FREEBORN, KENNETH M. DIREKLY,**
**MANUEL ACOSTA, PLLC, PRANAV SHUKLA**
**MD, THANH CHENG MD, AND TOWARDS**
**INFINITY LLC**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 30th day of September, 2020, a copy of the foregoing **MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court using the CM/ECF system and served electronically on all persons and parties who have entered an appearance in this case.


_/s/ Juan F. Vasquez, Jr._
JUAN F. VASQUEZ, JR.