## OPERATING AGREEMENT
## OF
## NHS EMERGENCY CENTERS, LLC

### A Texas Limited Liability Company

This Operating Agreement (this "Agreement"), dated to be effective as of January 1, 2014, is adopted, executed and agreed to, for good and valuable consideration, by all of the Members (as defined below) of NHS Emergency Centers, LLC, a Texas limited liability company.

### ARTICLE 1
### DEFINITIONS

1.01    *Definitions.*  As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the provision following such term:

*Adjusted Capital Account* – a Capital Account determined and maintained for each Member throughout the term of this Agreement, the balance of which shall be equal to such Member's Capital Account balance, modified as follows:

(a)    increased by the amount, if any, of such Member's share of the Minimum Gain of the Company as determined under Treasury Regulation Section 1.704-2(g)(1);

(b)    increased by the amount, if any, of such Member's share of the Minimum Gain attributable to Member Nonrecourse Debt of the Company pursuant to Treasury Regulation Section 1.704-2(i)(5);

(c)    increased by the amount, if any, of such Member's share of the Member's Modified 752 Share of Recourse Debt;

(d)    increased by the amount, if any, that such Member is treated as being obligated to contribute subsequently to the capital of the Company as determined under Treasury Regulation Section 1.704-1(b)(2)(ii)(c);

(e)    decreased by the amount, if any, of cash that is reasonably expected to be distributed to such Member, but only to the extent that the amount thereof exceeds any offsetting increase in such Member's Capital Account that is reasonably expected to occur during (or prior to) the tax year during which such distributions are reasonably expected to be made as determined under Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(6); and

(f)    decreased by the amount, if any, of loss and deduction that is reasonably expected to be allocated to such Member pursuant to Code Section

1

**EXHIBIT 1**

704(e)(2) or 706(d), Treasury Regulation Section 1.751-1(b)(2)(ii) or Treasury Regulation Section 1.704-1(b)(2)(iv)(k).

*Affiliate* – (a) with respect to any Person who is a natural person, (i) each entity that such Person Controls, and (ii) each member of such Person's immediate family; and (b) with respect to any person that is an entity, (i) each entity that such person Controls, (ii) each person that Controls such Person, and (iii) each entity that is under common Control with such Person.

*Arbitration Notice* – Section 13.01(b).

*Arbitrator* – Section 13.02(a).

*Assignee* – any Person that acquires Membership Rights or any portion thereof (including an Interest) through a Disposition. The Assignee of a deceased Member is the Person or Persons to whom the deceased Member's Membership Rights are bequeathed, or by whom they are inherited, pursuant to the deceased Member's duly-probated will or a probate court order applying the laws of intestate succession. The Assignee of a dissolved Member is the shareholder, partner, member or other equity owner or owners of the dissolved Member to whom such Member's Membership Rights are assigned by the Person conducting the liquidation or winding up of such Member. The Assignee of a Bankrupt Member is the Person or Persons (if any) to whom such Bankrupt Member's Membership Rights are assigned by order of the bankruptcy court or other governmental authority having jurisdiction over such Bankruptcy; or, in the event of a general assignment for the benefit of creditors, the creditor to which such Membership Rights are assigned. In the case of a Divorce, the Assignee is the spouse of the applicable Member. In the case of a Spouse's Death, the Assignee is the Person or Persons to whom the spouse's (or former spouse's) Spouse's Fraction is bequeathed, or by whom it is inherited, pursuant to the deceased spouse's (or former spouse's) duly-probated will or a probate court order applying the laws of intestate succession.

*BOC* – The Texas Business Organizations Code, as the same may be amended from time to time.

*Bankruptcy* or *Bankrupt* – with respect to any Person, that (a) such Person (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for such Person a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of such Person's or of all or any substantial part of such Person's properties; or (b) against such Person, a proceeding seeking reorganization, arrangement,

2

**EXHIBIT 1**

composition, readjustment, liquidation, dissolution, or similar relief under any Law has been commenced and 120 Days have expired without dismissal thereof or with respect to which, without such Person's consent or acquiescence, a trustee, receiver, or liquidator of such Person or of all or any substantial part of such Person's properties has been appointed and 90 Days have expired without the appointment's having been vacated or stayed, or 90 Days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

*Book Depreciation* – for each fiscal year (or other period for which Book Depreciation must be computed) the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset, except that, if the Book Value of an asset differs from its adjusted tax basis at the beginning of the year, Book Depreciation will be an amount which bears the same ratio to Book Value at the beginning of the year as the federal income tax depreciation, amortization or other cost recovery deduction for the year bears to the beginning adjusted tax basis; provided, however, that if the adjusted tax basis of the asset at the beginning of the year is zero, Book Depreciation will be determined by the Member using any reasonable method.

*Book Value* – with respect to any asset, the adjusted basis of the asset for federal income tax purposes, adjusted as provided in Section 7.04.

*Business Day* – any day other than a Saturday a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

*Capital Account* – the account to be maintained by the Company for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv) and, to the extent not inconsistent therewith, the following provisions:

(a)     a Member's Capital Account shall be credited with the cash or Net Agreed Value of the Member's Capital Contributions, the amount of any Company liabilities assumed by the Member, the Member's distributive share of Profit and any item of income or gain specially allocated to the Member pursuant to the provisions of Article 6 and

(b)     a Member's Capital Account shall be debited with the amount for cash and the Net Agreed Value of any Company property distributed to the Member, the amount of any liabilities of the Member assumed by the Company (or which are secured by property contributed by the Member to the Company), the Member's distributive share of Loss and any item of expenses or losses specially allocated to the Member pursuant to the provisions of Article 6.

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest; provided, however, that if the transfer causes a

3

**EXHIBIT 1**

termination of the Company under Code Section 708(b)(1)(B), the Capital Accounts of the Members shall be adjusted in conformance with Treasury Regulation Section 1.704-1(b)(2)(iv)(*l*). A Member that has more than one Interest shall have a single Capital Account that reflects all of its Interests, regardless of the class of Interest owned by that Member and regardless of the time or manner in which it was acquired.

*Capital Contribution* – with respect to any Member, the amount of money and the initial Book Value of any property (other than money) contributed to the Company by the Member. Any reference in this Agreement to the Capital Contribution of a Member shall include a Capital Contribution of his predecessors in interest.

*Capital Transaction* – any transaction that results in the Company's receipt of cash or other consideration other than Capital Contributions, including proceeds of sales or exchanges or other Dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds that, in accordance with generally accepted accounting principles, are considered capital in nature.

*Code* – the United States Internal Revenue Code of 1986, as amended from time to time. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding Law.

*Company* – NHS EMERGENCY CENTERS, LLC, a Texas limited liability company.

*Company Interests* – Section 3.01(a)

*Control* – the possession, directly or indirectly, through one or more intermediaries, of the following: (a) in the case of a Company, more than 50% of the outstanding voting securities thereof; (b) in the case of a professional limited liability company, partnership, limited partnership or venture, the right to more than 50% of the distributions therefrom (including liquidating distributions); (c) in the case of a trust or estate, more than 50% of the beneficial interest therein; (d) in the case of any other entity, more than 50% of the economic or beneficial interest therein; or (e) in the case of any entity, the power or authority, through ownership of voting securities, by contract or otherwise, to direct the management, activities or policies of the entity.

*Control Person* – with regard to each Entity Member, the Person who has Control of such Entity Member, whether directly or through one or more intermediaries.

*Day* – a calendar day; provided, however, that, if any period of Days referred to in this Agreement shall end on a Day that is not a Business Day, the expiration of such period shall be automatically extended until the first succeeding Business Day.

4

**EXHIBIT 1**

*Default* – with respect to any Member, (a) the failure of such Member to contribute, within 10 Days of the date required, all or any portion of a Capital Contribution that such Member is required to make as provided in this Agreement; or (b) the failure of a Member to comply in any material respect with any of its other agreements, covenants or obligations under this Agreement (other than its agreement not to Withdraw from the Company in Section 3.06), or the failure of any representation or warranty made by a Member in this Agreement to have been true and correct in all material respects at the time it was made, in each case if such default is not cured by the applicable Member within 30 Days of its receiving notice of such default from the Manager or any other Member (or, if such default is not capable of being cured within such 30-Day period, if such Member fails to promptly commence substantial efforts to cure such default or to prosecute such curative efforts to completion with continuity and diligence).

*Default Rate* – a rate per annum equal to the lesser of (a) 10.0%, and (b) the maximum rate permitted by Law.

*Director* – a member of the Company's Board of Directors.

*Dispose, Disposing* or *Disposition* – with respect to any asset (including Membership Rights or any portion thereof, including an Interest), a sale, assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by operation of Law, including the following: (a) in the case of an asset owned by a natural person, a transfer of such asset upon the death of its owner, whether by will, intestate succession or otherwise; (b) in the case of an asset owned by an Entity, (i) a merger or consolidation of such Entity, (ii) a conversion of such Entity into another type of Entity, or (iii) a distribution of such asset in connection with the dissolution, liquidation, winding-up or termination of such Entity (unless, in the case of dissolution, such Entity's business is continued without the commencement of liquidation or winding-up); and (c) a disposition in connection with, or in lieu of, a foreclosure of an Encumbrance; but such terms shall not include the creation of an Encumbrance.

*Dispute* – Section 13.01(a).

*Disputing Party* – Section 13.01(a).

*Dissolution Event* – Section 14.01(a).

*Divorce* – the establishment of a Spouse's Fraction as a result of the divorce or other termination of the marital relationship of any Member (other than by death), or upon the partition of community of property or other Disposition of property between a Member and such Member's spouse.

5

**EXHIBIT 1**

*Encumber, Encumbering,* or *Encumbrance* – the creation of a security interest, lien, pledge, mortgage or other encumbrance, whether such encumbrance be voluntary, involuntary or by operation of Law.

*Expel, Expelled* or *Expulsion* – the expulsion or removal of a Member from the Company as a member.

*Including* – "including, without limitation,".

*Interest* – a Person's share of the income, gain, loss, deduction and credits of, and the right to receive distributions from, the Company.

*Law* – any applicable constitutional provision, statute, act, code (including the Code), law, regulation, rule, ordinance, order, decree, ruling, proclamation, resolution, judgment, decision, declaration, or interpretative or advisory opinion or letter of a governmental authority.

*Liquidation Sharing Ratio* – Section 14.02(d).

*Manager* – Section 8.01.

*Member Nonrecourse Deductions* – the meaning assigned to that term in Treasury Regulation Section 1.704-2(i).

*Member Nonrecourse Debt* – the meaning assigned to that term in Treasury Regulation Section 1.704-2(b)(4).

*Member Nonrecourse Minimum Gain* – the meaning assigned to that term in Treasury Regulation Section 1.704-2(i)(2).

*Membership Rights* – with respect to any Member, (a) that Member's status as a Member; (b) that Member's Interest; (c) all other rights, benefits and privileges enjoyed by that Member (under the Act, the Articles, this Agreement or otherwise) in its capacity as a Member, including that Member's rights to vote, consent and approve and otherwise to participate in the management of the Company; and (d) all obligations, duties and liabilities imposed on that Member (under the Act, the Articles, this Agreement or otherwise) in its capacity as a Member, including any obligations to make Capital Contributions.

*Minimum Gain* – the meaning assigned to that term in Treasury Regulation Section 1.704-2(d).

*Modified 752 Share of Recourse Debt* – of any Member, as of any date, the aggregate amount of economic risk of loss that such Member and all Related Persons to such Member are treated as bearing with respect to such liability pursuant to Treasury

6

**EXHIBIT 1**

Regulation Section 1.752-2 with respect to any Company liability (or portion thereof) that is neither a Nonrecourse Liability nor a Company liability that is treated as a "member nonrecourse debt" under Treasury Regulation Section 1.704-2(b)(4) (determined, as of the date in question, by assuming, for purposes of Treasury Regulation Section 1.752-2, that the Company constructively liquidates on such date (within the meaning of Treasury Regulation Section 1.752-2) except that all Company properties shall be deemed thereunder to be transferred in fully taxable exchanges for an aggregate amount of cash consideration equal to their respective book values and such consideration shall be deemed thereunder to be used, in the appropriate order of priority, in full or partial satisfaction of all Company liabilities).

*Net Agreed Value* – (a) in the case of any property contributed to the Company, the Book Value of the Company's property reduced by any indebtedness either assumed by the Company upon the contribution of the property or to which such property is subject when contributed; and (b) in the case of any property distributed to a Member, the Book Value of such property reduced by any indebtedness either assumed by such Member upon such distribution or to which such property is subject at the time of distribution.

*Net Capital Proceeds* – the proceeds received by the Company in connection with a Capital Transaction after the payment of costs and expenses incurred by the Company in connection with such Capital Transaction, including brokers' commissions, loan fees, loan payments, other closing costs and the cost of any alteration, improvement, restoration or repair of any Company property necessitated by or incurred in connection with such Capital Transaction and, if the Capital Transaction is a financing or refinancing, after the payment of any Company indebtedness that is repaid in connection with such financing or refinancing.

*Net Cash Flow* – all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, and capital improvements. Net Cash Flow shall not include proceeds or costs included in the determination of Net Capital Proceeds but shall be increased by the reduction of any reserve previously established.

*Nonrecourse Deductions* – the meaning assigned that term in Treasury Regulation Section 1.704-2(b)(1).

*Nonrecourse Liability* – the meaning assigned that term in Treasury Regulation Section 1.704-2(d).

*Officer* – any Person appointed as an officer of the Company, but such term does not include any Person who has ceased to be an officer of the Company.

7

**EXHIBIT 1**

*Person* – the meaning assigned that term in Article 1.02(A)(4) of the Act and also includes a governmental authority and any other entity.

*Proceeding* – Section 10.01.

*Profit* and *Loss* – For each fiscal year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income (not including income allocated pursuant to Section 5) or loss (not including loss or deduction allocated pursuant to Section 5) determined in accordance with Code Section 703(a), with the following adjustments:

(a)     all items of income, gain, loss and deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(b)     any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(c)     any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(d)     gain or loss resulting from any disposition of Company property shall be computed by reference to the Book Value of the property;

(e)     in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account Book Depreciation; and

(f)     if the Book Value of an asset of the Company is adjusted pursuant to Section 8.06, any increase or decrease in the Book Value of the asset as a result of the adjustment shall be treated as gain or loss, respectively, from the disposition of the asset and shall be taken into account in computing Profits or Losses.

*Related Person* – with respect to any Member, any Person who is related to such Member within the meaning of Treasury Regulation Section 1.752-4(b).

*Securities Act* – Securities Act of 1933, as amended.

*Separate Series Agreement* – Section 3.01(b)

8

**EXHIBIT 1**

*Series* – a designated Series of Members and Membership Interests established in accordance with the Texas Business Organizations Code and this Agreement having the separate rights, powers or duties with respect to assets and properties specifically identified with such Series, and/or separate business operations specifically identified with such Series, and the separate obligations, profits and losses associated with such assets, property and business operations as set forth in the Separate Series Agreement (as defined in Section 3.01(b)) for such Series. Each Series shall have a separate business purpose or objective consistent with Section 2.08 of this Agreement and, as designated in the Separate Series agreement for such series, a separate Manager or Managers.

*Series Manager* – those Members and/or other persons who are appointed in accordance with this Agreement to exercise the authority of Manager under this Agreement and the Texas Business Corporations Act with respect to a Series. One or more Series Managers will be designated in a Separate Series Agreement for each Series.

*Series Member* – those persons and/or entities who are Members of a Series established under this Agreement.

*Series Property* – all of the real, personal and intangible property owned by any Series of the Company. The Series Property initially allocated to each Series shall be listed in the Separate Series agreement for such Series.

*Sharing Ratio* – subject in each case to adjustments on account of Dispositions of Membership Rights permitted by this Agreement, (a) in the case of a Member executing this Agreement as of the date of this Agreement or a Person acquiring those Membership Rights, the percentage specified for that Member as its Sharing Ratio on the signature pages hereof, and (b) in the case of membership rights issued pursuant to Section 3.03, the Sharing Ratio established pursuant thereto.

*Tax Matters Member* – Section 11.03.

*Terminating Capital Transaction* – any Capital Transaction that is entered into in connection with or will result in the dissolution, winding up and termination of the Company.

*Treasury Regulations* – the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute proposed or final Treasury Regulations.

*Voting Ratio* – with respect to any Member, a Member's respective percentage of the total voting power of the Company that is equal to such Member's Sharing Ratio; provided however, that, if a Member shall have Disposed of all or any portion of its Interest but shall have retained its other Membership Rights, such member shall be

9

**EXHIBIT 1**

deemed, solely for purposes of determining such Member's Voting Ratio, to continue to hold the Sharing Ratio attributable to the Interest that was the subject of such Disposition

*Withdraw, Withdrawing* or *Withdrawal* – the withdrawal, resignation or retirement of a Member from the Company as a member. Such terms shall not include any Dispositions of Membership Rights (which are governed by Section 3.04), even though the Member making a Disposition may cease to be a Member as a result of such Disposition.

Other terms defined herein have the meanings so given them.

1.02   *Construction.*   Unless the context requires otherwise; (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) references to Articles and Sections refer to Articles and Sections of this Agreement; and (c) references to Exhibits are to the Exhibits attached to this Agreement, each of which is made a part hereof for all purposes.

## ARTICLE 2
## ORGANIZATION

2.01   *Formation.*   The Company has been organized as a Texas limited liability company by the filing of Certificate of Formation ("Certificate") under and pursuant to the Act and the issuance of a Certificate of Filing for the Company dated December 23, 2013 by the Secretary of State of Texas.

2.02   *Series Limited Liability Company.*   The Company shall be a Series Limited Liability Company, established and operated subject to the provisions of Subchapter M of the Texas Business Organizations Code. Accordingly:

(a)   The Operating Agreement of the Company may establish or provide for the establishment of one or more designated series of members, managers, membership interests or assets that:

(i)   Has separate rights, powers, or duties with respect to specified property or obligations of the Company or profits and losses associated with specified property or obligations; or

(ii)   Has a separate business purpose of investment objective.

(b)   A series established in accordance with Subsection (a) of this Section 2.02 may carry on any business, purpose or activity, whether or not for profit, that is not prohibited by Section 2.003 of the Texas Business Organizations Code.

10

## EXHIBIT 1

(c). Notwithstanding any provision of the Texas Business Organization Code or other provision of law, but subject to the provisions of Section 2.02(c)(ii) below:

   (i) The debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to a particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the Company generally or any other series; and

   (ii) None of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to the Company generally or any other series shall be enforceable against the assets of a particular series.

2.03    *Registered Office; Registered Principal Office; Other Offices.* The Registered Office of the Company required by the Act to be maintained in the State of Texas shall be the office identified in the Certificate and the Company shall maintain records there as required by Article 2.22 of the Act.  The Company may have such other offices as the Members may designate.

2.04    *Purposes.* The purposes of the Company are those set forth in the Certificate.

2.05    *Foreign Qualifications.* Prior to the Company's conducting business in any jurisdiction other than Texas, the Members shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Members, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.  The Members shall execute, acknowledge, swear to, and deliver all certificates and other instruments conforming with this Agreement that is necessary or appropriate to qualify, continue, and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

2.06    *Term.* The Company commenced on the date the Secretary of State of Texas issued a certificate of formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

2.07    *No State-Law Partnership.* The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member be a partner or joint venturer of any other Member, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.  The Members hereby agree and acknowledge that the Company and each separate Series may be treated as a separate partnership for federal income tax and other pertinent purposes.

**EXHIBIT 1**

2.08   *Series Creation.*   The Members hereby agree that the rights, duties and liabilities of the Members shall be as provided for in this Agreement and the Texas Business Organizations Code.   Additionally, pursuant to Chapter M of the Texas Business Organizations Code the Manager shall have authority to establish separate Series of membership interests. The number of Series and provisions applicable to each Series shall be determined by the Manager as set forth herein and in the Separate series agreements approved by the Members of each Series.   Without the need for the consent of any Person, the Manager may, from time to time, establish additional Series as the Manager may determine in its sole discretion.   As established from time to time in accordance with this Agreement, the additional Series shall have separate rights, power or duties with respect to specified business location, business purpose, property and profits and losses associated with specified business location and operations.   A Member may become a Series Member associated with one or more Series.

2.09   *Series Assets and Liabilities/Series Property.*   The assets and liabilities of each Series are separate unless otherwise indicated herein.   The Series Property, or other assets of each Series, together with all income, earnings, profits and proceeds thereof, including all proceeds derived from the business operation, or the sale, exchange or liquidation of the Series Property held by such Series, and any funds or assets derived from any reinvestment of such proceeds, shall be deemed to be Series Property, held by and belonging to such Series.   The foregoing notwithstanding, the Company may acquire in its name from time to time limited partnership interests in one or more Texas limited partnerships and such limited partnership interests (including all voting rights) shall pursuant to Section 101.003 of the BOC be held by the Company, provided that, the Company shall allocate or attribute to one or more Series the profits, losses, distributions, and allocations associated with such limited partnership interests if and when determined or received (as applicable), and such profits, losses, distributions, and allocations shall, when determined or received (as applicable), be the Series Property of such series. Each Series shall be identified by a separate Series name and shall have a corresponding series of limited liability company membership interests corresponding to and evidencing membership in such Series.   The names and addresses of each Series Member and the ownership interest in each Series shall be set forth in the Separate Series Agreement for such Series.   The Series Property belonging to a particular Series shall belong to that Series for all purposes and to no other Series, and such Series Property shall be subject only to the rights of the creditors of that Series.   The assets belonging to a particular Series shall be recorded upon the books of the Series as maintained by the Series Manger, and to the extent such Series Property is deemed to be held by the Company, it shall be held by the Company and the Manager in trust for the benefit of the Series Members.   The assets belonging to each particular Series shall be charged with the liabilities of that Series.   Except as expressly otherwise provided herein, no debt, liability or obligation of a Series shall be a debt, liability or obligation of any other Series.   The debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a Series shall be enforceable against the assets of such Series only, and not against any other assets of the Company generally or any other Series. Separate and distinct records shall be maintained for each Series, and the assets associated with any such Series shall be accounted for separately from the other assets of the Company, or any other Series of the Company.   The Manager and Members shall not commingle the assets of one Series with the assets of any other Series.   All assets, income, proceeds, payments, liabilities and other obligations that are not allocated to or

12

**EXHIBIT 1**

readily identifiable as belonging to or being attributable to a particular Series, including administrative costs and expenses of the Company as a whole, shall be allocated by the Company to the Series by the Manager in such manner as is deemed fair and equitable. Each such allocation by the Manager shall be conclusive and binding on all Members and all Series Members, for all purposes. Subject to the rights of the Manager in its discretion to allocate general and administrative liabilities, expenses, costs and charges or reserves as herein provided, the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of the Company generally or of any other Series. Any Person extending credit to, contracting with, or having any claim against any Series may look only to the assets of that Series to satisfy or enforce any debt, liability, obligation or expense incurred, contracted for otherwise existing with respect to that Series.

2.10    *Defects As to Formalities.* The failure to observe any formalities or requirements of this Agreement of the Texas Business Organizations Code shall not be grounds for imposing personal liability on the Members or Managers for liabilities of the Company or any Series of the Company.

### ARTICLE 3
### MEMBERSHIP; SERIES OF INTERESTS; SERIES COMPANIES

3.01(a) The Company is authorized to issue up to 100 shares of Membership Interests (the "Company Interests").

(b)    Additionally, pursuant to the Company's Certificate of Formation, the provisions of the Texas Business Organizations Code and the other provisions of this Agreement, the Company hereby establishes the following Series Membership Interests and series companies, each of which shall issue such Series Membership Interests as shall be authorized in their respective series operating agreements (each a "Separate Series Agreement"):

3.02    Series 100-Bellaire.    The Company hereby creates a separate Series of membership interests to be designated as "Series 100-Bellaire." The Separate Series Agreement of Series 100-Bellaire is attached to this Agreement as Schedule 3.02.    The Series Members, Series Manager, Series Property and business purpose of series 100-Bellaire are set forth in the Separate Series Agreement.

3.03    Series 101-Kingwood.    The Company hereby creates a separate Series of membership interests to be designated as "Series 101-Kingwood."    The Separate Series Agreement of Series 101-Kingwood is attached to this Agreement as Schedule 3.03.    The Series Members, Series Manager, Series Property and business purpose of Series 101-Kingwood are set forth in the Separate Series Agreement.

3.04    Series 101.1-Kingwood Asset Holdings.  The Company hereby creates a separate Series of membership interests to be designated as "Series 101.1-Kingwood Asset Holdings."

13

**EXHIBIT 1**

The Separate Series Agreement of Series 101.1-Kingwood Asset Holdings is attached to this Agreement as Schedule 3.04. The Series Members, Series Manager, Series Property and business purpose of Series 101.1-Kingwood Asset Holdings are set forth in the Separate Series Agreement.

3.05   Series 102-Baytown.   The Company hereby creates a separate Series of membership interests to be designated as "Series 102-Baytown." The Separate Series Agreement of Series 102-Baytown is attached to this Agreement as Schedule 3.05. The Series Members, Series Manager, Series Property and business purpose of Series 102-Baytown are set forth in the Separate Series Agreement.

3.06   Series 102.1-Baytown Asset Holdings. The Company hereby creates a separate Series of membership interests to be designated as "Series 102.1-Baytown Asset Holdings." The Separate Series Agreement of Series 102.1-Baytown Asset Holdings is attached to this Agreement as Schedule 3.06. The Series Members, Series Manager, Series Property and business purpose of Series 102.1-Baytown Asset Holdings are set forth in the Separate Series Agreement.

3.07   Series 103-Pasadena.   The Company hereby creates a separate Series of membership interests to be designated as "Series 103-Pasadena." The Separate Series Agreement of Series 103-Pasadena is attached to this Agreement as Schedule 3.07. The Series Members, Series Manager, Series Property and business purpose of Series 103-Pasadena are set forth in the Separate Series Agreement.

3.08   Series 104-Pearland.   The Company hereby creates a separate Series of membership interests to be designated as "Series 104-Pearland." The Separate Series Agreement of Series 104-Pearland is attached to this Agreement as Schedule 3.08. The Series Members, Series Manager, Series Property and business purpose of Series 104-Pearland are set forth in the Separate Series Agreement.

3.09   Series 104.1-Pearland Asset Holdings. The Company hereby creates a separate Series of membership interests to be designated as "Series 104.1-Pearland Asset Holdings." The Separate Series Agreement of Series 104.1-Pearland Asset Holdings is attached to this Agreement as Schedule 3.09. The Series Members, Series Manager, Series Property and business purpose of Series 104.1-Pearland Asset Holdings are set forth in the Separate Series Agreement.

3.10 Series 105-Mueller. The Company hereby creates a separate Series of membership interests to be designated as "Series 105-Mueller." The Separate Series Agreement of Series 105-Mueller is attached to this Agreement as Schedule 3.10. The Series Members, Series Manager, Series Property and business purpose of Series 105-Mueller are set forth in the Separate Series Agreement.

3.11   Series 106-Beaumont.   The Company hereby creates a separate Series of membership interests to be designated as "Series 106-Beaumont." The Separate Series

14

**EXHIBIT 1**

Agreement of Series 106-Beaumont is attached to this Agreement as Schedule 3.11. The Series Members, Series Manager, Series Property and business purpose of Series 106-Beaumont are set forth in the Separate Series Agreement.

3.12   Series 106.1-Beaumont Asset Holdings. The Company hereby creates a separate Series of membership interests to be designated as "Series 106.1-Beaumont Asset Holdings." The Separate Series Agreement of Series 106.1-Beaumont Asset Holdings is attached to this Agreement as Schedule 3.12.   The Series Members, Series Manager, Series Property and business purpose of Series 106.1-Beaumont Asset Holdings are set forth in the Separate Series Agreement.

3.13   Series 107-Lakeline. The Company hereby creates a separate Series of membership interests to be designated as "Series 107-Lakeline." The Separate Series Agreement of Series 107-Lakeline is attached to this Agreement as Schedule 3.13. The Series Members, Series Manager, Series Property and business purpose of Series 107-Lakeline are set forth in the Separate Series Agreement.

3.14   *Representations and Warranties.* Each of the Members, and each of the Series Members who become parties hereto and to the Separate Series Agreements, hereby represent and warrant to the Company as follows:

(a)   that Member has duly executed and delivered this Agreement, and it constitutes the legal, valid and binding obligation of that Member enforceable against it in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar laws of general application and by the effect of general principles of equity that permit the exercise of judicial discretion, regardless of whether considered at law or in equity, and except that any indemnification provisions may be limited by applicable securities laws and public policy);

(b)   that Member's authorization, execution, delivery, and performance of this Agreement do not and will not (i) conflict with, or result in a breach, default or violation of, (A) any contract or agreement to which that Member is a party or is otherwise subject, or (B) any Law, order, judgment, decree, writ, injunction or arbitral award to which that Member is subject; or (ii) require any consent, approval or authorization from, filing or registration with, or notice to, any governmental authority or other Person, unless such requirement has already been satisfied;

(c)   that Member is acquiring his or her Membership Rights for investment, solely for the Member's own beneficial account and not with a view to or any present intention or directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution or otherwise Disposing of all or a portion of its Membership Rights; and such Member acknowledges that the Membership Rights have not been registered under

15

**EXHIBIT 1**

the Securities Act or any other applicable federal or state securities laws, and that the Company has no intention, and shall not have any obligation, to register or to obtain an exemption from registration for the Membership Rights or to take action so as to permit sales pursuant to the Securities Act (including Rules 144 and 144A thereunder).

(d)     that, with regard to each Member that is a partnership, corporation, limited liability company, trust or other form of entity (an "Entity Member") the execution and delivery of this Agreement by the Entity Member's undersigned representative has been duly authorized by all necessary corporate action.

3.15     *Creation of Additional Membership Rights.* Additional Membership Rights may be created and issued to existing Members or to other Persons, and such other Persons may be admitted to the Company as Members, at the direction of the Board of Directors, on such terms and conditions as the Board of Directors may determine at the time of admission. The terms of admission or issuance must specify the Sharing Ratios applicable thereto and may provide for the creation of different classes or groups of members and having different rights, powers, and duties. The Members may reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such amendment need be executed only by the Members. Any such admission is effective only after the new Member has executed and delivered to the Members an instrument containing the notice address of the new Member, the Assignee's ratification of this Agreement and agreement to be bound by it, and its confirmation that the representations and warranties in Section 3.02 are true and correct with respect to it.

3.16     *Creation of Additional Series.* As set forth in Section 2. 08 of this Agreement and the terms of the Texas Business Organizations Code, the Manager of the Company shall have the right to create additional Series of membership and  to establish the rights, obligations, terms of membership, designations and Series Property of each such Series of membership interests and to designate one or more Series Managers for such Series.

3.17     *Withdrawal.* A Member does not have the right to Withdraw; provided, however, a Member shall have the power to withdraw at any time in violation of this Agreement. If a Member exercises such power in violation of this Agreement, such Withdrawing Member shall be liable to the Company and the other Members for all monetary damages suffered by them as a result of such Withdrawal. In no event shall the Company or any Member have the right, through specific performance or otherwise, to prevent a Member from Withdrawing in violation of this Agreement.

3.18     *Information.*

(a)     In addition to the other rights specifically set forth in this Agreement, each Member and each Assignee is entitled to all information to which that Member or Assignee is entitled to have access pursuant to the BOC, under

16

**EXHIBIT 1**

the circumstances and subject to the conditions therein stated. The Members (on behalf of themselves and their Assignees) agree, however, that the Members may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members or Assignees, and that it is not just or reasonable for those Members or Assignees (or representatives thereof) to examine or copy that information. An Assignee shall not have any of the rights to require information or account of transactions of the Company or to make inspection of the books and records of the Company, except to the extent such rights are also conferred on Assignees pursuant to the BOC.

(b)     The Members (on behalf of themselves and their Assignees) acknowledge that they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or Persons with which it does business. Each Member and Assignee shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member, except for disclosures (i) compelled by Law (but the Member or Assignee must notify the Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisers or representatives of the Member or Assignee, but only if the recipients have agreed to be bound by the provisions of this Section 3.05(b), or (iii) of information that a Member or Assignee also has received from a source independent of the Company that the Member or Assignee reasonably believes obtained that information without breach of any obligation of confidentiality. The Members (on behalf of themselves and their Assignees) agree that breach of the provisions of this Section 3.05(b) may cause irreparable injury to the Company for which monetary damages (or other remedy at law) are inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member or Assignee to comply with such provisions, (ii) the uniqueness of the Company business and the confidential nature of the information described in this Section 3.05(b). Accordingly, the Members (on behalf of themselves and their Assignees) agree that the provisions of this Section 3.05(b) may be enforced by specific performance.

(c)     Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

17

**EXHIBIT 1**

3.19   *Liability to Third Parties.*   No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.20   *Spouses of Members.*   Spouses of the Members do not become Members as a result of such marital relationship.

### ARTICLE 4
### MEMBERSHIP INTERESTS

4.01   *Capital Contributions in Exchange for Interests in the Company.*   Initially, Persons making (or agreeing to make) Capital Contributions to the Company shall, upon the execution of this Agreement by such Persons and the receipt by the Company of said Capital Contributions, become Members of the Company with the Membership Rights provided for in this Agreement.

4.02   *Certificates Representing Membership Interests.*   The Manager shall have the right to issue certificates reflecting the Membership Interests.

### ARTICLE 5
### RIGHTS OF MEMBERSHIP INTERESTS

5.01   *Rights of Membership Interests*

(a)   *Voting.*   The Members owning Membership Interests shall have proportionate voting rights of the Company with regard to any matter permitted to be voted on by Law or under the terms of this Agreement, each Member's Voting Ratio to be identical to such Member's Sharing Ratio.

(b)   *Distributions.*   Distributions from the Net Cash Flow of the Company or Net Proceeds of any Refinancing may be declared and paid to holders of Membership Interests to the extent that funds are available therefore.

(c)   *Series Limited Liability Companies.*   The rights, designations and privileges of the Membership Interests of the Series Limited Liability Companies shall be established by the Manager and shall be set forth in the Separate Series Agreement of each such company.

### ARTICLE 6
### CAPITAL CONTRIBUTIONS

6.01   *Initial Contributions.*   Contemporaneously with the execution by such Member of this Agreement, the Company has received initial Capital Contributions which, in the aggregate, shall not exceed $1,000.00 (One Thousand Dollars).

**EXHIBIT 1**

6.02    *Capital Accounts.*   A Capital Account shall be established and maintained for each Member.

### ARTICLE 7
### ALLOCATIONS AND DISTRIBUTIONS

7.01    *Distributions on Dissolution and Winding Up.*   Upon the dissolution and winding up of the Company, all available proceeds distributable to the Members as determined under Section 15.02 shall be distributed to all Members.

7.02    *Allocations of Profit and Loss.*   Profit and Loss of the Company shall be allocated as follows:

    (a)    Loss shall be allocated to the Members in their Sharing Ratios.

    (b)    Profit shall be allocated to the Members in their Sharing Ratios.

7.03    *Allocation of Net Gains or Net Losses from the Dissolution and Winding Up of the Company.*

    (a)    *Net Gains.*   Net gain resulting from a sale of the Company's property upon the dissolution and winding up of the Company shall be allocated to the Members in their Respective Liquidation Sharing Ratios.

    (b)    *Net Loss.*   After adjusting the Capital Accounts for distributions and allocations, net loss resulting from a sale of the Company's assets upon the dissolution and winding up of the company shall be allocated to the Members in their respective Liquidation Sharing Ratios.

7.04    *Adjustment of Book Value.*   Book Value with respect to any asset of the Company for any purpose shall be the asset's adjusted tax basis for federal income tax purposes. The Book Value of each asset will be increased or decreased to reflect any adjustment to the adjusted basis of the asset under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Treasury Regulation Section 1.704-1(b)(2)(iv)(m). Book Value will be adjusted by Book Depreciation, and gain or loss on a disposition of any asset shall be determined by reference to such assets Book Value as adjusted herein. The determination of the fair market value of property as required under this Section 7.04 shall be determined by the Members using any reasonable method of valuation.

7.05    *Tax Allocations.*

    (a)    Except as otherwise provided in this Section 7.05, each item of income, gain, loss, deduction and credit determined for federal income tax purposes shall be allocated among the Members in the same manner as each correlative item of income, gain, loss, deduction and credit is

19

**EXHIBIT 1**

allocated to the Members for purposes of maintaining their respective Capital Accounts.

(b)    Under Code Section 704(c) and Treasury Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any asset contributed to the capital of the Company, solely for federal income tax purposes, shall be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset for federal income tax purposes and the initial Book Value. If the Book Value of any asset is adjusted under Section 7.04, subsequent allocations of income, gain, loss and deduction, solely for federal income tax purposes, will be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset and its Book Value as adjusted in the manner required under Treasury Regulation Section 1.704-3(a)(6). The allocations required by this Section 7.05 shall be made collectively by the Members.

7.06   *Stop Loss.*  Notwithstanding any other provision hereof to the contrary, no Loss (or item of loss or deduction) of the Company shall be allocated to a Member if such allocation would result in a deficit balance in such Member's Adjusted Capital Account. Such Loss (or item of loss or deduction) shall be allocated among the Members whose Adjusted Capital Account balances are positive in proportion to such positive balances to the extent necessary to reduce the balances of such other Member's positive Adjusted Capital Accounts balances to zero, it being the intention of the Members that no Member's positive Adjusted Capital Account balance shall fall below zero while any other Member's positive Adjusted Capital Account balance has a positive balance.

7.07   *Nonrecourse Deductions.*  All Nonrecourse Deductions shall be allocated among the Members in their Sharing Ratios.

## ARTICLE 8
## MANAGEMENT

8.01   *Management by Manager.*  Day to day management of the Company is reserved to a Manager. The Company will enter into a written Management Agreement subject to the approval of the Members. The operations of the Company will be conducted by the Manager in accordance with the Management and Administrative Services Agreement between the Company and the Manager, and the Manager's salary, if any, shall be set by the Members. The initial Manager will be Neighbors Health System, Inc. The Manager shall have the exclusive right and power to manage, operate and control the general business and operations of the Company which is not attributable to the business of a particular Series, provided that the separate Series Managers of each Series, as designated in the Separate Series Agreement for such Series, shall have the right and power to manage, operate and control the business of such Series of the Company and to do all things and make all decisions necessary or appropriate to carry on the business and affairs of the Series of the Company.

20

**EXHIBIT 1**

## ARTICLE 9
## RESTRICTIVE COVENANTS

9.01   *Restrictive Covenants.*

    (a)    Each Member agrees that, for the time during which the Member is a Member of the Company and for a period of twenty-four (24) months thereafter (the "Restricted Period"), the Member shall not participate as a manager, medical director or owner, in any company or practice group that provides emergency medicine services at an "Excluded Location" (as defined below). For purposes of this Agreement, the term "Excluded Location" means any free standing emergency medical facility located within twenty-five (25) miles in any direction of any emergency department operated or managed by the Company or any affiliate of the Manager.

    (b)    Each Member agrees that such Member shall not disclose to any Person any "Confidential Information" (as defined below) of the Company except upon the Company's advance written consent. For purposes of this Agreement, Confidential Information means any information intended by the Manager to remain confidential relating to the Company's professional staff, business plans, facilities, equipment, financial results, assets, liabilities, business plans, practice management plans, agreements and business operations.

    (c)    Each Member agrees that, during the Restricted Period, to refrain from soliciting any officer, director, employee, contractor, manager, patient or other person affiliated with or representing the Company or the Manager to terminate or modify their respective existing business/medical relationships with the Company or the Manager.

9.02   *Series Members.*   The restrictive covenants, if any, binding upon the Series Members of any Series Limited Liability Company established by the Company, shall be set forth in the Separate Series Agreement of such Series Limited Liability Company.

## ARTICLE 10
## INDEMNIFICATION

10.01   *Right to Indemnification.*   Subject to the limitations and conditions as provided in this Article 10, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Member or Manager of the Company shall be indemnified by the Company to the fullest

21

**EXHIBIT 1**

extent permitted by the BOC, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the company to provide broader indemnification rights than said Law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 10 shall continue as to a person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 10 shall be deemed contract rights, and no amendment, modification or repeal of this Article 10 shall have the effect limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article 10 could involve indemnification for negligence or under theories of strict liability.

10.02 *Indemnification of Officers, Employees and Agents.* The Company may indemnify and advance expenses to an Officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to the Members under this Article 10.

10.03 *Appearance as a Witness.* Notwithstanding any other provision of this Article 10, the Company may pay or reimburse expenses incurred by any of the Members or the Manager in connection with their appearance as a witness or other participation in a Proceeding at a time when it is not a named defendant or respondent in the Proceeding.

10.04 *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Article 10 shall not be exclusive of any other right which the Manager, Members or other Person indemnified pursuant to Section 10.02 may have or hereafter acquire under any Law, provision of the Certificate or this Agreement, or vote of Members.

10.05 *Insurance.* The Company may purchase and maintain insurance, at its expense, to protect itself and any Person who is or was serving as one of the Members, Manager, Officer, employee or agent of the Company or is or was serving at the request of the Company as a member, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic  limited liability company, Company, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 10.

ARTICLE 11
TAXES

11.01 *Tax Returns.* The Company shall prepare and timely file all federal, state and local tax returns required to be filed by the Company. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is

22

**EXHIBIT 1**

necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a copy of each such return to the Members on or before ten (10) business days prior to the due date of any such return, together with such additional information as may be required by the Members in order for the Members to file their individual returns reflecting the Company's operations. The Company shall bear the costs of the preparation and filing of its returns.

11.02 *Tax Elections.*   The Company shall make the following elections on the appropriate tax returns:

(a)     to adopt the calendar year as the Company's fiscal year;

(b)     to adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method;

(c)     if a distribution of the Company's property as described in Code Section 734 occurs or upon a transfer of Membership Rights as described in Code Section 743 occurs, on request by notice from any Member, to elect, pursuant to Code Section 754, to adjust the basis of Company's properties;

(d)     to elect to amortize the organizational expenses of the Company ratably over a period of 60 months as permitted by Section 709(b) of the Code; and

(e)     any other election the Members may deem appropriate and in the best interests of the Members.

Neither the Company nor the Members or any other Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement shall be construed to sanction or approve such an election.

11.03 *Tax Matters Member.*

(a)     The Manager shall serve as the "tax matters member" (hereinafter referred to as the "Tax Matters Member") of the Company pursuant to Section 6231(a)(7) of the Code. The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Section 6223 of the Code. The Tax matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity.

23

**EXHIBIT 1**

(b)   The Tax Matters Member shall take no action without the authorization of the Members, other than such action as may be required by Law. Any cost or expense incurred by the Tax Matters Member in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

(c)   The Tax Matters Member shall not enter into any extension of the period of limitations for making assessments on behalf of the Members without first obtaining the consent of the Members. The Tax Matters Member shall not bind any Member to a settlement agreement without obtaining the consent of such members. Any Member that enters into a settlement agreement with respect to any Company item (within the meaning of Code Section 6231(a)(3)) shall notify the other Members of such settlement agreement and its terms within 90 Days from the date of the settlement.

(d)   No Member shall file a request pursuant to Code Section 6227 for an administrative adjustment of Company items for any taxable year without first notifying the other Members. If the other Members consent to the requested adjustment, the Tax Matters Member shall file the request for the administrative adjustment on behalf of the Members. If such consent is not obtained within 30 Days from such notice, or within the period required to timely file the request for administrative adjustment, if shorter, any Member, including the Tax Matters Member, may file a request for administrative adjustment on its own behalf. Any Member intending to file petition under Code Sections 6226, 6228 or other Code Section with respect to any item involving the Company shall notify the other Members of such intention and the nature of the contemplated proceeding. In the case where the Tax Matters Member is the Member intending to file such petition on behalf of the Company, such notice shall be given within a reasonable period of time to allow the other Members to participate in the choosing of the forum in which such petition will be filed.

(e)   If any Member intends to file a notice of inconsistent treatment under Code Section 6222(b), such Member shall give reasonable notice under the circumstances to the other Members of such intent and the manner in which the Members' intended treatment of an item is (or may be) inconsistent with the treatment of that item by the other Members.

11.04   *Series Limited Liability Companies.* The Series Manager of each Series Limited Liability Company established by the Company under the terms of this Agreement shall administer the tax compliance and return programs of the Series Limited Company.

## ARTICLE 12
### BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

24

**EXHIBIT 1**

12.01  *Maintenance of Books.*  The Manager shall keep or cause to be kept at the principal office of the Company complete and accurate books and records of the Company, supporting documentation of the transactions with respect to the conduct of the Company's business and minutes of the proceedings of its Members.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company; a copy of the Articles and this Agreement and all amendments thereto; a current list of the names and last known business, residence, or mailing addresses of all Members; each Member's Interest; and the Company's federal, state, and local tax returns.

12.02  *Accounts.*  The Manager shall establish one or more separate bank and investment accounts for the Company, which shall be maintained in the Company's name with financial institutions and firms that the Manager determines.  The Manager may not commingle the Company's funds with the funds of any Member; provided, however, that the Company funds may be invested in a manner the same as or similar to any Member's investment of its own funds.

12.03  *Series Limited Liability Companies.*  The Series Manager of each Series Limited Liability Company shall be responsible for the creation and maintenance of books of account for such Series Limited Liability Company that shall be limited to the transactions of the Series Limited Liability Company.

### ARTICLE 13
### ARBITRATION

13.01  *Submission of Disputes to Arbitration.*

(a)   This Article 13 shall apply to any of the following types of disputes (each a "Dispute"):

(i)   any dispute as to any accounting or tax issue under this Agreement; or

(ii)   except for disputes described in the foregoing paragraph (A) any dispute regarding the construction, interpretation, performance, validity or enforceability of any provision of the Certificate or this Agreement, or whether any Person is in compliance with, or breach of, any provisions of the Articles or this Agreement, or (B) any other dispute of a legal nature arising under the Certificate or this Agreement, it being intended that this Section 13.01(a)(ii) shall not include any disputes of a purely business nature, such as disputes as to business strategy.

With respect to a particular Dispute, each Person that is a party to such Dispute (whether a Member or other Person) is referred to herein as a "Disputing Party."

25

**EXHIBIT 1**

(b)     If the disputing Parties are unable to resolve a dispute within a reasonable period of time after the commencement of the Dispute, any Disputing Party may submit such Dispute to binding arbitration under this Article 13 by notifying the other Disputing Parties (an "Arbitration Notice"). Arbitration pursuant to this Article 13 shall be the exclusive method of resolving Disputes other than through agreement of the Disputing Parties.

13.02   *Conduct of Arbitration.*  Any arbitration conducted hereunder shall be conducted before a sole arbitrator selected by the agreement of the Disputing Parties.  Absent such agreement, the Arbitrator shall be designated by the American Arbitration Association.  The Arbitrator shall expeditiously (and, if possible, within 60 Days after the Arbitrator's selection) hear and decide all matters concerning the Dispute.  Any arbitration hearing shall be held in the City of Houston, Texas.  The Arbitration shall be conducted in accordance with the then-current Commercial Arbitration Rules of the American Arbitration Association (excluding rules governing the payment of arbitration, administrative or other fees or expenses to the Arbitrator or such Association), to the extent that such Rules do not conflict with the terms of this Agreement. Except as expressly provided to the contrary in this Agreement, the Arbitrator shall have the power (a) to gather such materials, information, testimony and evidence as it deems relevant to the dispute before it (and each Member will provide such materials, information, testimony and evidence requested by the Arbitrator, except to the extent any information so requested is proprietary, subject to a third-party confidentiality restriction or to an attorney-client or other privilege) and (b) to grant injunctive relief and enforce specific performance.  The responsibility for paying the costs and expenses of the arbitration, including compensation to the Arbitrator, shall be allocated among the Disputing Parties in a manner determined by the Arbitrator to be fair and reasonable under the circumstances.  Each Disputing Party shall be responsible for the fees and expenses of its respective counsel, consultants and witnesses, unless the Arbitrator determines that compelling reasons exist for allocating all or a portion of such costs and expenses to one or more other Disputing Parties.

## ARTICLE 14
## DISSOLUTION, WINDING-UP AND TERMINATION

14.01   *Dissolution.*

(a)     Subject to Section 14.01(b), the Company shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "Dissolution Event"):

(i)     the expiration of the period fixed for the duration of the Company in the Certificate;

(ii)    the death, Expulsion, Withdrawal, dissolution or Bankruptcy of any Member, or the occurrence of any other event that terminates the continued membership of any Member in the Company;

26

**EXHIBIT 1**

(iii)     entry of a decree of judicial dissolution of the Company; and

(iv)    the affirmative vote of a Majority in Interest of the Members.

(b)    If a Dissolution Event described in subparagraphs (i), (ii) or (iv) of Section 14.01(a) shall occur and there shall be at least one other Member remaining, the Company shall not be dissolved, and the business of the Company shall be continued, if a Majority in Interest (calculated without reference to any Member with respect to whom a Dissolution Event described in subparagraph (iii) has occurred) so agree within 90 Days of the occurrence of such Dissolution Event (such agreement is referred to herein as a "Continuation Election").

14.02  *Winding-Up and Termination.*  On the occurrence of a Dissolution Event, unless a Continuation Election is made, the Manager shall act as liquidator, or in the absence of a Manager, the Members may appoint one or more Members as liquidator; provided, however that (i) no Member with respect to whom a Dissolution Event described in subparagraph (iii) of Section 14.01(a) has occurred shall serve as a liquidator, either in its capacity as a Member.  The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of winding up shall be borne as a Company expense.  Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of all of the Members.  The steps to be accomplished by the liquidator are as follows:

(a)    as promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable;

(b)    the liquidator shall cause notice to be mailed to each known creditor of and claimant against the Company;

(c)    the liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)    all remaining assets of the Company shall be distributed to the Members as follows:

(i)    the liquidator may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be

27

**EXHIBIT 1**

computed and allocated to the Capital Accounts of the Members in accordance with the provisions of Article 7;

(ii)    with respect to all Company property that has not been sold the fair market value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

(iii)   Company property, including the proceeds of accounts receivable, shall be distributed among the Members in accordance with their respective Liquidation Sharing Ratios (as defined below) and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 Days after the date of the liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 14.02. The distribution of cash and/or property to a Member in accordance with the provisions of this Section 14.02 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Rights and all the Company's property and constitutes a compromise to which all Members have consented. To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

14.03   *Deficit Capital Accounts.* No Member will be required to pay to the Company, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

14.04   *Articles of Dissolution.* On completion of the distribution of Company assets as provided herein, the Members (or such other Person or Persons as the BOC may require or permit) shall file Articles of Dissolution with the Secretary of State of Texas, cancel any other filings made pursuant to Section 2.05, and take such other actions as may be necessary to terminate the existence of the Company. Upon the issuance of a certificate of dissolution by the Secretary of State of Texas, the existence of the Company shall cease, except as may be otherwise provided by the BOC or other applicable Law.

28

**EXHIBIT 1**

## ARTICLE 15
## GENERAL PROVISIONS

15.01   *Offset.*  Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

15.02   *Notices.*  Except as expressly set forth to the contrary in this Agreement; all notices, requests or consents provided for or permitted to be given hereunder must be in writing and must be delivered to the recipient in person, by courier or mail or by facsimile, telegram, telex, cablegram or similar transmission; and a notice, request or consent given under this Agreement is effective on receipt by the Person to receive it.  Whenever any notice is required to be given by Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

15.03   *Entire Agreement; Supersedure.*   This Agreement constitutes the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

15.04   *Effect of Waiver or Consent.*  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

15.05   *Amendment or Restatement.* This Agreement shall be amended or restated only by a written instrument adopted and executed by the Members.

15.06   *Binding Effect.*   Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

15.07   *Governing Law; Severability.*  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION.

15.08   *Further Assurances.*  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

## EXHIBIT 1

15.09 *Indemnification.* To the fullest extent permitted by Law, each Member shall indemnify the Company and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

15.10 *Counterparts.* This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

*[Signature Pages to Follow]*

**EXHIBIT 1**

DocuSign Envelope ID: ██████████████

IN WITNESS WHEREOF, the undersigned Members of NHS EMERGENCY CENTERS, LLC has executed the Operating Agreement, intending thereby to be bound in all respects by its terms, as of the effective date first set forth above.

NEIGHBORS HEALTH SYSTEM, INC., Sole Member

By: _Setul Patel_ ██████████

Setul Patel, President and CEO

31

**EXHIBIT 1**