# SERIES AGREEMENT

This Series Agreement, dated to be effective as of July 21, 2014, is adopted, executed and agreed to, for good and valuable consideration, by the undersigned owners and holders of Membership Interests issued by NHS Emergency Centers, LLC (each a "Member"), under Series 110 - Crosby (the "Series").

1. ***Acknowledgments.***

    A.    The Series has been established to operate a free standing emergency center known as NEC Crosby Emergency Center, LP (the "Series Business.")

    B.    "The Class A Member" is Neighbors Investment Group, LLC. There shall be a total of 3900 shares of Class A Interests. The Class A Member shall have a Sharing Ratio of 39%. The execution and delivery of this Agreement by the Class A Member has been duly authorized by all necessary entity action.

    C.    "The Class B Members" are those individuals who have executed a Series Share Purchase Agreement and the Series Acknowledgement evidencing their agreement to become a Class B Member of the Series. There shall be a total of 6000 shares of Class B Interests. The Class B Members shall have an aggregate Sharing Ratio of 60%.

    D.    The Class A Member and Class B Members are collectively referred to as "the Members" and each may be referred to from time to time as a "Member."

    E.    The Members hereby agree to adopt and to be bound by the terms of this Series Agreement for the Series.

    F.    The Members hereby consent to and approve the terms of the Operating Agreement of NHS Emergency Centers, LLC.

    G.    The Members hereby consent to and approve the terms of the Management and Administrative Services Agreement between Neighbors Health System, Inc. and the Series.

    H.    NHS Emergency Centers, LLC and/or the Series may from time to time enter into credit, guaranty or similar loan agreements with one or more commercial lenders (collectively the "Loan Agreements"). The Members hereby consent to the imposition of liens, security interests, mortgages or other encumbrances upon the Series Property (as defined in Section 5 of this Agreement) pursuant to the terms of the Loan Agreements. The Members hereby waive the right to challenge the making or enforceability of any guaranty by NHS Emergency Centers, LLC or by

the Series on the grounds that such guaranty cannot reasonably be expected to benefit NHS Emergency Centers, LLC or the Series.

2.    *The Series Membership Interests (the "Interests").*

A.    *Rights, Entitlements, and Designations.*

(a)    *Class A Interests.*

(i)    The Class A Interests of the Series shall be certificated and shall be issued to the Class A Member.

(ii)    The Class A Interests of the Series carry voting rights.  Each share of Class A Interests carries the right to cast one (1) vote on any matter submitted to the Members for their action or approval.

(iii)    The Class A Interests shall be equal, one to the other, and to the Class B Interests, in priority and seniority.  Upon a liquidation or dissolution of the Series,  the Class A Members shall participate in distributions of the Series Liquidation/Dissolution Proceeds (as defined in Section 8(B) below), each in accordance with such Member's Sharing Ratio.

(iv)    The Class A Members of this Series shall not be individually liable for any debt or obligation of the Series by virtue of the Members' ownership of Interests of the Series.

(v)    Neither the Series nor the Series Property shall be responsible for, liable for or obligated in any way for the liabilities and obligations of any other Series of Membership Interests established by NHS Emergency Centers, LLC.  The Series Property identified herein shall not be chargeable with any debt, obligation, mortgage or security interest relating to the assets or business activities of any other Series of Membership Interests established by NHS Emergency Centers, LLC.

(b)    *Class B Interests.*

(i)    The Class B Interests of the Series shall be certificated and shall be issued to the Class B Members.

(ii)    The Class B Interests of the Series do not carry voting rights except with regard to "Major Decisions" as defined in Section 3(A) below.

(iii)   The Class B Interests shall be equal, one to the other, and to the Class A Interests, in priority and seniority.   Upon a liquidation or dissolution of the Series,  the Class B Members shall participate in distributions of the Series Liquidation/Dissolution Proceeds (as defined in Section 8(B) below), each in accordance with such Member's Sharing Ratio.

(iv)   The Members of this Series shall not be individually liable for any debt or obligation of the Series by virtue of the Members' ownership of Interests of the Series.  The Class B Members shall be subject to the provisions of this Agreement regarding providing services to the Series Business, as indicated below.

(v)   Neither the Series nor the Series Property shall be responsible for, liable for or obligated in any way for the liabilities and obligations of any other Series of Membership Interests established by NHS Emergency Centers, LLC.  The Series Property identified herein shall not be chargeable with any debt, obligation, mortgage or security interest relating to the assets or business activities of any other Series of Membership Interests established by NHS Emergency Centers, LLC.

B.   ***Representations and Warranties.***  Each Class B Member hereby represents and warrants to the Series as follows:

(a)   that Member has duly executed the Acknowledgement to this Agreement, and it constitutes the legal, valid and binding obligation of that Member enforceable against that Member in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar laws of general application and by the effect of general principles of equity that permit the exercise of judicial discretion, regardless of whether considered at law or in equity, and except that any indemnification provisions may be limited by applicable securities laws and public policy);

(b)   that Member's authorization, execution, delivery, and performance of the Acknowledgment to this Agreement do not and will not (i) conflict with, or result in a breach, default or violation of, (A) any contract or agreement to which that Member is a party or is otherwise subject, or (B) any law, order, judgment, decree, writ, injunction or arbitral award to which that Member is subject; or (ii) require any consent, approval or authorization from filing or registration with, or notice to, any governmental  authority or other Person, unless such requirement has already been satisfied;

(c)    that Member is acquiring his or her Interests for investment, solely for the Member's own beneficial account and not with a view to or any present intention or directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution or otherwise transferring all or a portion of its Interests; and such Member acknowledges that the Interests have not been registered under the Securities Act or any other applicable federal or state securities laws, and that the Series has no intention, and shall not have any obligation, to register or to obtain an exemption from registration for the Interests or to take action so as to permit sales pursuant to the Securities Act (including Rules 144 and 144A thereunder);

C.    *Issuance of Additional Interests.*  Additional Interests may be created and issued to existing Members or to other Persons upon the approval and consent of all of the Members in accordance with the terms of Section 3(A) below, and such other Persons may be admitted to the Series as Members, at the direction of the Members on such terms and conditions as the Members may determine at the time of admission.  The terms of admission or issuance as presented to the Members for approval must specify all terms and rights applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers, and duties.  The foregoing notwithstanding, no sale of additional Class B Shares shall be authorized by the Members except under terms that provide that any Person acquiring such Class B Shares shall accept the obligations to staff shifts at the Series' facility in accordance with Section 3(C) below.  The Members may reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such amendment shall be approved and executed only by the Members.  Any such admission is effective only after the new Member has executed and delivered to the Series an instrument containing the notice address of the new Member, the new Member's ratification of this Agreement and agreement to be bound by it, and its confirmation that the representations and warranties in Section 2(B) are true and correct with respect to it.

D.    *Withdrawal.*  Withdrawal of a Member shall be governed by the provisions of Section 7(C).  Except as provided therein, Members will have no right to Withdraw.

E.    *Information.*

(a)    The Series shall be managed by the Manager with reasonable financial transparency, and the Manager shall provide to the Members information

regarding the business affairs, properties and financial results of the Series Business.

(b) If requested by a Member in writing (email notification constitutes written notice), the Manager shall send to each Member a copy of (i) a balance sheet of the Series as of the end of the most recent fiscal year, (ii) an income statement of the Series for such year, and (iii) a statement showing the revenues distributed by the Series to Members in respect of such year. Such financial statements shall be delivered by the Manager no later than thirty (30) days following the Manager's receipt of such request.

(c) The Members acknowledge that they may receive information from or regarding the Series in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Series or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Series that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member, except for disclosures (i) compelled by law (but the Member must notify the Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisers or representatives of the Member but only if the recipients have agreed to be bound by the provisions of this Section 2(E)(c), or (iii) of information that a Member also has received from a source independent of the Series that the Member  reasonably believes he or she obtained that information without breach of any obligation of confidentiality. The Members  agree that breach of the provisions of this Section 2(E)(c) may cause irreparable injury to the Series for which monetary damages (or other remedy at law) are inadequate in view of (A) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions or (B) the uniqueness of the Series Business and the confidential nature of the information described in this Section 2(E)(c). Accordingly, the Members agree that the provisions of this Section 2(E)(c) may be enforced by specific performance.

F. **Liability to Third Parties.**  No Member shall be liable for the debts, obligations or liabilities of the Series, including under a judgment decree or order of a court.

G. **Spouses of Members.**  Spouses of the Members do not become Members as a result of such marital relationship.

H.   ***Certificates and Ledger.***   The Class A Shares and Class B Shares shall be represented by share certificates that shall be issued from time to time by the Series, acting through its Manager.  The Manager shall maintain a current transfer ledger of all Share issuances and transfers.  A copy of such transfer ledger will be provided to a Member within ten (10) days of such Member's written request therefor.

I.   ***Distributions.***   Commencing no later than the end of the Series' first fiscal quarter, the Manager shall, periodically balance the Series' accounts and, in its sole discretion, distribute to the Members the amount by which cash on hand exceeds the amount necessary or appropriate to meet the current costs, expenses and liabilities of the Series (including, without limitation, a reserve for working capital and contingencies and cash sufficient to fund the Series' growth plans).  Subject to Section 9(B), all distributions shall be made to the Members pro rata in accordance with their ownership of Shares.   The Series shall not make any distribution to the Members if, immediately after giving effect to the distribution, (i) all liabilities of the Series, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Series, exceed the fair value of Series Property (except that the fair value of Series Property that is subject to a liability for which recourse of creditors is limited shall be included in the Series assets only to the extent that the fair value of that Series Property exceeds that liability), or (ii) the Series would be in default of any financial covenant binding upon the Series under any contract associated with the Series' commercial debt.

J.   ***Determination of Sharing Ratio.***

    (a)   ***Class A Members.***

        (i)   Each share of Class A Interests represents 0.01% of the aggregate interests.  Each Class A Member's Sharing Ratio is equal to the number of shares owned by such Member, multiplied times 0.01%

    (b)   ***Class B Members.***

        (i)   Each share of Class B Interests represents 0.01% of the aggregate Interests.  Each Class B Member's Sharing Ratio is equal to the number of Class B shares owned by such Member, multiplied times 0.01%

3. **Management.**

   A. **Management by Manager.** Management of the Series is reserved to a Manager. The Manager of the Series shall be Neighbors Health System, Inc. ("Neighbors"). It will require the unanimous affirmative vote of the Class A and Class B Members to authorize the following actions (each a "Major Decision"):

      (a) To authorize any distribution or dividend to any Member except in accordance with the provisions of this Agreement; or

      (b) To issue additional Shares.

   Nothing in this Section 3 shall limit the right of the Manager to take any action without the consent or vote of any Member except an action that is a Major Decision as defined above.

   B. **Meetings of Members.** The Members shall have the right to meet in person, or by teleconference, upon fifteen (15) days advance written notice to all Members with voting rights with respect to the matters to be voted on at such meeting. The foregoing notwithstanding, the Members may act in writing to authorize any action, provided that such writing is signed by Members having not less than the minimum number of votes necessary to take such action. Prompt notice of any action taken, whether at a meeting or by written consent, shall be given to all Members who were not present at the meeting or who did not sign the written consent, respectively.

   C. **Employment of Members by the Series Business.**

      (a) Each of the Class B Members has agreed to provide services to the Series Business as an independent contractor of Neighbors Physician Group, PLLC, an affiliate of the Manager, pursuant to the terms of an Independent Contractor Agreement. Each Class B Member has agreed to work clinical shift coverage at the Series Business as set forth under the terms of his or her Share Purchase Agreement. The Series Business agrees that it will provide to the Class B Members medical malpractice insurance.

      (b) Subject to their engagement with Neighbors Physician Group, PLLC, the Class B Members shall be subject to the supervision of the Chief Medical Officer of the Manager.

   D. **Provisions Relating to TRICARE.** The Members acknowledge that certain of the Members are military personnel or employees who receive health benefits, or provide services to patients who receive benefits, under the Department of Defense's TRICARE health insurance plan, and who have or may have certain

restrictive covenants applicable to their practice of medicine outside of Department of Defense authorized environments. Accordingly, the Members agree that, for so long as any Member of the Series is in the military or an employee of the Department of Defense:

(a)   The Series shall not accept TRICARE insurance, submit any billing to TRICARE or accept patients whose third party payor is TRICARE.

(b)   The Manager, its professional staffing Affiliates and the Series shall not bill TRICARE for any physician services.

E.   ***Manager Event.***  If Neighbors Health System, Inc. ceases to be the Manager of the Series, or there is a change in control of Neighbors Health System, Inc., or it sells substantially all of its assets (collectively, a "Manager Event"), it shall within ten (10) days of such Manager Event provide written notice thereof to the Class B Members. Each Class B Member will have the option, exercisable within fifteen (15) days of receipt of such notice, to require the Series to repurchase all (and not less than all) of his or her Class B Shares for their fair market value, as reasonably determined by the Manager. Any repurchase pursuant to this Section will be consummated within ten (10) days of the Series receiving written notice from the Class B Member of its intent to exercise its option hereunder.

4.   ***Business Purpose.***

The purpose of the Series is to operate a free standing emergency center.

5.   ***Series Property.***

The Series Property of the Series shall consist of the profits, losses, distributions, and other benefits received by NHS Emergency Centers, LLC from the Series Business. NHS Emergency Centers, LLC is the sole limited partner of the Series Business.

6.   ***Series Membership.***

A.   ***Ownership of the Series.***

(a)   The Class A Member as of the Effective Date is Neighbors Investment Group, LLC.

(b)   Class B Members as of the Effective Date are those individuals who have executed a Series Share Purchase Agreement and a Series Acknowledgement

B.   ***Representations and Warranties of the Class B Members (each a "Purchaser").***

(a)    Each Purchaser hereby represents and warrants to the Series as follows:

(i)    Purchaser has not relied on the Series' evaluation of the Shares and Purchaser's decision to purchase same on the terms and conditions set forth in the Share Purchase and Sale Agreement (the "Share Agreement") is not based on any representation, statement, financial statement or projection or other inducement of any nature, written or oral, whatsoever except the statements, representations and warranties made in the Share Agreement or in this Agreement.

(ii)    Purchaser is a sophisticated investor capable of evaluating the risks of the sale contemplated in the Share Agreement, the value of the Shares and the fairness of the purchase price set forth in the Share Agreement.

(iii)    Purchaser has been afforded an opportunity to meet with the Members and Manager of the Series and ask such questions and review such information contained in the books and records of the Series, as Purchaser has deemed relevant in evaluating the risks of the sale contemplated in the Share Agreement and the value of the Shares.

(iv)    Purchaser is financially able to risk the loss of the entire Purchase Price for the Shares, and could suffer such loss without suffering undue financial hardship.

(v)    Purchaser has purchased the Shares with a view toward investment and for Purchaser's own account, and not with the purpose or intent of effecting a wider distribution of the Shares.

C.    *Restrictive Covenants.*

(a)    Each Class B Member agrees that, for the time during which the Member is a Member of the Series and for a period of 24 months thereafter (the "Restricted Period"), absent the prior written consent of the Manager, the Member shall not participate as an owner or manager in any company or practice group that provides emergency medicine services at an Excluded Location (as defined below). For purposes of this Agreement, the term "Excluded Location" means any facility that is (y) licensed by the applicable Department of Health as a free standing emergency medical facility and (z) is located within twenty five (25) miles in any direction of any free standing emergency medical facility operated or managed by the

Series or any Affiliate of the Manager as of the Effective Date hereof. The foregoing restrictive covenant shall not preclude any Member from providing medical services as a contract physician at any facility provided that such Member does not have a beneficial ownership interest in such facility or provide management services to such facility.

(b)     Each Member agrees that such Member shall not disclose to any Person any Confidential Information (as defined below) of the Series except upon the Series' advance written consent.   For purposes of this Agreement, "Confidential Information" means any information intended by the Manager to remain confidential relating to the Series' professional staff, business plans, facilities, equipment, financial results, assets, liabilities, practice management plans, agreements and business operations.

(c)     Each Member agrees, during the Restricted Period, to refrain from soliciting any officer, director, employee, contractor, manager, patient or other Person affiliated with or representing the Series or the Manager to terminate or modify their respective existing business and/or medical relationships with the Series or the Manager.

(d)     With regard to an Entity Member, to the extent not specifically stated above, the Members agree that the foregoing restrictive covenants shall be performed by, and a personal obligation of, each equity owner of the Entity Member.

(e)     The Members acknowledge that the foregoing restrictive covenants are reasonable in scope and necessary for the sound administration of the Series Business.   The Members acknowledge and agree that any breach of the restrictive covenants set forth in this Section 6 would result in the irreparable injury to the Series Business, and that the Series would be entitled in such event to obtain a temporary restraining order and temporary and permanent injunctive relief to restrain further breaches of this Section 6.

7.     ***Restrictions on Transfer.***   No Member shall transfer such Member's Shares except in accordance with the terms of this Agreement, including, without limitation, the following:

A.     ***Prohibited and Permitted Transfers.***

(a)     Except as permitted by this Agreement, no Member may directly or indirectly Transfer all or part of its Shares without the prior written

consent of the Manager, and any such prohibited Transfer, if made, shall be void and without force or effect. Specifically included within the prohibition set forth in this Section 7(A) are Transfers of Interests in connection with the Divorce of a Member, which Transfers shall be null and void as against the Series and the remaining Members absent the prior consent of the Manager. Any Member who is married or in an exclusive relationship with a life partner with legally cognizable property rights shall cause his or her spouse or life partner to execute the Spousal Consent attached to the Acknowledgement of this Series Agreement.

(b)   Notwithstanding the provisions of Section 7(A)(a), the following Transfers shall be "Permitted Transfers" and shall not require the prior consent of the Manager under this Agreement, nor will they be subject to the purchase option set forth in Section 7(C):

   (i)    a Transfer to a trust solely for the benefit of one or more members of such Member's immediate family, if the Member or another Member is the trustee of the trust;

   (ii)   a Transfer to an entity if, following the Transfer, at least a majority interest in the entity is owned by the transferring Member or if the entity is Controlled by the transferring Member;

   (iii)  a Transfer to another Member; or

   (iv)   a redemption of Shares by the Series approved in accordance with the terms hereof.

(c)   In connection with any Transfer permitted under this Agreement, and any admission of an assignee as a Member, the Member making such Transfer and the assignee shall furnish the Manager with such documents regarding the Transfer as the Manager may reasonably request (in form and substance reasonably satisfactory to the Manager), including a copy of the Transfer instrument and a ratification by the assignee of this Agreement (if the assignee is to be admitted as a Member).

B.   ***Sale of Interests to Other Members Must Be Offered Pro Rata.***

(a)   No Class B Member may offer his or her Interests to any person who is not a board certified or board eligible licensed emergency physician, or a licensed physician reasonably experienced in the practice of emergency medicine.

(b)      Any Class B Member who desires to sell his or her Interest in the Series (a "Class B Selling Member") shall first offer to the other Class B Members, in writing, the right of first refusal and the opportunity to acquire such Interest on the price, terms, provisions and conditions hereafter stated in this Section 7(B).  The Class B Members receiving the notice shall have thirty (30) days following the date of receipt of the notice (which notice shall contain all terms and conditions of the proposed offer of sale) within which to exercise such right by giving written notice thereof to the Class B Selling Member.  The Class B Members can elect to purchase all or any portion of such Class B Selling Member's Interest, with each purchasing Class B Member being entitled to acquire that portion of the Class B Selling Member's Interest which the Interest of such Class B Member desiring to purchase bears to the sum of the Interests of all such other Class B Members desiring to purchase (the "ROFR Interest").  The purchase price for the ROFR Interests shall be the purchase price set forth in the Class B Selling Member's original notice of sale.  Class B Members who elect to exercise the rights provided for herein and purchase their respective ROFR Interest must provide written notice to the Selling Class B Member and all other Class B Members on or before the close of business on the thirtieth (30th) day following their receipt of the Selling Class B Member's notice of sale.  In the event that no Class B Member elects to purchase any portion of the Selling Class B Member's Interest, the Selling Class B Member shall have the right to proceed with the proposed sale to the third party, which sale must be on terms substantially the same as the terms set forth in the original notice of sale.  Any sale of an Interest to a third party must be consummated within ninety (90) days following the date on which the right of first refusal given to the other equity owners of the Class B Member expires; otherwise, a subsequent sale of such Interest may be consummated only upon compliance again with the conditions of this Section 7(B).  The sale of the ROFR Interests to the Class B Members who have exercised their rights hereunder shall close on or before the sixtieth (60th) day following the Class B Members' receipt of the original notice of sale.

(b)      Any proposed assignee of an Interest shall execute such instruments as may be deemed necessary by the Manager to confirm that any such sale or Transfer is not in violation of applicable federal and state securities laws, that the proposed new Member agrees to be bound by all the terms and provisions of this Agreement, and that such proposed new Member will pay all fees and expenses related to such Transfer.  Any Transfer of the

Interest of a Class B Member shall carry with it the obligation to perform clinical services for the Series Business as set forth herein.

C.   ***Withdrawal.***   In the event that any of the following events occur with respect to a Class B Member (a "Withdrawing Member"), the provisions of this Section 7C shall apply.  The non-withdrawing Class B Members can elect to purchase all or any portion of a Withdrawing Member's Class B Shares for the purchase price provided in Section 7(D), with each purchasing Class B Member being entitled to acquire that portion of the Withdrawing Member's Class B Shares which the Class B Shares of such Class B Member desiring to purchase bears at the time to the sum of the Class B Shares of all other Class B Members desiring to purchase.  If the Class B Member(s) do not elect to purchase all of a Withdrawing Member's Class B Shares, as the case may be, the Series shall be entitled to purchase any unpurchased Class B Shares for the purchase price provided in Section 7(D).  The events that shall constitute the involuntary withdrawal of a Class B Member are as follows:

(a)   A Member files a voluntary petition in Bankruptcy or shall be adjudicated to be Bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal Bankruptcy law or any present or future applicable state, federal or other Law relative to Bankruptcy, insolvency or other relief for debts;

(b)   Any Member shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of such Member, or of all or any substantial part of its properties or its Interest;

(c)   If a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against a Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal Bankruptcy act or any present or future applicable state, federal or other law relating to Bankruptcy, insolvency or other relief of debtors and such Member shall acquiesce in the entry thereof;

(d)   Any trustee, receiver, conservator or liquidator of such Member or of all or any substantial part of its properties or its Interest shall be appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not conservative);

(e)     If a Member makes an assignment for the benefit of creditors or takes any similar action for the protection or benefit of creditors;

(f)     Any Member shall admit in writing his or her inability to pay his or her debts as they mature or give notice to any governmental body of its insolvency or suspension of operation or initiate proceedings to dissolve or liquidate;

(g)     If a Member makes a Transfer of the Member's Interest in connection with a Divorce proceeding without the prior written consent of the Manager;

(h)     The conviction of a felony, commission of any act of moral turpitude, or license forfeiture in any state of a Member; or

(i)     The death, disability or retirement of a Member.

Except as set forth herein, a Member shall be considered to acquiesce in an order, judgment or decree if such Member does not file a petition or motion to vacate or discharge the same within twenty one (21) days after its entry.

### D.     *Purchase Price.*

(a)     In the event of a sale of Shares pursuant to Sections 7(C)(a)through 7(C)(h), the sale price shall be the book value of the Shares as reasonably determined by the Manager (the "Book Value").

(c)     In the event of an involuntary withdrawal of a Class B Member upon such Member's death, disability or retirement, the following provisions shall apply:

(i)     The Withdrawing  Member shall be entitled to retain his or her Shares provided that the Manager is able to obtain coverage of the Withdrawing Member's clinical shift obligations at the Series Business without a material increase in cost to the Series Business (as determined by the Manager at Manager's sole discretion);

(ii)     If the Manager reasonably determines that the Series cannot obtain coverage of the Withdrawing Member without incurring material additional cost, the Manager shall provide the Withdrawing Member written notice of such fact, and the Withdrawing Member shall have ninety (90) days to find a qualified licensed physician to purchase the Withdrawing Member's Class B Shares (subject to approval of the Manager).  Absent such sale, the Series shall have the right to either repurchase the Withdrawing Member's Shares at

Book Value or to waive such right and deduct the additional cost of obtaining clinical shift coverage from any distributions that would be otherwise payable to the Withdrawing Member.

F. **_Encumbrance of an Interest._** With the consent of the Manager, a Member may Encumber (and the pledgee, assignee, or secured party may foreclose on) all or any part of a Member's rights to distributions from the Series.

8. **_Termination/Dissolution._**

A. **_Dissolution._**

(a) Subject to Section 8(A)(b), the Series shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "Dissolution Event"):

(i) the death, Expulsion, Withdrawal, dissolution or Bankruptcy of any Member, or the occurrence of any other event that terminates the continued membership of any Member in the Series;

(ii) entry of a decree of judicial dissolution of the Series; and

(iii) the unanimous affirmative vote of the Members.

(b) If a Dissolution Event described in subparagraphs (i), (ii) or (iii) of Section 8(A)(a) shall occur and there shall be at least one other Member remaining, the Series shall not be dissolved, and the business of the Series shall be continued, if a Majority in Interest (calculated without reference to any Member with respect to whom a Dissolution Event described in subparagraph (iii) has occurred) so agree within ninety (90) days of the occurrence of such Dissolution Event (such agreement is referred to herein as a "Continuation Election").

B. **_Winding-Up and Termination._** On the occurrence of a Dissolution Event, unless a Continuation Election is made, the Manager shall act as liquidator, or in the absence of a Manager, the Members may appoint one or more Members as liquidator; provided, however that (i) no Member with respect to whom a Dissolution Event described in subparagraph (iii) of Section 8(A)(a) has occurred shall serve as a liquidator. The liquidator shall proceed diligently to wind up the affairs of the Series and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Series expense. Until final distribution, the liquidator shall continue to operate the Series properties with all

of the power and authority of all of the Members and Manager.  The steps to be accomplished by the liquidator are as follows:

(a)  as promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Series' assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable;

(b)  the liquidator shall cause notice to be mailed to each known creditor of and claimant against the Series;

(c)  the liquidator shall pay, satisfy or discharge from the Series' funds all of the debts, liabilities and obligations of the Series or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)  all remaining assets of the Series (the "Series Liquidation/Dissolution Proceeds") shall be distributed to the Members as follows:

(i)  the liquidator may sell any or all Series property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members in accordance with the provisions of Section 9;

(ii)  with respect to all Series property that has not been sold, the Fair Market Value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the Fair Market Value of that property on the date of distribution; and

(iii)  The Series Liquidation/Dissolution Proceeds property, including the proceeds of accounts receivable, shall be distributed among the Members in accordance with their respective Sharing Ratios and those distributions shall be made by the end of the taxable year of

the Series during which the liquidation of the Series occurs (or, if later, ninety (90) days after the date of the liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Series has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 8(B). The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8(B) constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Rights and all the Series' property and constitutes a compromise to which all Members have consented. To the extent that a Member returns funds to the Series, it has no claim against any other Member for those funds.

C. **Deficit Capital Accounts.** No Member will be required to pay to the Series, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

D. **Certificate of Termination.** On completion of the distribution of Series' assets as provided herein, the Manager (or such other Person or Persons as the BOC may require or permit) shall file Certificate of Termination with the Secretary of State of Texas, cancel any other filings made pursuant to foreign qualifications, and take such other actions as may be necessary to terminate the existence of the Series. Upon the issuance of a certificate of dissolution by the Secretary of State of Texas, the existence of the Series shall cease, except as may be otherwise provided by the BOC or other applicable Law.

9. **Distributions/Allocations of Profits and Losses.**

A. **Distributions on Dissolution and Winding Up.** Upon the dissolution and winding up of the Series, all available proceeds distributable to the Members as determined under Section 8(B) shall be distributed to all Members.

B. **Allocations of Profit and Loss.** Profit and Loss of the Series shall be allocated to the Members in their Sharing Ratios.

C. **Allocation of Net Gains or Net Losses from the Dissolution and Winding Up of the Series.**

(a) **Net Gains.** Net gain resulting from a sale of the Series' property upon the dissolution and winding up of the Series shall be allocated to the Members in their Respective Sharing Ratios.

    (b)    **Net Loss.**  After adjusting the Capital Accounts for distributions and allocations, net loss resulting from a sale of the Series' assets upon the dissolution and winding up of the Series shall be allocated to the Members in their respective Sharing Ratios.

D.    **Adjustment of Book Value.**  Book Value with respect to any asset of the Series for any purpose shall be the asset's adjusted tax basis for federal income tax purposes. The Book Value of each asset will be increased or decreased to reflect any adjustment to the adjusted basis of the asset under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Treasury Regulation Section 1.704-1(b)(2)(iv)(m). Book Value will be adjusted by Book Depreciation, and gain or loss on a disposition of any asset shall be determined by reference to such asset's Book Value as adjusted herein. The determination of the fair market value of property as required under this Section 9(D) shall be determined by the Members using any reasonable method of valuation.

E.    **Tax Allocations.**

    (a)    Except as otherwise provided in this Section 9(E), each item of income, gain, loss, deduction and credit determined for federal income tax purposes shall be allocated among the Members in the same manner as each correlative item of income, gain, loss, deduction and credit is allocated to the Members for purposes of maintaining their respective Capital Accounts.

    (b)    Under Code Section 704(c) and Treasury Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any asset contributed to the capital of the Series, solely for federal income tax purposes, shall be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset for federal income tax purposes and the initial Book Value. If the Book Value of any asset is adjusted under Section 9(D), subsequent allocations of income, gain, loss and deduction, solely for federal income tax purposes, will be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset and its Book Value as adjusted in the manner required under Treasury Regulation Section 1.704-3(a)(6). The allocations required by this Section 9(E) shall be made by the Manager.

F.    **Stop Loss.**  Notwithstanding any other provision hereof to the contrary, no Loss (or item of loss or deduction) of the Series shall be allocated to a Member if such allocation would result in a deficit balance in such Member's Adjusted Capital Account. Such Loss (or item of loss or deduction) shall be allocated among the

Members whose Adjusted Capital Account balances are positive in proportion to such positive balances to the extent necessary to reduce the balances of such other Member's positive Adjusted Capital Accounts balances to zero, it being the intention of the Members that no Member's positive Adjusted Capital Account balance shall fall below zero while any other Member's positive Adjusted Capital Account balance has a positive balance.

G.   ***Nonrecourse Deductions.***   All Nonrecourse Deductions shall be allocated among the Members in their Sharing Ratios.

H.   ***Mandatory Distributions.***   Unless prohibited by bank covenants or contractual restrictions, the Company shall make distributions to the Members in such amounts as may be reasonably determined by the Manager to be necessary to fund the Members' respective income tax obligations.   Unless prohibited by bank covenants or contractual restrictions, the Company also shall make distributions of operating profits, at such times and intervals as shall be reasonably determined by the Manager, and not less than annually.

I.   ***Suspension of Distributions/Allocations.***   NHS Emergency Centers, LLC is a party to the Loan Agreements (defined above).   In the event of an uncured Event of Default under any Loan Agreement, all distributions and allocations hereunder may be suspended until such default is cured.

*[Signature Page to Follow]*

**IN WITNESS WHEREOF**, the undersigned owners and holders of Class A Series 110 - Crosby Membership Interests have executed the foregoing Series Agreement, intending thereby to be bound in all respects by its terms, as of the effective date first set forth above.

NEIGHBORS INVESTMENT GROUP, LLC

By: _____
     Setul Patel, President of
     Neighbors Health System Inc., its Manager

**IN WITNESS WHEREOF**, each owner and holder of Class B Membership Interests has executed the Class B Member's Acknowledgement, attached hereto, intending thereby to be bound in all respects by its terms, as of the effective date first set forth above.

## SERIES AGREEMENT

This Series Agreement, dated to be effective as of December 15, 2015, is adopted, executed and agreed to, for good and valuable consideration, by the undersigned owners and holders of Membership Interests (each a "Member") issued by NHS Emergency Centers, LLC (the "Company"), under Series 124 – Porter (the "Series").

1.   *Acknowledgments.*

   A.   The Series has been established to operate a free standing emergency center known as NEC Porter Emergency Center, LP (the "Series Business").

   B.   "The Class A Member" is Neighbors Investment Group, LLC.   There shall be a total of 6,900 shares of Class A Interests.   The Class A Member shall have a Sharing Ratio of 69%.   The execution and delivery of this Agreement by the Class A Member has been duly authorized by all necessary entity action.

   C.   "The Class B Members" are those individuals who have executed a Series Share Purchase Agreement and the Series Acknowledgement evidencing their agreement to become a Class B Member of the Series.   There shall be a total of 3,000 shares of Class B Interests.   The Class B Members shall have an aggregate Sharing Ratio of 30%.

   D.   In the event that a Class B Member purchases his or her shares through an entity, the person who ultimately controls the purchasing entity directly or through one or more intermediaries (the "Control Person") is a medical doctor, licensed to practice in the state in which the Emergency Center is located, and duly qualified to provide services as an independent contractor to the Emergency Center.   The term "Class B Member" hereafter shall be defined to include the Control Person of a Class B Member.

   E.   In the event that a Class B Member purchases his or her shares through an entity, the Control Person hereby agrees to adopt and to be personally bound by the terms and conditions of this Series Agreement.

   F.   The Class A Member and Class B Members are collectively referred to as "the Members" and each may be referred to from time to time as a "Member."

   G.   The Members hereby agree to adopt and to be bound by the terms of this Series Agreement for the Series.

   H.   The Members hereby consent to and approve the terms of the Operating Agreement of NHS Emergency Centers, LLC.

## EXHIBIT 4

I.    The Members hereby consent to and approve the terms of the Management and Administrative Services Agreement between Neighbors Health System, LLC and the Series.

J.    NHS Emergency Centers, LLC and/or the Series may from time to time enter into credit, guaranty or similar loan agreements with one or more commercial lenders (collectively the "Loan Agreements"). The Members hereby consent to the imposition of liens, security interests, mortgages or other encumbrances upon the Series Property (as defined in Section 5 of this Agreement) pursuant to the terms of the Loan Agreements. The Members hereby waive the right to challenge the making or enforceability of any guaranty by NHS Emergency Centers, LLC or by the Series on the grounds that such guaranty cannot reasonably be expected to benefit NHS Emergency Centers, LLC or the Series.

2.    ***The Series Membership Interests (the "Interests").***

    A.    ***Rights, Entitlements, and Designations.***

        (a)    ***Class A Interests.***

            (i)    The Class A Interests of the Series shall be certificated and shall be issued to the Class A Member.

            (ii)    The Class A Interests of the Series carry voting rights. Each share of Class A Interests carries the right to cast one (1) vote on any matter submitted to the Members for their action or approval.

            (iii)    The Class A Interests shall be equal, one to the other, and to the Class B Interests, in priority and seniority. Upon a liquidation or dissolution of the Series, the Class A Member shall participate in distributions of the Series Liquidation/Dissolution Proceeds (as defined in Section 8(B) below), each in accordance with such Member's Sharing Ratio.

            (iv)    The Class A Member of this Series shall not be individually liable for any debt or obligation of the Series by virtue of the Members' ownership of Interests of the Series.

            (v)    Neither the Series nor the Series Property shall be responsible for, liable for or obligated in any way for the liabilities and obligations of any other Series of Membership Interests established by NHS Emergency Centers, LLC. The Series Property identified herein shall not be chargeable with any debt, obligation, mortgage or security interest relating to the assets or business activities of any

other Series of Membership Interests established by NHS Emergency Centers, LLC.

(b)   *Class B Interests.*

(i)   The Class B Interests of the Series shall be certificated and shall be issued to the Class B Members.

(ii)   The Class B Interests of the Series do not carry voting rights except with regard to "Major Decisions" as defined in Section 3(A) below.

(iii)   The Class B Interests shall be equal, one to the other, and to the Class A Interests, in priority and seniority.   Upon a liquidation or dissolution of the Series, the Class B Members shall participate in distributions of the Series Liquidation/Dissolution Proceeds (as defined in Section 8(B) below), each in accordance with such Member's Sharing Ratio.

(iv)   The Members of this Series shall not be individually liable for any debt or obligation of the Series by virtue of the Members' ownership of Interests of the Series.   The Class B Members shall be subject to the provisions of this Agreement regarding providing services to the Series Business, as indicated below.

(v)   Neither the Series nor the Series Property shall be responsible for, liable for or obligated in any way for the liabilities and obligations of any other Series of Membership Interests established by NHS Emergency Centers, LLC.   The Series Property identified herein shall not be chargeable with any debt, obligation, mortgage or security interest relating to the assets or business activities of any other Series of Membership Interests established by NHS Emergency Centers, LLC.

B.   *Representations and Warranties.*   Each Class B Member hereby represents and warrants to the Series as follows:

(a)   that Member has duly executed the Acknowledgement to this Agreement, and it constitutes the legal, valid and binding obligation of that Member enforceable against that Member in accordance with its terms (except as may be limited by bankruptcy, insolvency or similar laws of general application and by the effect of general principles of equity that permit the exercise of judicial discretion, regardless of whether considered at law or

in equity, and except that any indemnification provisions may be limited by applicable securities laws and public policy);

(b)    that Member's authorization, execution, delivery, and performance of the Acknowledgment to this Agreement do not and will not (i) conflict with, or result in a breach, default or violation of, (A) any contract or agreement to which that Member is a party or is otherwise subject, or (B) any law, order, judgment, decree, writ, injunction or arbitral award to which that Member is subject; or (ii) require any consent, approval or authorization from filing or registration with, or notice to, any governmental authority or other Person, unless such requirement has already been satisfied;

(c)    that Member is acquiring his or her Interests for investment, solely for the Member's own beneficial account and not with a view to or any present intention or directly or indirectly selling, transferring, offering to sell or transfer, participating in any distribution or otherwise transferring all or a portion of its Interests; and such Member acknowledges that the Interests have not been registered under the Securities Act or any other applicable federal or state securities laws, and that the Series has no intention, and shall not have any obligation, to register or to obtain an exemption from registration for the Interests or to take action so as to permit sales pursuant to the Securities Act (including Rules 144 and 144A thereunder).

C.    *Issuance of Additional Interests.* Additional Interests may be created and issued to existing Members or to other Persons upon the approval and consent of all of the Members in accordance with the terms of Section 3(A) below, and such other Persons may be admitted to the Series as Members, at the direction of the Members on such terms and conditions as the Members may determine at the time of admission. The terms of admission or issuance as presented to the Members for approval must specify all terms and rights applicable thereto and may provide for the creation of different classes or groups of Members having different rights, powers, and duties. The foregoing notwithstanding, no sale of additional Class B Shares shall be authorized by the Members except under terms that provide that any Person acquiring such Class B Shares shall accept the obligations to staff shifts at the Series' facility in accordance with Section 3(C) below. The Members may reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such amendment shall be approved and executed only by the Members. Any such admission is effective only after the new Member has executed and delivered to the Series an instrument containing the notice address of the new Member, the new Member's ratification of this Agreement and agreement to be bound by it,

**EXHIBIT 4**

and its confirmation that the representations and warranties in Section 2(B) are true and correct with respect to it.

D.   **Withdrawal.**   Withdrawal of a Member shall be governed by the provisions of Section 7(C).   Except as provided therein, Members will have no right to Withdraw.

E.   **Information.**

    (a)   The Series shall be managed by the Manager with reasonable financial transparency, and the Manager shall provide to the Members information regarding the business affairs, properties and financial results of the Series Business.

    (b)   If requested by a Member in writing (email notification constitutes written notice), the Manager shall send to each Member a copy of (i) a balance sheet of the Series as of the end of the most recent fiscal year, (ii) an income statement of the Series for such year, and (iii) a statement showing the revenues distributed by the Series to Members in respect of such year. Such financial statements shall be delivered by the Manager no later than thirty (30) days following the Manager's receipt of such request.

    (c)   The Members acknowledge that they may receive information from or regarding the Series in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Series or Persons with which it does business.   Each Member shall hold in strict confidence any information it receives regarding the Series that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member, except for disclosures (i) compelled by law (but the Member must notify the Members promptly of any request for that information, before disclosing it if practicable), (ii) to advisers or representatives of the Member but only if the recipients have agreed to be bound by the provisions of this Section 2(E)(c), or (iii) of information that a Member also has received from a source independent of the Series that the Member   reasonably believes he or she obtained that information without breach of any obligation of confidentiality. The Members   agree that breach of the provisions of this Section 2(E)(c) may cause irreparable injury to the Series for which monetary damages (or other remedy at law) are inadequate in view of (A) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Member to comply with such provisions or (B) the uniqueness

of the Series Business and the confidential nature of the information described in this Section 2(E)(c). Accordingly, the Members agree that the provisions of this Section 2(E)(c) may be enforced by specific performance.

F.   **Liability to Third Parties.**  No Member shall be liable for the debts, obligations or liabilities of the Series, including under a judgment decree or order of a court.

G.   **Spouses of Members.**  Spouses of the Members do not become Members as a result of such marital relationship.

H.   **Certificates and Ledger.**  The Class A Shares and Class B Shares shall be represented by share certificates that shall be issued from time to time by the Series, acting through its Manager. The Manager shall maintain a current transfer ledger of all Share issuances and transfers. A copy of such transfer ledger will be provided to a Member within ten (10) days of such Member's written request therefor.

I.   **Distributions.**  Commencing no later than the end of the Series' first fiscal quarter, the Manager shall, periodically balance the Series' accounts and, in its sole discretion, distribute to the Members the amount by which cash on hand exceeds the amount necessary or appropriate to meet the current costs, expenses and liabilities of the Series (including, without limitation, a reserve for working capital and contingencies and cash sufficient to fund the Series' growth plans). Subject to Section 9(B), all distributions shall be made to the Members pro rata in accordance with their ownership of Shares. The Series shall not make any distribution to the Members if, immediately after giving effect to the distribution, (i) all liabilities of the Series, other than liabilities to Members with respect to their Interests and liabilities for which the recourse of creditors is limited to specified property of the Series, exceed the fair value of Series Property (except that the fair value of Series Property that is subject to a liability for which recourse of creditors is limited shall be included in the Series assets only to the extent that the fair value of that Series Property exceeds that liability), or (ii) the Series would be in default of any financial covenant binding upon the Series under any contract associated with the Series' commercial debt.

J.   **Determination of Sharing Ratio.**

   (a)   **Class A Member.**

      (i)   Each share of Class A Interests represents 0.01% of the aggregate interests. Each Class A Member's Sharing Ratio is equal to the number of shares owned by such Member, multiplied times 0.01%

**EXHIBIT 4**

    (b)    ***Class B Members.***

        (i)    Each share of Class B Interests represents 0.01% of the aggregate Interests. Each Class B Member's Sharing Ratio is equal to the number of Class B shares owned by such Member, multiplied times 0.01%

3.    ***Management.***

    A.    ***Management by Manager.*** Management of the Series is reserved to a Manager. The Manager of the Series shall be Neighbors Health System, LLC ("Neighbors"). It will require the unanimous affirmative vote of the Class A and Class B Members to authorize the following actions (each a "Major Decision"):

        (a)    To authorize any distribution or dividend to any Member except in accordance with the provisions of this Agreement; or

        (b)    To issue additional Shares.

Nothing in this Section 3 shall limit the right of the Manager to take any action without the consent or vote of any Member except an action that is a Major Decision as defined above.

    B.    ***Meetings of Members.*** The Members shall have the right to meet in person, or by teleconference, upon fifteen (15) days advance written notice to all Members with voting rights with respect to the matters to be voted on at such meeting. The foregoing notwithstanding, the Members may act in writing to authorize any action, provided that such writing is signed by Members having not less than the minimum number of votes necessary to take such action. Prompt notice of any action taken, whether at a meeting or by written consent, shall be given to all Members who were not present at the meeting or who did not sign the written consent, respectively.

    C.    ***Employment of Members by the Series Business.***

        (a)    Each of the Class B Members has agreed to provide services to the Series Business as an independent contractor of Neighbors Physician Group, LLC, an affiliate of the Manager, pursuant to the terms of an Independent Contractor Agreement. Each Class B Member has agreed to work clinical shift coverage at the Series Business as set forth under the terms of his or her Share Purchase Agreement. The Series Business agrees that it will provide to the Class B Members medical malpractice insurance.

**EXHIBIT 4**

(b)     Subject to their engagement with Neighbors Physician Group, LLC, the Class B Members shall be subject to the supervision of the Chief Medical Officer of the Manager.

D.     ***Provisions Relating to TRICARE.***  The Members acknowledge that certain of the Members are military personnel or employees who receive health benefits, or provide services to patients who receive benefits, under the Department of Defense's TRICARE health insurance plan, and who have or may have certain restrictive covenants applicable to their practice of medicine outside of Department of Defense authorized environments.  Accordingly, the Members agree that, for so long as any Member of the Series is in the military or an employee of the Department of Defense:

(a)     The Series shall not accept TRICARE insurance, submit any billing to TRICARE or accept patients whose third party payor is TRICARE.

(b)     The Manager, its professional staffing Affiliates and the Series shall not bill TRICARE for any physician services.

E.     ***Manager Event.***  If Neighbors Health System, LLC ceases to be the Manager of the Series, or there is a change in control of Neighbors Health System, LLC, or it sells substantially all of its assets (collectively, a "Manager Event"), it shall within ten (10) days of such Manager Event provide written notice thereof to the Class B Members.  Each Class B Member will have the option, exercisable within fifteen (15) days of receipt of such notice, to require the Series to repurchase all (and not less than all) of his or her Class B Shares for their fair market value, as reasonably determined by the Manager.  Any repurchase pursuant to this Section will be consummated within ten (10) days of the Series receiving written notice from the Class B Member of its intent to exercise its option hereunder.

4.     ***Business Purpose.***

The purpose of the Series is to operate a free standing emergency center.

5.     ***Series Property.***

The Series Property of the Series shall consist of the profits, losses, distributions, and other benefits received by NHS Emergency Centers, LLC from the Series Business.  NHS Emergency Centers, LLC is the sole limited partner of the Series Business.

**EXHIBIT 4**

6.    *Series Membership.*

   A.    ***Ownership of the Series.***

      (a)   The Class A Member as of the Effective Date is Neighbors Investment Group, LLC.

      (b)   Class B Members as of the Effective Date are those individuals who have executed a Series Share Purchase Agreement and a Series Acknowledgement.

   B.    ***Representations and Warranties of the Class B Members (each a "Purchaser").***

      (a)   Each Purchaser hereby represents and warrants to the Series as follows:

         (i)    Purchaser has not relied on the Series' evaluation of the Shares and Purchaser's decision to purchase same on the terms and conditions set forth in the Share Purchase and Sale Agreement (the "Share Agreement") is not based on any representation, statement, financial statement or projection or other inducement of any nature, written or oral, whatsoever except the statements, representations and warranties made in the Share Agreement or in this Agreement.

         (ii)   Purchaser is a sophisticated investor capable of evaluating the risks of the sale contemplated in the Share Agreement, the value of the Shares and the fairness of the purchase price set forth in the Share Agreement.

         (iii)  Purchaser has been afforded an opportunity to meet with the Members and Manager of the Series and ask such questions and review such information contained in the books and records of the Series, as Purchaser has deemed relevant in evaluating the risks of the sale contemplated in the Share Agreement and the value of the Shares.

         (iv)   Purchaser is financially able to risk the loss of the entire Purchase Price for the Shares, and could suffer such loss without suffering undue financial hardship.

         (v)    Purchaser has purchased the Shares with a view toward investment and for Purchaser's own account, and not with the purpose or intent of effecting a wider distribution of the Shares.

**EXHIBIT 4**

C.      *Restrictive Covenants.*

    (a)      Each Class B Member agrees that, for the time during which the Member is a Member of the Series and for a period of twenty-four (24) months thereafter (the "Restricted Period"), absent the prior written consent of the Manager, the Member shall not participate as an owner or manager in any company or practice group that provides emergency medicine services at an Excluded Location (as defined below).   For purposes of this Agreement, the term "Excluded Location" means any facility that is (y) licensed by the applicable Department of Health as a free standing emergency medical facility and (z) is located within twenty five (25) miles in any direction of any free standing emergency medical facility operated or managed by the Series or any Affiliate of the Manager as of the Effective Date hereof.   The foregoing restrictive covenant shall not preclude any Member from providing medical services as a contract physician at any facility provided that such Member does not have a beneficial ownership interest in such facility or provide management services to such facility.

    (b)      Each Member agrees that such Member shall not disclose to any Person any Confidential Information (as defined below) of the Series except upon the Series' advance written consent.   For purposes of this Agreement, "Confidential Information" means any information intended by the Manager to remain confidential relating to the Series' professional staff, business plans, facilities, equipment, financial results, assets, liabilities, practice management plans, agreements and business operations.

    (c)      Each Member agrees, during the Restricted Period, to refrain from soliciting any officer, director, employee, contractor, manager, patient or other Person affiliated with or representing the Series or the Manager to terminate or modify their respective existing business and/or medical relationships with the Series or the Manager.

    (d)      With regard to an Entity Member, to the extent not specifically stated above, the Members agree that the foregoing restrictive covenants shall be performed by, and a personal obligation of, each equity owner of the Entity Member.

    (e)      The Members acknowledge that the foregoing restrictive covenants are reasonable in scope and necessary for the sound administration of the Series Business. The Members acknowledge and agree that any breach of the restrictive covenants set forth in this Section 6 would result in the irreparable injury to the Series Business, and that the Series would be entitled in such event to obtain a temporary restraining order and temporary and permanent injunctive relief to restrain further breaches of this Section 6.

**EXHIBIT 4**

7.   ***Restrictions on Transfer.***  No Member shall transfer such Member's Shares except in accordance with the terms of this Agreement, including, without limitation, the following:

A.   ***Prohibited and Permitted Transfers.***

    (a)   Except as permitted by this Agreement, no Member may directly or indirectly Transfer all or part of its Shares without the prior written consent of the Manager, and any such prohibited Transfer, if made, shall be void and without force or effect.  Specifically included within the prohibition set forth in this Section 7(A) are Transfers of Interests in connection with the Divorce of a Member, which Transfers shall be null and void as against the Series and the remaining Members absent the prior consent of the Manager.  Any Member who is married or in an exclusive relationship with a life partner with legally cognizable property rights shall cause his or her spouse or life partner to execute the Spousal Consent attached to the Acknowledgement of this Series Agreement.

    (b)   Notwithstanding the provisions of Section 7(A)(a), the following Transfers shall be "Permitted Transfers" and shall not require the prior consent of the Manager under this Agreement, nor will they be subject to the purchase option set forth in Section 7(C):

        (i)   a Transfer to a trust solely for the benefit of one or more members of such Member's immediate family, if the Member or another Member is the trustee of the trust;

        (ii)   a Transfer to an entity if, following the Transfer, at least a majority interest in the entity is owned by the transferring Member or if the entity is Controlled by the transferring Member;

        (iii)   a Transfer to another Member; or

        (iv)   a redemption of Shares by the Series approved in accordance with the terms hereof.

    (c)   In connection with any Transfer permitted under this Agreement, and any admission of an assignee as a Member, the Member making such Transfer and the assignee shall furnish the Manager with such documents regarding the Transfer as the Manager may reasonably request (in form and substance reasonably satisfactory to the Manager), including a copy of the Transfer instrument and a ratification by the assignee of this Agreement (if the assignee is to be admitted as a Member).

B.      ***Sale of Interests to Other Members Must Be Offered Pro Rata.***

(a)      No Class B Member may offer his or her Interests to any person who is not a board certified or board eligible licensed emergency physician, or a licensed physician reasonably experienced in the practice of emergency medicine.

(b)      Any Class B Member who desires to sell his or her Interest in the Series (a "Class B Selling Member") shall first offer to the other Class B Members, in writing, the right of first refusal and the opportunity to acquire such Interest on the price, terms, provisions and conditions hereafter stated in this Section 7(B).  The Class B Members receiving the notice shall have thirty (30) days following the date of receipt of the notice (which notice shall contain all terms and conditions of the proposed offer of sale) within which to exercise such right by giving written notice thereof to the Class B Selling Member.  The Class B Members can elect to purchase all or any portion of such Class B Selling Member's Interest, with each purchasing Class B Member being entitled to acquire that portion of the Class B Selling Member's Interest which the Interest of such Class B Member desiring to purchase bears to the sum of the Interests of all such other Class B Members desiring to purchase (the "ROFR Interest").  The purchase price for the ROFR Interests shall be the purchase price set forth in the Class B Selling Member's original notice of sale.  Class B Members who elect to exercise the rights provided for herein and purchase their respective ROFR Interest must provide written notice to the Selling Class B Member and all other Class B Members on or before the close of business on the thirtieth (30th) day following their receipt of the Selling Class B Member's notice of sale.  In the event that no Class B Member elects to purchase any portion of the Selling Class B Member's Interest, the Selling Class B Member shall have the right to proceed with the proposed sale to the third party, which sale must be on terms substantially the same as the terms set forth in the original notice of sale.  Any sale of an Interest to a third party must be consummated within ninety (90) days following the date on which the right of first refusal given to the other equity owners of the Class B Member expires; otherwise, a subsequent sale of such Interest may be consummated only upon compliance again with the conditions of this Section 7(B).  The sale of the ROFR Interests to the Class B Members who have exercised their rights hereunder shall close on or before the sixtieth (60th) day following the Class B Members' receipt of the original notice of sale.

**EXHIBIT 4**

(b)     Any proposed assignee of an Interest shall execute such instruments as may be deemed necessary by the Manager to confirm that any such sale or Transfer is not in violation of applicable federal and state securities laws, that the proposed new Member agrees to be bound by all the terms and provisions of this Agreement, and that such proposed new Member will pay all fees and expenses related to such Transfer.  Any Transfer of the Interest of a Class B Member shall carry with it the obligation to perform clinical services for the Series Business as set forth herein.

C.     *Withdrawal.*  In the event that any of the following events occur with respect to a Class B Member (a "Withdrawing Member"), the provisions of this Section 7(C) shall apply.  The non-withdrawing Class B Members can elect to purchase all or any portion of a Withdrawing Member's Class B Shares for the purchase price provided in Section 7(D), with each purchasing Class B Member being entitled to acquire that portion of the Withdrawing Member's Class B Shares which the Class B Shares of such Class B Member desiring to purchase bears at the time to the sum of the Class B Shares of all other Class B Members desiring to purchase.  If the Class B Member(s) do not elect to purchase all of a Withdrawing Member's Class B Shares, as the case may be, the Series shall be entitled to purchase any unpurchased Class B Shares for the purchase price provided in Section 7(D).  The events that shall constitute the involuntary withdrawal of a Class B Member are as follows:

(a)     A Member files a voluntary petition in Bankruptcy or shall be adjudicated to be Bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal Bankruptcy law or any present or future applicable state, federal or other Law relative to Bankruptcy, insolvency or other relief for debts;

(b)     Any Member shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of such Member, or of all or any substantial part of its properties or its Interest;

(c)     If a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against a Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal Bankruptcy act or any present or future applicable state, federal or other law relating to Bankruptcy, insolvency or other relief of debtors and such Member shall acquiesce in the entry thereof;

**EXHIBIT 4**

(d)    Any trustee, receiver, conservator or liquidator of such Member or of all or any substantial part of its properties or its Interest shall be appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not conservative);

(e)    If a Member makes an assignment for the benefit of creditors or takes any similar action for the protection or benefit of creditors;

(f)    Any Member shall admit in writing his or her inability to pay his or her debts as they mature or give notice to any governmental body of its insolvency or suspension of operation or initiate proceedings to dissolve or liquidate;

(g)    If a Member makes a Transfer of the Member's Interest in connection with a Divorce proceeding without the prior written consent of the Manager;

(h)    The conviction of a felony, commission of any act of moral turpitude, or license forfeiture in any state of a Member;

(i)    The death, disability or retirement of a Member;

(j)    Violation of one of the restrictive covenants set forth herein by the Member or the Control Person;

(k)    If a Member loses his or her privileges, or fails to qualify for credentials, to practice at any clinical facility operated by or affiliated with the Company.

Except as set forth herein, a Member shall be considered to acquiesce in an order, judgment or decree if such Member does not file a petition or motion to vacate or discharge the same within twenty one (21) days after its entry.

**D.**    ***Purchase Price.***

(a)    In the event of a sale of Shares pursuant to Sections 7(C)(a)through 7(C)(h), the sale price shall be the book value of the Shares as reasonably determined by the Manager (the "Book Value").

(b)    In the event of an involuntary withdrawal of a Class B Member upon such Member's death, disability or retirement pursuant to Section 7(C)(i), the following provisions shall apply:

(i)    The Withdrawing Member shall be entitled to retain his or her Shares provided that the Manager is able to obtain coverage of the

**EXHIBIT 4**

Withdrawing Member's clinical shift obligations at the Series Business without a material increase in cost to the Series Business (as determined by the Manager at Manager's sole discretion);

(ii)    If the Manager reasonably determines that the Series cannot obtain coverage of the Withdrawing Member without incurring material additional cost, the Manager shall provide the Withdrawing Member written notice of such fact, and the Withdrawing Member shall have ninety (90) days to find a qualified licensed physician to purchase the Withdrawing Member's Class B Shares (subject to approval of the Manager). Absent such sale, the Series shall have the right to either repurchase the Withdrawing Member's Shares at Book Value or to waive such right and deduct the additional cost of obtaining clinical shift coverage from any distributions that would be otherwise payable to the Withdrawing Member.

(c)    In the event of a sale of Shares pursuant to Section 7(C)(j), the sale price shall be the Class B Member's original purchase price.

F.    ***Encumbrance of an Interest.*** With the consent of the Manager, a Member may Encumber (and the pledgee, assignee, or secured party may foreclose on) all or any part of a Member's rights to distributions from the Series.

8.    ***Termination/Dissolution.***

A.    ***Dissolution.***

(a)    Subject to Section 8(A)(b), the Series shall dissolve and its affairs shall be wound up on the first to occur of the following events (each a "Dissolution Event"):

(i)    the death, Expulsion, Withdrawal, dissolution or Bankruptcy of any Member, or the occurrence of any other event that terminates the continued membership of any Member in the Series;

(ii)    entry of a decree of judicial dissolution of the Series; and

(iii)    the unanimous affirmative vote of the Members.

(b)    If a Dissolution Event described in subparagraphs (i), (ii) or (iii) of Section 8(A)(a) shall occur and there shall be at least one other Member remaining, the Series shall not be dissolved, and the business of the Series shall be continued, if a Majority in Interest (calculated without reference

to any Member with respect to whom a Dissolution Event described in subparagraph (iii) has occurred) so agree within ninety (90) days of the occurrence of such Dissolution Event (such agreement is referred to herein as a "Continuation Election").

B.  ***Winding-Up and Termination.***  On the occurrence of a Dissolution Event, unless a Continuation Election is made, the Manager shall act as liquidator, or in the absence of a Manager, the Members may appoint one or more Members as liquidator; provided, however that (i) no Member with respect to whom a Dissolution Event described in subparagraph (iii) of Section 8(A)(a) has occurred shall serve as a liquidator. The liquidator shall proceed diligently to wind up the affairs of the Series and make final distributions as provided herein and in the Act. The costs of winding up shall be borne as a Series expense. Until final distribution, the liquidator shall continue to operate the Series properties with all of the power and authority of all of the Members and Manager. The steps to be accomplished by the liquidator are as follows:

(a)  as promptly as possible after dissolution and again after final winding up, the liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Series' assets, liabilities, and operations through the last calendar day of the month in which the dissolution occurs or the final winding up is completed, as applicable;

(b)  the liquidator shall cause notice to be mailed to each known creditor of and claimant against the Series;

(c)  the liquidator shall pay, satisfy or discharge from the Series' funds all of the debts, liabilities and obligations of the Series or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)  all remaining assets of the Series (the "Series Liquidation/Dissolution Proceeds") shall be distributed to the Members as follows:

(i)  the liquidator may sell any or all Series property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members in accordance with the provisions of Section 9;

**EXHIBIT 4**

(ii)      with respect to all Series property that has not been sold, the Fair Market Value of that property shall be determined and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the Fair Market Value of that property on the date of distribution; and

(iii)     The Series Liquidation/Dissolution Proceeds property, including the proceeds of accounts receivable, shall be distributed among the Members in accordance with their respective Sharing Ratios and those distributions shall be made by the end of the taxable year of the Series during which the liquidation of the Series occurs (or, if later, ninety (90) days after the date of the liquidation).

All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Series has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 8(B). The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8(B) constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Rights and all the Series' property and constitutes a compromise to which all Members have consented. To the extent that a Member returns funds to the Series, it has no claim against any other Member for those funds.

C.      ***Deficit Capital Accounts.*** No Member will be required to pay to the Series, to any other Member or to any third party any deficit balance which may exist from time to time in the Member's Capital Account.

D.      ***Certificate of Termination.*** On completion of the distribution of Series' assets as provided herein, the Manager (or such other Person or Persons as the BOC may require or permit) shall file Certificate of Termination with the Secretary of State of Texas, cancel any other filings made pursuant to foreign qualifications, and take such other actions as may be necessary to terminate the existence of the Series. Upon the issuance of a certificate of dissolution by the Secretary of State of Texas, the existence of the Series shall cease, except as may be otherwise provided by the BOC or other applicable Law.

9.      ***Distributions/Allocations of Profits and Losses.***

## EXHIBIT 4

A.   ***Distributions on Dissolution and Winding Up.***   Upon the dissolution and winding up of the Series, all available proceeds distributable to the Members as determined under Section 8(B) shall be distributed to all Members.

B.   ***Allocations of Profit and Loss.***   Profit and Loss of the Series shall be allocated to the Members in their Sharing Ratios.

C.   ***Allocation of Net Gains or Net Losses from the Dissolution and Winding Up of the Series.***

    (a)   ***Net Gains.***   Net gain resulting from a sale of the Series' property upon the dissolution and winding up of the Series shall be allocated to the Members in their Respective Sharing Ratios.

    (b)   ***Net Loss.***   After adjusting the Capital Accounts for distributions and allocations, net loss resulting from a sale of the Series' assets upon the dissolution and winding up of the Series shall be allocated to the Members in their respective Sharing Ratios.

D.   ***Adjustment of Book Value.***   Book Value with respect to any asset of the Series for any purpose shall be the asset's adjusted tax basis for federal income tax purposes. The Book Value of each asset will be increased or decreased to reflect any adjustment to the adjusted basis of the asset under Code Section 734(b) or 743(b), but only to the extent that the adjustment is taken into account in determining Capital Accounts under Treasury Regulation Section 1.704-1(b)(2)(iv)(m). Book Value will be adjusted by Book Depreciation, and gain or loss on a disposition of any asset shall be determined by reference to such asset's Book Value as adjusted herein. The determination of the fair market value of property as required under this Section 9(D) shall be determined by the Members using any reasonable method of valuation.

E.   ***Tax Allocations.***

    (a)   Except as otherwise provided in this Section 9(E), each item of income, gain, loss, deduction and credit determined for federal income tax purposes shall be allocated among the Members in the same manner as each correlative item of income, gain, loss, deduction and credit is allocated to the Members for purposes of maintaining their respective Capital Accounts.

    (b)   Under Code Section 704(c) and Treasury Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any asset contributed to the capital of the Series, solely for federal income tax purposes, shall be allocated among the Members so as to take into account

any variation between the adjusted tax basis of the asset for federal income tax purposes and the initial Book Value.  If the Book Value of any asset is adjusted under Section 9(D), subsequent allocations of income, gain, loss and deduction, solely for federal income tax purposes, will be allocated among the Members so as to take into account any variation between the adjusted tax basis of the asset and its Book Value as adjusted in the manner required under Treasury Regulation Section 1.704-3(a)(6).  The allocations required by this Section 9(E) shall be made  by the Manager.

F.    ***Stop Loss.***  Notwithstanding any other provision hereof to the contrary, no Loss (or item of loss or deduction) of the Series shall be allocated to a Member if such allocation would result in a deficit balance in such Member's Adjusted Capital Account.  Such Loss (or item of loss or deduction) shall be allocated among the Members whose Adjusted Capital Account balances are positive in proportion to such positive balances to the extent necessary to reduce the balances of such other Member's positive Adjusted Capital Accounts balances to zero, it being the intention of the Members that no Member's positive Adjusted Capital Account balance shall fall below zero while any other Member's positive Adjusted Capital Account balance has a positive balance.

G.    ***Nonrecourse Deductions.***  All Nonrecourse Deductions shall be allocated among the Members in their Sharing Ratios.

H.    ***Mandatory Distributions.***  Unless prohibited by bank covenants or contractual restrictions, the Company shall make distributions to the Members in such amounts as may be reasonably determined by the Manager to be necessary to fund the Members' respective income tax obligations.  Unless prohibited by bank covenants or contractual restrictions, the Company also shall make distributions of operating profits, at such times and intervals as shall be reasonably determined by the Manager, and not less than annually.

I.    ***Suspension of Distributions/Allocations.***  NHS Emergency Centers, LLC is a party to the Loan Agreements (defined above).  In the event of an uncured Event of Default under any Loan Agreement, all distributions and allocations hereunder may be suspended until such default is cured.

*[Signature Page to Follow]*

**IN WITNESS WHEREOF**, the undersigned owners and holders of Class A Series 124 – Porter Membership Interests have executed the foregoing Series Agreement, intending thereby to be bound in all respects by its terms, as of the effective date first set forth above.

NEIGHBORS INVESTMENT GROUP, LLC

By: _____

      Setul Patel, President and Chief Executive Officer of
      Neighbors Health System, LLC, its Manager

**IN WITNESS WHEREOF,** each owner and holder of Class B Series 124 – Porter Membership Interests has executed the Class B Member's Acknowledgement, attached hereto, intending thereby to be bound in all respects by its terms, as of the effective date first set forth above.

**<u>EXHIBIT 4</u>**