## SERIES INTEREST PURCHASE AGREEMENT

This Series Interest Purchase Agreement (this "Agreement") is entered into to be effective on the day and date set forth opposite the signature lines below, between **NHS EMERGENCY CENTERS, LLC**, a Texas series limited liability company (hereinafter referred to as "NHS" or the "Company"), and Kenneth Direkly, MD ("Purchaser") (each referred to as a "Party" and collectively referred to as the "Parties"). The "Effective Date" of this Agreement shall be the date that (i) the Purchase Price is delivered to Alberto A. Gonzalez, MD and (ii) this Agreement is executed by the Company.

### RECITALS:

WHEREAS, NHS and its affiliates operate multiple freestanding emergency centers in various locations throughout Texas and elsewhere;

WHEREAS, NHS and its affiliates intend to open a freestanding emergency center to be known as NEC Crosby Emergency Center, LP, a Texas limited partnership (the "Emergency Center");

WHEREAS, the Company, as a Texas "series" limited liability company, is legally authorized to issue multiple classes and "series" of limited liability company ownership interests;

WHEREAS, in connection with the Emergency Center, the Company has determined to offer a series of limited liability company ownership interests known as the Series 110-Crosby Membership Interests (the "Series");

WHEREAS, the profits and losses of the Emergency Center are reserved for the owners of the Series;

WHEREAS, the Company is authorized to issue up to six thousand (6,000) Class B Series Shares, representing in the aggregate sixty percent (60%) of the ownership of the Series;

WHEREAS, Purchaser desires to purchase a number of the Class B Series Shares on the terms set forth in Section 1 of this Agreement;

==WHEREAS, Purchaser acknowledges and agrees that the consideration for the Purchase of the Class B Series Shares includes a commitment by Purchaser to work one (1) twenty-four (24) hour clinical shift per month as a physician at the Emergency Center for the two hundred four (204) Class B Series Shares purchased, on the terms set forth in Section 1 below (the "Clinical Shift Coverage"); and==

## **EXHIBIT 5**

WHEREAS, Purchaser is a medical doctor, licensed to practice in the state in which the Emergency Center is located, and duly qualified to provide services as an independent contractor to the Emergency Center;

NOW, THEREFORE, in consideration of the Parties' undertakings herein and the consideration recited hereafter, the receipt and sufficiency of which are duly acknowledged by the Parties, the Company and Purchaser agree as follows:

**Section 1. Sale of Shares**

Alberto A. Gonzalez, MD hereby sells, transfers, conveys and sets over to Purchaser two hundred four (204) shares of the Company's Class B Series Shares (referred to as the "Shares"). Purchaser shall make payment to Alberto A. Gonzalez, MD in complete satisfaction of the purchase price of Twenty-Five Thousand Five Hundred Dollars ($25,500.00) (the "Purchase Price"), delivered to the Company on or before the date of this Agreement.

As additional consideration, Purchaser agrees to provide the Clinical Shift Coverage per month as an emergency room physician at the Emergency Center or at another approved stand-alone emergency center managed by Neighbors Health, LLC. Notwithstanding the foregoing, Purchaser further agrees to work, at a minimum, the following holiday shifts based upon the number of Shares owned by Purchaser: (i) one (1) Major Holiday shift and one (1) Minor Holiday shift for each 100-300 Shares owned by Purchaser; (ii) two (2) Major Holiday shifts and two (2) Minor Holiday shifts for each 400-600 Shares owned by Purchaser; and (iii) three (3) Major Holiday shifts and three (3) Minor Holiday shifts for each 700-900 Shares owned by Purchaser. "Major Holiday" shall mean New Year's Day, Memorial Day, Independence Day, Thanksgiving Day, the Friday immediately following Thanksgiving, Christmas Eve, Christmas Day, and New Year's Eve. "Minor Holiday" shall mean Valentine's Day, Good Friday, Easter, Mother's Day, Father's Day, Labor Day and Halloween. The period typically reserved as "Spring Break" in the local public school districts will be counted as a Major Holiday fulfillment when Physician provides shift coverage for a minimum of ninety-six (96) hours during the one-week period. Spring Break will be counted as a Minor Holiday fulfillment when Physician provides shift coverage for a minimum of twenty-four (24) hours, but less than ninety-six (96) hours during the one-week period. These services will be provided by Purchaser as an independent contractor of Neighbors Physician Group, LLC and its successors or assigns (collectively "NPG"). Compensation to Purchaser for these shifts will be paid by NPG at prevailing market rates. Purchaser agrees that the first of these twenty-four (24) hour shifts will be worked during weekend (Saturday to Sunday) hours.

Purchaser's agreement to perform the required Clinical Shift Coverage, including holiday shifts when applicable, per month is a material element of consideration for the purchase of the Shares. The failure of Purchaser to perform his or her monthly Clinical Shift Coverage will result in a failure of consideration. Additionally, an event of involuntary withdrawal as a Member of the Series shall occur if Purchaser fails for any reason to timely and completely perform the monthly Clinical Shift Coverage required under the terms of

**EXHIBIT 5**

this Agreement. Examples of failure of Purchaser to provide such Clinical Shift Coverage shall include, but not be limited to, Purchaser being removed from the schedule due to disciplinary action, Purchaser's breach of company policies, loss or revocation of Purchaser's credentials, or Purchaser's loss of Purchaser's medical license in the state where the Emergency Center is located. An event of involuntary withdrawal caused by the failure of Purchaser to provide the required Clinical Shift Coverage shall result in the mandatory redemption of the Shares and the refund of the Purchase Price to Purchaser.

### Section 2. Certificates Representing the Shares

The Company shall deliver a certificate or certificates representing the Shares to Purchaser at Closing, configured in terms of the number of shares per certificate and the total number of certificates as may be determined by Purchaser. Purchaser agrees that the certificates shall bear, at least, restrictive legends relating to the following matters:

(a) The fact that the Shares have not been registered under applicable securities laws and that transfer of the Shares therefore is restricted.

(b) The fact that the holders of the Company's Class B Series Shares have limited voting rights under the terms of the Series Agreement, and that the Shares carry no preemptive or cumulative voting rights.

(c) The fact that the Shares are subject to restrictions on transfer and rights of redemption under the terms of the Series Agreement of the Series (the "Series Agreement").

### Section 3. Securities Law Matters

(i) THE SHARES SOLD HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE APPLICABLE SECURITIES LAWS OF ANY STATE. AS A RESULT, THE SHARES MAY NOT BE RESOLD UNLESS THEY ARE REGISTERED SUBSEQUENTLY UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE. NONE OF THE SHARES MAY BE RESOLD, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS THE SHARES HAVE BEEN QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION EXISTS.

(ii) The sale of Shares contemplated hereunder is pursuant to exemptions from registration under the Securities Act of 1933 including, without limitation, Sections 3(b), 4(2) and/or 4(6) thereof and Rule 144.

### Section 4. Representations and Warranties of the Purchaser

Purchaser hereby represents and warrants to the Company as follows:

**EXHIBIT 5**

(a) Purchaser has not relied on the Company's evaluation of the Shares and Purchaser's decision to purchase same on the terms and conditions set forth herein is not based on any representation, statement, financial statement or projection or other inducement of any nature, written or oral, whatsoever except the statements, representations and warranties made herein.

(b) Purchaser is a sophisticated investor capable of evaluating the risks of the sale contemplated herein, the value of the Shares and the fairness of the purchase price set forth herein.

(c) Purchaser has been afforded an opportunity to meet with the Manager of the Company and ask such questions and review such information contained in the books and records of the Company, as Purchaser has deemed relevant in evaluating the risks of the sale contemplated herein and the value of the Shares.

(d) Purchaser is financially able to risk the loss of the entire purchase price for the Shares, and could suffer such loss without suffering undue financial hardship.

(e) Purchaser has purchased the Shares with a view toward investment and for Purchaser's own account, and not with the purpose or intent of effecting a wider distribution of the Shares.

(f) Purchaser represents to the Company that Purchaser has reviewed the Operating Agreement of the Company (the "Operating Agreement") and the Series Agreement, and has had adequate opportunity to review the Operating Agreement and the Series Agreement with counsel and such other advisors as Purchaser has deemed appropriate; Purchaser understands and agrees to the terms of the Operating Agreement and the Series Agreement and has unequivocally agreed to become bound thereto by execution of an Acknowledgment in form satisfactory to Purchaser and the Company.

(g) Except as disclosed on the Purchaser's Disclosure Schedule attached hereto as Exhibit A, Purchaser represents to the Company that Purchaser does not participate as an owner or manager in any company or practice group that provides emergency medicine services at an Excluded Location (as defined below). For purposes of this Agreement, the term "Excluded Location" means any facility that is (y) licensed by the applicable Department of Health as a freestanding emergency medical facility and (z) is located within twenty-five (25) miles in any direction of any freestanding emergency medical facility operated or managed by the Series or any affiliate of the Manager of the Company as of the Effective Date hereof.

**EXHIBIT 5**

## Section 5. The Class B Series Membership Interests

Under the terms of the Company's Series Agreement, the Shares will be subject to certain terms and conditions that may affect the value and/or transferability of the Shares, including without limitation the following:

(a) The Shares will carry restricted voting rights as the Class B Shares are authorized to cast votes only on Major Decisions (as defined in the Series Agreement);

(b) Holders of Class B Shares of the Company are precluded from management of the Company;

(c) The Shares will be subject to mandatory redemption upon the Purchaser's withdrawal as a Member of the Company;

(d) The Shares will be subject to mandatory redemption if any of Purchaser's representations and warranties made herein prove to be incorrect, and the redemption price will be equal to the Purchase Price set forth in Section 1 of this Agreement;

(e) The Purchaser will be deemed to have withdrawn, and the Shares will be subject to mandatory redemption, upon the Purchaser's death, retirement, disability or the loss of Purchaser's license to practice medicine in the state in which the Emergency Center is located;

(f) The Shares will be subject to mandatory restrictions on transfer;

(g) Purchaser, as a Member of the Company, will be subject to certain restrictive covenants including covenants not to compete against the Company as set forth in the Series Agreement;

(h) Purchaser shall be subject to a ninety (90) day probationary period, commencing on the date of Purchaser's initial Clinical Shift Coverage at the Emergency Center and ending ninety (90) days thereafter (the "Initial Term"). During the Initial Term, this Agreement may be canceled by the Company if the Company determines, at its sole discretion, that Purchaser has (i) failed to adhere to the written Medical Staff Bylaws, Code of Conduct or clinical policies and procedures of the Company or one of its affiliates; (ii) failed to meet the Clinical Shift Coverage obligations imposed under this Agreement and/or the Purchaser's Physician Independent Contractor Agreement with NPG for any reason including, without limitation, due to Purchaser being removed from the schedule for disciplinary or patient care reasons; or (iii) engaged in any conduct that would constitute "Cause" for termination (as defined in Section 7 of the Physician Independent Contractor Agreement). Purchaser's credentials to practice at the Emergency Center or at another approved stand-alone emergency center managed by Neighbors Health, LLC will be conditioned upon the successful completion of the Initial Term. It will be an event of mandatory withdrawal from the Series if Purchaser does not satisfactorily complete the Initial Term, and the Shares

**EXHIBIT 5**

shall be subject to mandatory redemption at Purchaser's original Purchase Price as defined in Section 1 above. The Executive Medical Director of NPG shall have the sole authority in determining whether Purchaser has successfully completed and passed his or her ninety (90) day probationary period.

**Section 6. Miscellaneous**

    (a)    The Parties hereto agree that this Agreement may not be altered or amended except by a written instrument signed by the Company and Purchaser.

    (b)    THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF TEXAS.

    (c)    Venue over any dispute relating to or arising under the terms of this Agreement shall lie exclusively in the state district courts of Harris County, Texas.

    (d)    This Agreement, the Operating Agreement and the Series Agreement supersede all prior statements and communications of the Parties with regard to the subject matter hereof. There are no verbal understandings or agreements of any nature whatsoever between the Company and Purchaser relating to any matter, including the purchase and sale of the Shares.

    (e)    Notices: all notices required under the terms of this Agreement may be given electronically, by facsimile or email, by personal delivery or by First Class United States Mail to the Parties at their addresses set forth on the signature page below, or such other address as shall be provided by a Party in writing from time to time. Notices shall be effective upon actual receipt by the Party to whom notice is given.

*[Signature Page to Follow]*

**EXHIBIT 5**

"THE COMPANY:" NHS EMERGENCY CENTERS, LLC

By: _____
Andy Chen, Executive Medical Director of
Neighbors Health, LLC, its Manager

Approved by the Company on the __1__ day of __July__, 2017.

"PURCHASER:" KENNETH DIREKLY, MD

_____
(Signature)

**EXHIBIT 5**

## SERIES INTEREST PURCHASE AGREEMENT

This Series Interest Purchase Agreement (this "Agreement") is entered into to be effective on the day and date set forth opposite the signature lines below, between **NHS EMERGENCY CENTERS, LLC**, a Texas series limited liability company (hereinafter referred to as "NHS" or the "Company"), and Kenneth M. Direkly, MD ("Purchaser").

### RECITALS:

WHEREAS, NHS and its affiliates operate multiple free standing emergency centers in various locations throughout Texas and elsewhere;

WHEREAS, NHS and its affiliates intend to open a free standing emergency center to be known as NEC Porter Emergency Center, LP (the "Emergency Center");

WHEREAS, the Company, as a Texas "series" limited liability company, is legally authorized to issue multiple classes and "series" of limited liability company ownership interests;

WHEREAS, in connection with the Emergency Center, the Company has determined to offer a series of limited liability company ownership interests known as the Series 124 - Porter Membership Interests (the "Series");

WHEREAS, the profits and losses of the Emergency Center are reserved for the owners of the Series;

WHEREAS, the Company is authorized to issue up to 3,000 Class B Series Shares, representing in the aggregate 30% of the ownership of the Series;

WHEREAS, Purchaser desires to purchase a number of the Class B Series Shares on the terms set forth in Section 1 of this Agreement;

==WHEREAS, Purchaser acknowledges and agrees that the consideration for the Purchase of the Class B Series Shares includes a commitment by Purchaser to work one 24 hour clinical shift as a physician at the Emergency Center for each 100 Class B Series Shares purchased, on the terms set forth in Section 1 below (the "Clinical Shift Coverage");==

WHEREAS, Purchaser is a medical doctor, licensed to practice in the state in which the Emergency Center is located, and duly qualified to provide services as an independent contractor to the Emergency Center;

NOW, THEREFORE, in consideration of the parties' undertakings herein and the consideration recited hereafter, the receipt and sufficiency of which are duly acknowledged by the parties, the Company and Purchaser agree as follows:

1

**EXHIBIT 5**

**Section 1.  Sale of Shares**

The Company hereby sells, transfers, conveys and sets over to Purchaser one hundred (100) shares of the Company's Class B Series Shares (referred to as the "Shares").  Purchaser shall make payment to the Company in complete satisfaction of the purchase price of twenty-five thousand dollars ($25,000) (the "Purchase Price"), delivered to the Company on or before the date of this Agreement.

As additional consideration, the Purchaser agrees to provide the Clinical Shift Coverage as an emergency room physician at the Emergency Center or at another approved stand-alone emergency center managed by Neighbors Health System, LLC.  These services will be provided by Purchaser as an independent contractor of Neighbors Physician Group, LLC ("NPG").  Compensation to Purchaser for these shifts will be paid by NPG at prevailing market rates.  Purchaser agrees that the first of these 24 hour shifts will be worked during weekend (Saturday to Sunday) hours.

The Company hereby acknowledges the receipt and sufficiency of the Purchase Price for the Shares.

**Section 2.  Certificates Representing the Shares**

The Company shall deliver a certificate or certificates representing the Shares to Purchaser at Closing, configured in terms of the number of shares per certificate and the total number of certificates as may be determined by Purchaser.  Purchaser agrees that the certificates shall bear, at least, restrictive legends relating to the following matters:

(a)  The fact that the Shares have not been registered under applicable securities laws and that transfer of the Shares therefore is restricted.

(b)  The fact that the holders of the Company's Class B Series Shares have limited voting rights under the terms of the Series Agreement, and that the Shares carry no preemptive or cumulative voting rights.

(c)  The fact that the Shares are subject to restrictions on transfer and rights of redemption under the terms of the Series Agreement of the Series (the "Series Agreement").

**Section 3.  Securities Law Matters**

(i)  THE SHARES SOLD HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE APPLICABLE SECURITIES LAWS OF ANY STATE.  AS A RESULT, THE SHARES MAY NOT BE RESOLD UNLESS THEY ARE REGISTERED SUBSEQUENTLY UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.  NONE OF THE SHARES MAY BE RESOLD, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS THE SHARES HAVE BEEN QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION EXISTS.

**EXHIBIT 5**

(ii) The sale of Shares contemplated hereunder is pursuant to exemptions from registration under the Securities Act of 1933 including, without limitation, Sections 3(b), 4(2) and/or 4(6) thereof and Rule 144.

**Section 4. Representations and Warranties of the Purchaser**

Purchaser hereby represents and warrants to the Company as follows:

(a) Purchaser has not relied on the Company's evaluation of the Shares and Purchaser's decision to purchase same on the terms and conditions set forth herein is not based on any representation, statement, financial statement or projection or other inducement of any nature, written or oral, whatsoever except the statements, representations and warranties made herein.

(b) Purchaser is a sophisticated investor capable of evaluating the risks of the sale contemplated herein, the value of the Shares and the fairness of the purchase price set forth herein.

(c) Purchaser has been afforded an opportunity to meet with the Manager of the Company and ask such questions and review such information contained in the books and records of the Company, as Purchaser has deemed relevant in evaluating the risks of the sale contemplated herein and the value of the Shares.

(d) Purchaser is financially able to risk the loss of the entire purchase price for the Shares, and could suffer such loss without suffering undue financial hardship.

(e) Purchaser has purchased the Shares with a view toward investment and for Purchaser's own account, and not with the purpose or intent of effecting a wider distribution of the Shares.

(f) Purchaser represents to the Company that Purchaser has reviewed the Operating Agreement of the Company (the "Operating Agreement") and the Series Agreement, and has had adequate opportunity to review the Operating Agreement and the Series Agreement with counsel and such other advisors as Purchaser has deemed appropriate; Purchaser understands and agrees to the terms of the Operating Agreement and the Series Agreement and has unequivocally agreed to become bound thereto by execution of an Acknowledgment in form satisfactory to Purchaser and the Company.

**Section 5. The Class B Series Membership Interests**

Under the terms of the Company's Series Agreement, the Shares will be subject to certain terms and conditions that may affect the value and/or transferability of the Shares, including without limitation the following:

3

**EXHIBIT 5**

(a) The Shares will carry restricted voting rights as the Class B Shares are authorized to cast votes only on Major Decisions (as defined in the Series Agreement);

(b) Holders of Class B Shares of the Company are precluded from management of the Company;

(c) The Shares will be subject to mandatory redemption upon the Purchaser's withdrawal as a Member of the Company;

(d) The Shares will be subject to mandatory redemption if any of Purchaser's representations and warranties made herein prove to be incorrect, and the redemption price will be equal to the Purchase Price set forth in Section 1 of this Agreement;

(e) The Purchaser will be deemed to have withdrawn, and the Shares will be subject to mandatory redemption, upon the Purchaser's death, retirement, disability or the loss of Purchaser's license to practice medicine in the state in which the Emergency Center is located;

(f) The Shares will be subject to mandatory restrictions on transfer;

(g) Purchaser, as a Member of the Company, will be subject to certain restrictive covenants including covenants not to compete against the Company as set forth in the Series Agreement.

6. **Miscellaneous**

(a) The parties hereto agree that this Agreement may not be altered or amended except by a written instrument signed by the Company and Purchaser.

(b) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF TEXAS.

(c) Venue over any dispute relating to or arising under the terms of this Agreement shall lie exclusively in the state district courts of Harris County, Texas.

(d) This Agreement, the Operating Agreement and the Series Agreement supersede all prior statements and communications of the parties with regard to the subject matter hereof. There are no verbal understandings or agreements of any nature whatsoever between the Company and Purchaser relating to any matter, including the purchase and sale of the Shares.

(e) Notices: all notices required under the terms of this Agreement may be given electronically, by facsimile or email, by personal delivery or by First Class United States Mail to the parties at their addresses set forth on the signature page below, or such other address as shall be provided by a party in writing from time to time.

Notices shall be effective upon actual receipt by the party to whom notice is given.

[*Signature Page to Follow*]

5

**EXHIBIT 5**

SIGNED this 15TH day of FEBRUARY, 2016.

**"THE COMPANY:" NHS EMERGENCY CENTERS, LLC**

By: _____
    Setul Patel, President and Chief Executive Officer of
    Neighbors Health System, LLC, Manager

**"PURCHASER:" KENNETH M. DIREKLY, MD**

_____
**(Signature)**

6

**EXHIBIT 5**